**FILED**

FEB 2 0 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

United States *ex rel.*

Aaron J. Westrick, Ph.D.
03006 BC-EJ Road
Boyne City, MI 49712

BRINGING THIS ACTION ON BEHALF
OF THE UNITED STATES OF AMERICA :

and

c/o John Ashcroft
Attorney General of the United States
Department of Justice
10th and Constitution Avenues, NW
Washington, D.C. 20530

Plaintiffs,

vs.

Second Chance Body Armor, Inc.
7915 Cameron St.
Central Lake, MI 49622,

Second Chance Armor
1501 West Magnolia
Geneva, AL 36340

Second Chance Shield, Inc.
404 Nash Road
New Bedford, MA 02746

Second Chance Body Armor Canada Co.
c/o Second Chance Body Armor, Inc.
7915 Cameron St.
Central Lake, MI 49622,

:

Civil Action No. _____

Complaint and Jury Demand

Date Received _____

Original Complaint filed under
Seal pursuant to 31 U.S.C.
§3730(b)(2)

CASE NUMBER  1:04CV00280

JUDGE: Richard W. Roberts

DECK TYPE: General Civil

DATE STAMP: 02/20/2004

JURY
ACTION

IAG Manufacturing, s.a.r.l.                          :
c/o Second Chance Body Armor, Inc.                   :
7915 Cameron St.                                     :
Central Lake, MI 49622,                              :
                                                     :
                                                     :
Second Chance Body Armor GmbH                        :
c/o Second Chance Body Armor, Inc.                   :
7915 Cameron St.                                     :
Central Lake, MI 49622,                              :
                                                     :
                                                     :
Second Chance Body Armor, UK                         :
c/o Second Chance Body Armor, Inc.                   :
7915 Cameron St.                                     :
Central Lake, MI 49622,                              :
                                                     :
                                                     :
Second Chance Body Armor, Ltd.                       :
5 Townsend Street                                    :
London, SE 17 1HJ                                    :
                                                     :
                                                     :
             Defendants.                             :

## COMPLAINT

1.    This is an action by *qui tam* Relator Aaron J. Westrick, in the name of the United States

      Government, to recover penalties and damages arising from Defendant's actions in

      making and causing to be made false statements and fraudulent representations to the

      United States Government in order to obtain payments under its contracts to provide body

      armor to federal, state and local police departments. Defendant, Second Chance Body

      Armor, Inc., and its subsidiaries knowingly sold, and caused to be sold, defective body

      armor to federal, state and local police agencies under contract, in violation of express

      and implied warranties of merchantability, thereby placing the health and safety of its law

      enforcement customers in danger. Defendant continued to sell body armor made from the

      Zylon fiber after it became aware of chemical problems with the Zylon fiber that resulted

2

in hyper-accelerated degradation of its Zylon-type body armor. Due to its hyper-accelerated degradation Defendant's Zylon-type body armor could not meet the express terms of the warranty under which it was sold to federal, state, and local police departments. Furthermore, Defendant's Zylon-type body armor does not meet its warranty of merchantability, failed to meet federal specifications regarding compliance with its warranty , failed to adhere to federal regulations regarding the quality of items obtained with federal financial assistance and poses serious dangers to the health and safety of the police officers by whom it is worn. Defendants were aware of these facts as early as July of 2001; nonetheless, Defendants continued to sell the defective Zylon-type body armor to federal, state and local police agencies under contract in violation of 31 U.S.C. § 3729. Additionally, Defendant engaged in unlawful discrimination in violation of 31 U.S.C. § 3730(h) by subjecting Relator Westrick to a hostile working environment, removing him from the company's investigation of the problem of accelerated degradation of Zylon-type body armor, and removing him from his former position as Director of Research and Composite Development in retaliation for his protected whistleblower activity. All factual allegations and claims herein have also been revealed to the Office of the Attorney General in Relator Westrick's disclosure statement pursuant to 31 U.S.C. § 3730(b)(2).

## PARTIES

2.  Relator Aaron J. Westrick, Ph.D. is a citizen of the United States and resides in Boyne City, Michigan. Relator Westrick brings this civil action under the False Claims Act against Defendants Second Chance Body Armor, Second Chance Body Armor Canada

Co., IAG Manufacturing s.a.r.l., Second Chance Body Armor GmbH, Second Chance

Body Armor UK, Ltd., Second Chance Body Armor, Ltd.

3.      Defendant Second Chance Body Armor is a privately owned company, specializing in the

production of body armor, with headquarters in Central Lake, Michigan.

4.      Second Chance Armor is a subsidiary of Second Chance Body Armor, Inc., with

headquarters in Geneva, Alabama.

5.      Second Chance Shield, Inc., is a subsidiary of Second Chance Body Armor, Inc., with

headquarters in New Bedford, Massachusetts.

6.      Defendant Second Chance Body Armor Canada Co. is a subsidiary of Defendant Second

Chance Body Armor, with headquarters in Winnipeg, Canada.

7.      Defendant IAG Manufacturing s.a.r.l. is a subsidiary of Defendant Second Chance Body

Armor, with corporate headquarters in Tangier, Morocco.

8.      Defendant Second Chance Body Armor GmbH is a subsidiary of Second Chance Body

Armor with corporate headquarters in Brannenburg, Germany.

9.      Defendant Second Chance Body Armor UK, Ltd. is a subsidiary of Second Chance Body

Armor with headquarters in Glasgow, Scotland.

10.     Defendant Second Chance Body Armor, Ltd. is a subsidiary of Second Chance Body

Armor with headquarters in London, England.

11.     Hereinafter Defendants Second Chance Body Armor, Second Chance Body Armor

Canada Co., IAG Manufacturing s.a.r.l., Second Chance Body Armor GmbH, Second

Chance Body Armor UK, Ltd., and Second Chance Body Armor, Ltd., shall be referred to

as "SCBA".

12.     SCBA conducts business in the District of Columbia, where they have sold and continue

        to sell body armor to federal law enforcement agencies.


## JURISDICTION AND VENUE

13.     Relator Westrick, brings this complaint against Defendants SCBA under two related

        causes of action arising from Defendant's misrepresentations to the Government of the

        United States of America.

14.     Relator Westrick alleges that SCBA violated 31 U.S.C. § 3729-3730 of the False Claims

        Act ("FCA") by making false and fraudulent claims for payments from the United States

        Federal Government.

15.     Additionally, Relator Westrick alleges that Defendant SCBA violated 31 U.S.C. §

        3730(h) of the False Claims Act when it discriminated against him in the terms and

        conditions of his employment because of lawful acts done by Relator Westrick in

        furtherance of an action under Section 3730 of the FCA.

16.     Jurisdiction over Relator Westrick's FCA claims is conferred upon this Court by 31

        U.S.C. § 3732 of the FCA and 28 U.S.C. § 1331 in that this action arises under the laws

        of the United States.

17.     Venue is proper in the United States District Court, for the District of Columbia pursuant

        to 28 U.S.C.§ 1391(b) and (c) and 31 U.S.C. § 3732(a) because the Defendant has and

        continues to conduct business in the District of Columbia.

## FACTUAL ALLEGATIONS

18.     In 1998 Congress passed the Bullet Proof Vest Partnership Grant Act, 42 U.S.C. § 3796ll

et seq., pursuant to which the United States Government agreed to reimburse state and local police departments for up to 50% of the costs of obtaining body armor for their police officers. Under the Act, state and local police agencies have the authority to select and order the make and model of body armor with which they supply their police officers. The Federal Government then reimburses these state and local police agencies for up to 50% of the costs of the body armor.

19. SCBA is a maker of body armor, and between 1999 and 2003 consistently received roughly 39% of all state and federal government funding for body armor. Of the funds received by SCBA for supplying body armor to federal, state and local police agencies, roughly 70% was for Zylon-type "bullet proof vests."

20. Zylon ® is an industry name for the Poly-p-phenylene-2, 6-benzobisoxazole ("PBO") fiber.

21. The PBO fiber was first invented by the US Air Force, and was later developed by the Stanford University and South West Research Institute.

22. Dow Chemical Company ("Dow") further developed the PBO fiber and later sold the production rights to Toyobo Co., Ltd. ("Toyobo"), a Japanese company.

23. On information and belief, one of the reasons behind Dow's decision to sell the rights to the PBO fiber to Toyobo was that Dow was concerned that the PBO fiber would be limited in its applications due to its rapid rate of degradation.

24. Toyobo has since produced and marketed a form of the PBO fiber under the name of Zylon ® for use in a wide variety of end products, such as sailcloth, flame suits, and ballistic armor ("bullet proof vests").

25.   In late 1997/early 1998 Toyobo began to supply SCBA with Zylon ® for use in SCBA's body armor products.

26.   At the time when Toyobo first began to supply Zylon ® for use in body armor it informed its customers including SCBA that, as a fiber producer, it was not in a position conduct ballistic tests on bullet proof vests made with Zylon ®, because it did not have access to the different types or prototypes of body armor containing Zylon ®.  Toyobo also requested that the companies seeking to use Zylon ® in their body armor products test the Zylon ® product themselves to determine whether Zylon-type bullet proof vests met industry performance standards.

27.   In late 1997/early 1998 SCBA produced its first Zylon-type bullet proof vest from Zylon ® supplied by Toyobo.

28.   From 1998-1999 SCBA was the exclusive manufacturer of Zylon-type bullet proof vests.

29.   SCBA continues to manufacture some Zylon-type vests, and was one of the world's leading manufacturers of Zylon-type body armor.

30.   In April of 1996 Relator Westrick was hired by SCBA as the company's Director of Training.

31.   In addition to working for SCBA, Relator Westrick has been a police officer since 1981. Relator Westrick remains a fully commissioned police officer.

32.   In 1998 Relator Westrick was promoted by SCBA to the position of Director of Research and Composite Development.

33.   As early as December 18, 1998 Mr. Thomas E. Bachner, Jr., Group Vice President for SCBA's Technology, Product Assurance, Spcl. Projects & Corp. Development, and

Secretary for the Corporation, was informed by letter from Tadao Kuroki, an employee of

Toyobo, that preliminary testing had shown that Zylon ® began to degrade rapidly when

exposed to visible and fluorescent light.

34.   SCBA failed to release this information to customer and failed to provide Relator

Westrick with this information.

35.   In 2001 Toyobo began conducting tests on Zylon ® to estimate the aging performance of

the fiber itself.

36.   Toyobo maintained and continues to maintain that its tests were never intended to assess

the actual ballistic performance of any individual manufacturer's final product.

37.   After completing the first round of its aging tests on Zylon ®, Toyobo informed SCBA

and other manufacturers of body armor, by letters dated July 5, 2001, that "the strength of

Zylon fiber decreases under high temperature and humidity conditions."

38.   In its July 5, 2001 letter, Toyobo included graphs illustrating its findings on Zylon ®

degradation.  Toyobo also included information regarding the methodology behind its

testing procedures.

39.   As of July 5, 2001, the date on which Toyobo informed SCBA of its preliminary test

results on the issue of accelerated aging of the Zylon ® fiber, SCBA was aware that its

Zylon-type body armor might not meet the express or implied warranties under which it

was sold.

40.   SCBA expressly warranted that the inner Zylon ® panels of its bullet proof vests would

meet ballistics requirements for 5 years.

41.   Beginning on July 5, 2001 SCBA was aware of such information as would reasonably

indicate that its Zylon-type bullet proof vests were not capable of meeting the terms of the

5 year warranty on the inner Zylon ® protective panels.

42.   Upon receiving the data contained in the Toyobo study, SCBA downplayed the validity of

Toyobo's findings and the study itself.  SCBA management claimed that the study was

performed under unrealistic testing conditions, and that there was therefore no cause for

concern with SCBA's continued use of Zylon ® in its body armor products.

43.   SCBA issued a statement on July 6, 2001 claiming that the degradation studies performed

by Toyobo involved high temperatures that were well above normal use conditions.

Furthermore, SCBA claimed in this same July 6, 2001 statement that neither

extrapolation of the data provided by Toyobo in its July 5, 2001 letter nor separate

accelerated aging studies at temperatures slightly higher than normal use conditions

indicated any cause for concern regarding SCBA's Zylon-type vests.

44.   SCBA closed its July 6, 2001 letter by emphasizing the fact that it remained confident

that all of its body armor products would continue to meet or exceed design criteria well

beyond their stated warranty periods, as long as they were properly cared for.

45.   The representations made on July 6, 2001 were not true.

46.   Relator Westrick was first informed by upper management officials within SCBA of the

problem of accelerated degradation of the Zylon ® fiber in July of 2001, on or about the

date that SCBA received the letter regarding Toyobo's preliminary tests on Zylon ®

degradation.

47.   In light of the information revealed to him by SCBA's upper management, Relator

Westrick, acting as Director of Research for SCBA, recommended that SCBA obtain

samples of its Zylon-type body armor from police officers who wore the armor frequently

and test this armor for signs of accelerated degradation.

48. On July 10, 2001, Relator Westrick sent a letter to the Long Boat Key Police Department

of Long Boat Key, Florida requesting that the department send SCBA the Zylon-type

body armor used by ten of its officers who wore their armor the most frequently.

49. Similar letters were later sent to other police agencies in United States by SCBA,

requesting the return of worn body armor for purposes of testing.

50. Shortly after sending the letter to the Long Boat Key Police Department, SCBA received

the armor worn by ten of the department's officers who most frequently wore their armor.

51. SCBA then performed a series of "V-50" tests on the armor sent to them by the Long

Boat Key Police Department.

52. As Director of Research and Composite Development, Relator Westrick supervised the

Zylon-type body armor testing.

53. The "V-50" tests were conducted at U.S. Test Labs, a private armor testing company.

54. The "V-50" tests were designed to measure the degree of degradation in the worn body

armor. "V-50" testing essentially involves two steps. First, the tester fires shots at a new,

unused vest until 50% of the shots penetrate. Second, the tester fires shots at used vests

until 50% of the shots penetrate. The results of the new vest shootings and the used vest

shootings are then compared to determine the degree of degradation of the body armor.

55. Following the completion of the initial round of "V-50" tests on the armor returned by the

Long Boat Key Police Department, SCBA continued to receive samples of the worn

armor from police agencies across the country. This armor was sent for "V-50" testing at

U.S. Test Labs, as with the armor submitted by the Long Boat Key Police Department.

56.   Despite his status as Director of Research and Composite Development for SCBA, some upper management officials within SCBA did not want to share with Relator Westrick the data from these "V-50" tests.  Relator Westrick's own life had been saved by a SCBA product, and Relator was therefore extremely vocal in his concerns for police officer safety.

57.   Despite the reluctance of some officers of SCBA to share information with Relator Westrick, Richard C. Davis, President of SCBA (and, at this time, Mr. Bachner) informed Relator that the data from the early "V-50" tests was not favorable to SCBA, and that there was cause for concern about the problem of accelerated degradation of Zylon-type vests.

58.   Relator Westrick was also informed by Richard Mouser, President of U.S. Tests Labs, that the data from the "V-50" tests indicated that there was cause for concern about the problem of accelerated degradation of the Zylon-type vests.

59.   In a series of letters to SCBA and other body armor manufacturers dated July 19, 2001, Toyobo reiterated its findings regarding the degradation of Zylon ®, and reminded body armor manufacturers to bear in mind the degradation properties of Zylon ® when designing and testing their end product Zylon-type bullet proof vests.

60.   In July/August of 2001 SCBA won a bid for the supply of Zylon-type body armor to the German Government after a competing manufacturer of body armor, BSST, withdrew its bid for the supply of such vests.  SCBA's Executive Committee was, at the time, aware that BSST had withdrawn its bid because it had determined that Zylon ® was not safe for

11

use as a ballistic material.

61.    On information and belief SCBA added an additional two layers to the Zylon-type body

armor sold to the German Government because of its fears that without the two layer

upgrade the armor might fail initial testing by the Germans, due to the problem of Zylon's

® accelerated degradation.  No changes were made to the vests sold in the United States

markets.

62.    Furthermore, based on its bid for the supply of Zylon-type body armor to the German

Government, SCBA had a significant financial motive to downplay the Zylon ®

degradation problem and hinder Relator Westrick's efforts to research and document this

problem.

63.    Relator Westrick continued to request access to the data from the "V-50" tests conducted

by U.S. Test Labs on the worn SCBA Zylon-type vests.  His requests were, however,

repeatedly denied by upper management officials within SCBA.

64.    On August 7, 2001 Relator Westrick was informed, during a meeting with Mr. Bachner,

that SCBA's preliminary "V-50" tests on a set of "Ultima" Zylon-type vests used by

Pennsylvania State police indicated that the vests were degrading at a rate of 2-5% per

year.  Soon after Relator Westrick was advised by Mr. Davis and Mr. Bachner that one set

of "Ultima" armor had lost as much as 20 to 25% in "V-50" tests.

65.    The rates of degradation being reported in these tests demonstrated that the Zylon-type

vests could fail under normal usage.  The reported degradation rates obtained by SCBA

after these results reinforced this finding.

66.    On August 28, 2001 Toyobo made a supplemental disclosure to SCBA containing new

data on the issue of the accelerated degradation of the Zylon ® fiber. This supplemental

disclosure contained new data from Toyobo's Zylon ® aging tests demonstrating that the

fiber was degrading at an abnormally accelerated rate.

67. In its August 28, 2001 letter to SCBA, Toyobo requested that SCBA share the data from

the Toyobo studies with its customers.

68. In late August/early September of 2001 Relator Westrick was informed by SCBA upper

management personnel of the August 28, 2001 letter from Toyobo.

69. On September 11, 2001, during a meeting with Paul Banducci, General Manager of

SCBA, and Mr. Davis, Relator Westrick was told that the test data from SCBA's "V-50"

tests had shown a rate of degradation in the Zylon-type bullet proof vests of 3-9% per

year. Management within SCBA characterized these results as "inconclusive," despite

the fact that even a 3% rate of annual degradation is an abnormally high for tactical body

armor.

70. On September 21, 2001, during a meeting with Mr. Davis, Relator Westrick was again

informed that the results of SCBA's preliminary "V-50" tests indicated a degradation rate

in the Zylon-type armor of 3-9% per year. Although the test data were scattered, even the

low end of SCBA's V-50 degradation test results on its Zylon-type armor (3%) were

roughly three times the average rate of degradation in non-Zylon-type vests. It was

therefore Relator Westrick's professional opinion at the time that there was cause for

concern regarding the problem of accelerated degradation in Zylon-type vests.

71. During the September 21, 2001 meeting with Mr. Davis, Relator Westrick was also

informed that one of the tested vests showed a degradation rate of 16% over a 2 year

period.

72.   As of late October of 2001, upper management at SCBA were actively looking for a

fabric or spray on material to cover the Zylon ® material used in SCBA's body armor

products, so as to slow the seemingly accelerated degradation of Zylon-type body armor.

SCBA's then General Manager, Paul Banducci, informed Relator Westrick, in an October

17, 2001 meeting, of these efforts on behalf of SCBA to devise a solution to the problems

of accelerated degradation of the Zylon ® material.

73.   On November 20, 2001 during a meeting in Mr. Bachner's office, officials of SCBA

including Relator Westrick discussed the fact that Dutch State Mines ("DSM"), a

European manufacturer of Zylon ® material used by BSST and other manufacturers of

body armor, had announced that it would no longer engage in the manufacture of its Zylo-

Shield product because of safety concerns related to the accelerated degradation rate of

Zylon ®.

74.   The Zylo-Shield product essentially consists of Zylon ® fabric coated in a protective

laminate designed to slow the aging process of the Zylon ® fiber.

75.   The principle concern of DSM was that the Zylon ® fabric, due to its accelerated rate of

degradation, was not ballistically reliable.

76.   At the November 20, 2001 meeting, upper management officials of SCBA continued to

assert that the safety concerns of DSM were due entirely to a problem with the lamination

process used to create Zylo-Shield.

77.   Relator informed management at this meeting, and during informal conversations, that

the Zylon problem could not be explained away by lamination. This concern was based

14

both on the data obtained by Relator concerning the testing which had been conducted and the Relators expert belief that the degradation problem was innate to the fiber. This belief was also supported by the reports from Toyobo, which were based on tests conducted on unlaminated fiber.

78.     On or about November 26, 2001 Relator attended a meeting in which Mr. Davis, Ed Bachner and Paul Banducci, in which a concern was voiced the Toyobo (based on the advice of Toyobo's lawyers) was going to contact a German police department about the problems with Zylon ®. This was a significant concern for SCBA, because SCBA was attempting to sell a large quantity of vests to a German police department. SCBA objected to Toyobo's contacts with the German police, and, according to information obtained by the Relator, Toyobo agreed to back down.

79.     On November 29, 2001 upper management of SCBA held a meeting in which Relator was not invited to attend. At numerous times prior to this meeting, Relator had communicated to these members of upper management, including Mr. Davis, Ed Bachner, Jim Young, Larry McCraney and Paul Banducci, that he was gravely concerned for the company's customer's well being, and that he was concerned that a customer could be killed due to faulty armor.

80.     On November 29, 2001, after the meeting of upper management of SCBA, Mr. Davis informed Relator Westrick that SCBA's management had insisted that Relator Westrick not be informed about any new developments or ongoing research related to the problem of the accelerated aging of Zylon ®.

81.     The removal of Relator Westrick from his job duties related to body armor research, and

the specific attempt to prohibit Relator from accessing information about the accelerated

aging of Zylon ® and Zylon's degradation, was in retaliation for the numerous concerns

Relator raised on these issues, and the fact that some of SCBA managers intended on

covering up any problem with Zylon.

82.    The only member of upper management who did not comply with this directive was Mr.

Davis.

83.    During their November 29, 2001 conversation, Mr. Davis informed Relator Westrick that

the data pulled from SCBA's V-50 tests run on the armor returned to SCBA by police

agencies across the country indicated that the average rate of degradation of SCBA's

Zylon-type vests over a two year period was between 9 and 13%.

84.    On this same day, Relator Westrick was informed by Mr. Davis that new data released by

Toyobo cast serious doubt on the continued viability of the use of Zylon ® within the

body armor industry. Mr. Davis also informed Relator that the more the armor was worn

by a police officer, the more the armor degraded.

85.    On or about November 29, 2001, based on the information available to him as part of his

official duties, Relator Westrick drew the conclusion that the continued use of the Zylon

® material in body armor posed serious risks to the health and safety of the law

enforcement officers wearing the armor. Relator Westrick therefore recommended to

upper management officials within SCBA that the company recall its Zylon-type bullet

proof vests.

86.    Mr. Davis agreed with my assessment, and informed Relator that he was the "only one

standing up for the right thing." Mr. Davis informed Relator that Davis had attempted to

cancel the sales to the German police due to the safety problems, but management said
"no."

87.     From the date Relator was removed from his research duties, to the date in which Mr.
Davis stepped down as President of SCBA, he continuously agree with Relator's safety
concerns and made statements which gave Relator an indication that he would take
appropriate action within the company to respond to Relator's concerns.   Unfortunately,
Mr. Davis never took (or was able to take) appropriate corrective action.

88.     On or about December 13, 2001 representatives from both SCBA and Toyobo met in Los
Angeles to discuss problems related to the recent discovery of the accelerated degradation
of the Zylon ® fiber.

89.     At the December 13, 2001 meeting SCBA representatives informed the representatives of
Toyobo that the problems recently discovered in the Zylon ® fiber had reduced the value
of Zylon ® to it's business of constructing flexible, light-weight body armor.

90.     Following the December 13, 2001 meeting Mr. Davis drafted a letter from the
management group of SCBA to Toyobo outlining the problems with the use of Zylon ®
in SCBA's body armor, and proposing various solutions to these problems.

91.     On December 18, 2001 Mr. Davis showed a copy of this draft letter to Relator Westrick,
and informed him that according to tests conducted by SCBA and Toyobo, the average
degradation rate for the Zylon ® vests was 3-5% per year, and in some cases was as high
as 9% per year.

92.     Mr. Davis also informed Relator Westrick of his concerns that Karen McCraney, Senior
Vice President of SCBA, Larry McCraney, Vice President of SCBA, and possibly the

entire management group of SCBA wanted to conceal the problems with the Zylon-type

body armor until after the following year when SCBA's Executive Committee planed on

transforming SCBA into a publicly traded company.

93.    During this meeting, Relator informed Mr. Davis that the failure of the company to act on

the data could result in the death of policeman and result in "millions lost." Mr. David

informed Relator that "there are approximately 80,000 Ultima vest out, we [Second

Chance] are still making them" and that it would cost "20 million to recall the Zylon

vests." Mr. Davis informed Relator that he agreed with Relator that the vests should be

recalled, but his management did not agree with this.

94.    On or about December 18, 2001, based on his direct first hand review of the facts and

circumstances surrounding the Zylon ® degradation issue, Relator Westrick concluded

that SCBA's bullet proof vests could not meet the terms of the warranty under which they

were sold.

95.    In addition, by December 18, 2001 Relator had obtained information directly from the

President of SCBA which demonstrated that SCBA would attempt to cover-up the issues.

96.    On December 18, 2001, Relator Westrick submitted a formal memorandum to Mr. Davis.

This memorandum recapped the positions taken by Relator at the meeting between

Relator and Mr. Davis and was submitted in order to fully clarify, without any doubt, the

position of Relator on the safety issues posed by the use of Zylon ®.

97.    In this formal memorandum, which was hand delivered to Mr. Davis on December 18,

2001, the Relator stated that SCBA should immediately notify its customers of the

degradation problems in its Zylon-type body armor, clarify these problems with any

customers who had placed orders for the armor, and cancel any pending orders of Zylon-type armor if so requested by the customers.

98.   This memorandum stated, in relevant part,  as follows:

> **Second Chance should immediately notify our customers of the degradation problems we are experiencing with Ultima armor.  Second Chance should clarify this issue with major customers that have placed orders and after clarification, cancel orders if requested.  Second Chance should make the right difficult decisions regarding this issue.  Lives and our credibility are at stake.  You should cease all bonuses' etc. to keep funds within the company. We will only prevail if we do the right things and not hesitate.  This issue should not be hidden for obvious safety issues and because of future litigation.**

99.   In spite of Relator Westrick's repeated efforts to persuade the management of SCBA to publicize the problems that had surfaced regarding Zylon-type armor degradation, the management of SCBA refused to inform its customers of the degradation problems in its Zylon ® vests.

100.   On December 20, 2001 Mr. Davis issued a revised letter to Mr. Nojima of Toyobo recapping the December 13, 2001 meeting, proposing temporary solutions to the Zylon degradation problem, and reiterating SCBA's requests that Toyobo remedy the problems in SCBA's Zylon ® armor immediately.

101.   Toyobo responded to SCBA by stating that Toyobo was not responsible for the problems of accelerated degradation in SCBA's Zylon-type body armor.

102.   Toyobo also informed SCBA that it had disclosed the problem of Zylon ® degradation

when Toyobo and SCBA had first entered their business agreement for the supply of

Zylon ® material in 1998.  Furthermore, Toyobo stated that it had informed SCBA that

because it was not a producer of ballistic end products, it was not in a position to

guarantee that SCBA's Zylon ® end products would not experience accelerated

degradation, and that SCBA would bear any risk involved in its continued use of Zylon ®

in the manufacture of its body armor end products as early as 1998, when it first began to

supply Zylon ® for use in body armor end products.

103.   Toyobo continued to send SCBA quarterly updates on its research on the subject of Zylon

® degradation throughout 2002 and 2003.  The quarterly updates confirmed that the

Zylon ® fiber lost its tensile strength rapidly when exposed to heat and moisture.

104.   In late 2001/early 2002 SCBA discontinued its longstanding practice of performing

ballistics testing on samples of the Zylon ® fabric sent to SCBA by fabric weavers for use

in SCBA's bullet proof vest end products.

105.   These tests were discontinued in bad faith, and were part of an effort by SCBA to

eliminate documentation of the Zylon failures for which they knew existed.

106.   Although it discontinued ballistics testing of the raw Zylon ® fabric used in its Zylon-

type "soft" body armor, SCBA continues to perform ballistics testing on the raw materials

used in its "hard" body armor.

107.   SCBA was motivated, in whole or in part,  to stop its practice of performing ballistics

testing on the raw Zylon ® fabric used in its Zylon-type vests because of company

concerns related to the abnormal failure rates of the testing samples.

108. Relator Westrick continued to press Mr. Davis and other management officials within SCBA to continue research on the issue of Zylon ® degradation through the end of 2001 and into 2002.

109. Ultimately, Mr. Davis agreed that academic research on the problem of accelerated degradation of Zylon ® body armor should be conducted.

110. Due to the fact that Relator Westrick's sister worked as a chemist at Lake Superior State University, Relator Westrick determined that the academic study on Zylon ® degradation could be performed by his sister, Dr. Judy Westrick, at Lake Superior State University for a fraction of the cost of performing the same study elsewhere.

111. Mr. Davis agreed with this conclusion, and consented to allowing Dr. Judy Westrick to perform a study on the accelerated degradation of Zylon ® at Lake Superior State University.

112. Lake Superior State University's attorneys drafted the contract for Dr. Judy Westrick's research project.

113. During the negotiation of this contract both SCBA and Lake Superior State University were fully aware of Relator Westrick's relation to Dr. Judy Westrick. Neither Relator Westrick nor Dr. Judy Westrick in any way attempted to conceal their relation; nor did they mislead SCBA or Lake Superior State University as to the nature of their relation.

114. At the time that the contract was signed neither SCBA nor Lake Superior State University objected to entering the contract on the grounds that Dr. Judy Westrick was the sister of Relator Westrick.

115. Jim Young, J.D., a member of SCBA's Board of Directors and an attorney for SCBA,

reviewed the contract drafted by Lake Superior State University's attorneys and made

such additions and alterations to the agreement as were deemed necessary by SCBA.

116.    Ultimately, in late March of 2002, Mr. Davis and Robert Arbuckle, President of Lake

Superior State University, signed the final contract agreement between SCBA and Lake

Superior State University pursuant to which Dr. Judy Westrick would perform a research

study on the problem of accelerated degradation of Zylon ®.

117.    On April 3, 2002, Toyobo released a brief report containing additional results of its

accelerated degradation tests on the Zylon ® fabric to SCBA.  The data contained in the

report released by Toyobo demonstrated that the Zylon ® fiber degraded at abnormally

high rates when exposed to heat and moisture.

118.    On or around May 29, 2002, in a meeting with representatives from Dupont, Mr. Bachner

falsely informed the representatives of Dupont that SCBA had determined that

accelerated degradation of the Zylon ® fabric was not a problem that required SCBA's

immediate attention and that SCBA saw no need for testing the material.

119.    On July 10, 2002, Dr. Judy Westrick of Lake Superior State University completed her

preliminary study of the accelerated degradation of Zylon ® in accordance with the

contract between Lake Superior State University and SCBA.  On this date Dr. Judy

Westrick also issued a draft report containing the findings of her preliminary research and

recommending certain avenues of future research that would shed light on the question of

Zylon ® degradation.

120.    Dr. Judy Westrick's preliminary study analyzed data published by Toyobo regarding the

accelerated aging of the Zylon ® material under conditions of high heat and/or humidity.

121.   In the draft report of Dr. Judy Westrick's 2002 study, Dr. Westrick described the testing procedures used by Toyobo in its 2001 study on the issue of accelerated degradation of Zylon ® fiber.

122.   Dr. Westrick noted that given the data released by Toyobo, high humidity and temperature appeared to degrade the Zylon ® material at a much faster rate than normal conditions. Dr. Westrick's study notes in particular that over a 40 day time interval, the materials held under milder conditions, 80 C and 0% humidity, and 40 C with 80% humidity appeared to retain only 93-95% of their strength. Dr. Westrick then pointed out that if the 40 day experiment was extrapolated to 5 to 10 years, the Zylon ® material would have degraded by roughly 15%. This represented an abnormally high rate of degradation.

123.   Dr. Westrick's draft of the study then mentions that one potential reason for Zylon's ® accelerated degradation was because of a process called hydrolysis. Hydrolysis occurs where water and a portion of the Zylon molecule react to break the polymer chain of the Zylon ® material. Dr. Westrick noted that such a change in the physical characteristic of the Zylon polymer could have resulted in the decreased fiber strength noted in the Toyobo study of 2001.

124.   In conclusion, Dr. Westrick's study noted that for hydrolysis to occur, there was likely an acid catalyst present in the Zylon ® fibers, and that the presence of such an acid catalyst was likely due to a quality control problem in the production of the body armor end products.

125.   Dr. Westrick then proposed that additional research be performed by Lake Superior State

University, in conjunction with individuals at the University of Kentucky, to follow up on

the question of accelerated degradation of Zylon ® body armor. Dr. Westrick proposed

that SCBA perform a series of tests on the fibers of its vests under a variety of conditions

so as to measure changes in the Zylon ® fiber's strength, strain, modulus and density

under each set of conditions. Dr. Westrick first proposed that a control group be

established in order to measure the new Zylon ® fiber's strength, strain, modulus, and

density. The control group would be established by testing new fibers that have only

been exposed to room temperature and low humidity. Once a control group had been

established, Dr. Westrick proposed that old fibers exposed to three sets of environmental

conditions be tested. The first group of old fibers (preferably at least 3 years old) would

have only been exposed to room temperatures and low humidity. The second group were

to be drawn from body armor that had been worn by persons living in an area where the

climate is temperate. The third group was to be drawn from vests worn by persons living

in hot and humid areas, such as Florida or California.

126.   Anticipating SCBA's approval of additional research on the subject of Zylon ®

degradation, Dr. Westrick began to test both old and new SCBA Zylon-type vests and the

individual Zylon ® fibers from such vests for signs of advanced degradation. Dr.

Westrick compiled data from these tests, indicating that the Zylon ® fibers as well as the

Zylon-type body armor were experiencing noticeably advanced degradation due to heat

and humidity.

127.   Before Dr. Westrick or Relator Westrick had the opportunity to run statistical analyses of

the data compiled in Dr. Westrick's second study, however, SCBA's executive committee

terminated all future funding for any further research on this matter.

128.   Additionally, when Relator Westrick attempted to raise the findings of the Lake Superior

State University research with Mr. Bachner he was harshly criticized and threatened by

Mr. Bachner and other SCBA upper management officials.

129.   On or about July 28-29, 2002 Mr. Davis provided Relator with a memorandum he

intended on providing individually to SCBA's Executive Committee members

concerning the Zylon ® degradation issue.

130.   This document reflected, in large part, some of the concerns Relator had raised with Mr.

Davis prior to July 29th, but did not cover all of the issues and did not fully address the

facts which demonstrated that SCBA's product was deficient and could not perform as

warranted or required.  However, the document was drafted in such a manner as to

provide clear guidance to the Executive Committee that prompt corrective action needed

to be taken.

131.   On July 29, 2002, after discussing the memorandum with Relator, Mr. Davis provided the

memorandum individually to every member of the Executive Committee.  Relator

personally saw Mr. Davis provide the memorandum to two members of the committee.

132.   In relevant part, the memorandum stated as follows:

> **Second Chance Body Armor is currently facing two problems: (1)  Zylon ®**
>
> **seems to be degrading much faster than Twaron ® or Kevlar ®. . . .**
>
> **Possible Solutions**
>
> *Solution #1)* **We continue operating as though nothing is wrong until one of**
>
> **our customers is killed or wounded . . . .**

Downfalls) Either a Law Enforcement Officer will be killed wearing one of

our vests, or an involuntary exposure will lead to gross exaggeration. In

either case, we will be forced to make excuses as to why we didn't recognize

and correct the problem . . .

How many of us are willing to sign the following statement: *"I the*

*undersigned, knowing full well about the problems with Zylon ® and Level 2A*

*vests want to continue to produce and sell Level 2A vests, and 100% Zylon ®*

*vests to unsuspecting American Law Enforcement Officers, without telling*

*them about these problems?"*

Solution # 2) We publish and circulate an ad denouncing all 2A vests and

decline to make them anymore . . .

133.   Shortly after this memorandum was distributed to SCBA management officials, Mr.

Young ordered that it be collected from all SCBA officials who received copies and

destroyed. The destruction of this document included going into the computer in which

the document was drafted and erasing the document from the hard drive of the computer.

134.   Relator saved a copy of this document.

135.   In the July 29, 2002 letter, Mr. Davis proposes two solutions to the Zylon ® degradation

problem. The first solution proposed by Mr. Davis is that SCBA could continue on the

path it had adopted since it first became aware of the Zylon ® degradation problem and

"continue operating as though nothing is wrong until one of our customers is killed or

wounded." The second proposed solution is that SCBA discontinue the manufacture of

Level 2 and 2A Zylon ® vests, and fill all future Level 2 and 2A Zylon ® vest orders with

"Bi-Flex" Level 2 vests (composite vests consisting of 18 layers of Zylon ® material and 12 levels of Twaron, a similar ballistic material less susceptible to accelerated degradation).

136. In this July 29, 2002 letter Mr. Davis admits knowing that the Zylon ® vests appeared to be degrading at a rate of 4% per year, whereas Kevlar and Twaron (competing ballistic materials) were degrading at a rate of less than 1% per year.

137. Mr. Davis went on to admit, in this same letter, that given the average rate of degradation of the Zylon ® vests SCBA's Level 2A vests would fall well below acceptable standards for field use in less than 5 years.

138. Upon presenting this letter to the members of SCBA's executive board, including Mr. Young, Mr. Davis was harshly criticized for documenting his concerns on paper. Shortly after Mr. Davis presented this letter to SCBA's Executive Board, in an effort to conceal the statements contained in this letter, Mr. Young collected all existing copies of the letter of which he was aware and destroyed them. Relator personally witnessed the documents being shredded.

139. The recommendations in the memorandum were never followed, the recommended notifications were never given and the potential threat to human life was not acted upon by the Company.

140. In early August of 2002 Relator Westrick and Dr. Judy Westrick were informed that SCBA's Executive Committee would not support any additional research on the issue of Zylon ® degradation.

141. The reason for the Executive Committee's decision not to pursue any future research on

the issue of Zylon ® degradation was the fact that the studies conducted by Toyobo, SCBA, and Dr. Westrick in 2001 and 2002 had all returned unfavorable results.

142.   On or around early August of 2002, members of SCBA's upper management and Executive Committee began to deny any knowledge of Dr. Westrick's study on Zylon ® or SCBA's agreement with Lake Superior State University to perform research on this matter.

143.   On August 15, 2002 Karen McCraney e-mailed Relator Westrick falsely claiming that she had no knowledge of the fact that SCBA and Lake Superior State University had entered a formal contract to perform academic research on the issue of accelerated degradation of Zylon ®.

144.   From August 2002 through February of 2003 Relator Westrick repeatedly attempted to solicit the opinions of SCBA officials on the draft report on Zylon ® degradation prepared by Lake Superior State University.  Relator Westrick also continued to question these officials as to whether additional research would be performed to "follow up" on the 2002 Lake Superior State University study.  In response to his repeated inquiries on these matters Relator Westrick was informed that the Executive Committee of SCBA would not support additional research and that Relator Westrick was to cease analyzing data from the Lake Superior State University studies.

145.   In mid to late August of 2002 Relator Westrick was informed that the Executive Committee of SCBA, at the request of Mr. Davis, was interested in sending the Lake Superior State University draft report to officials at Toyobo to solicit their opinion and cooperation in further research on the issue of Zylon ® degradation.

146. However, on August 26, 2002, Mr. Young informed Relator Westrick via e-mail that the Executive Committee would not in fact send the report produced in the Lake Superior State University study to Toyobo, nor would it support any further research on the matter of Zylon ® degradation.

147. On or around September 4, 2002 Mr. Davis prepared a memorandum on the question of Zylon's ® durability. The memorandum admits that accelerated ageing studies of Zylon ® at high temperatures and humidity levels indicated that it may lose strength faster over time than competing products.

148. This memorandum was written by Mr. Davis with the intent of distributing it to SCBA's Zylon-type armor dealers at a Regional Sales Meeting for SCBA, for purposes of discussing the issue of Zylon's ® apparent accelerated degradation.

149. The memorandum was, however, not discussed at the Regional Sales Meeting. Instead the Executive Committee of SCBA, acting through Paul Banducci, directed that all copies of the memorandum be collected from the individuals who had received it. Once the copies of the memorandum were collected, Mr. Banducci directed that they be discarded.

150. On September 5, 2002 Relator Westrick informed Mr. Banducci that Dr. Judy Westrick of Lake Superior State University had conducted a follow up study on the issue of the possible accelerated degradation of the Zylon ® fabric in coordination with the University of Kentucky.

151. The data obtained during the course of this study demonstrated that the Zylon ® fabric was experiencing accelerated degradation.

152. Relator Westrick then made repeated attempts to obtain permission from Mr. Banducci to

have the data analyzed. Relator Westrick's efforts to raise this issue were, however, ignored by Mr. Banducci.

153. On October 11, 2002, Relator Westrick twice e-mailed Mr. Young requesting that SCBA analyze the data returned from Dr. Judy Westrick's follow up research on the question of Zylon ® degradation. Relator Westrick included printable forms containing this data as attachments to these e-mails.

154. Despite his repeated efforts to obtain permission to analyze the data returned by Dr. Westrick's follow up study on Zylon ® degradation, Relator Westrick received no response regarding this matter from either Mr. Young or Mr. Banducci for several months.

155. On January 16, 2003 Relator Westrick again contacted Mr. Young to inquire whether SCBA intended to follow up on the data returned from the follow up research to Dr. Judy Westrick's preliminary research on Zylon ® degradation.

156. On January 17, 2003 Relator Westrick was informed by Mr. Young that this data had not ever been discussed by SCBA's Executive Committee.

157. On February 5, 2003 Relator Westrick was called into a meeting in Paul Banducci's office. In attendance were Mr. Davis, Mr. Young, Paul Banducci, and Relator Westrick. In the course of this meeting Relator Westrick was told not to talk to individuals outside of SCBA regarding the Zylon ® degradation problem.

158. In the February 5, 2003 meeting Relator Westrick complained that he had been refused access to data from SCBA's September, 2001 study on Zylon ® degradation, and that he had otherwise been restricted from participating in SCBA's investigation of the Zylon ®

degradation issue. In response Mr. Banducci informed Relator Westrick that if he were given access to the data he requested, Relator Westrick would become a liability to SCBA.

159.   Relator Westrick also complained, in a February 5, 2003 Memo, of threats he had received from Mr. Bachner and other SCBA management officials related to his investigation of the Zylon ® degradation problem.

160.   In spite of his complaints, Relator Westrick continued to receive threats from members of SCBA's upper management.

161.   In retaliation for his continued efforts to bring to light potential problems with SCBA's Zylon-type armor related to the accelerated degradation of Zylon ®, Relator Westrick was removed as Director of Research and Composite Development for SCBA's "soft" body armor, and was placed in the position of Director of Research-Composite Development for SCBA's "hard" body armor products. By removing Relator Westrick his former position, SCBA attempted to limit Relator's "research" duties to exclude research related to "soft" body armor, and effectively prevented Relator Westrick from having any company sanctioned access to new data on the issue of Zylon ® degradation.

162.   Members of SCBA's upper management also continued to block Relator Westrick's access to company data on the issue of Zylon ® degradation.

163.   SCBA's Executive Committee began moving forward with a plan to transform SCBA from a privately held company into a publicly traded corporation in April and May of 2003.

164.   During the Spring of 2003, Relator Westrick was informed by Mr. Davis that SCBA's

Executive Committee had established a plan of action for SCBA in the event that one of

its Zylon-type vests was penetrated.

165.   Relator Westrick was informed by Mr. Davis that the SCBA Executive Committee's plan

for addressing any questions related to a Zylon-type vest failure was to shift the subject of

the investigation from the quality of the vest to ballistics variables, including the type of

bullet used in the shooting.

166.   Relator Westrick was informed by Mr. Davis, prior to his removal as SCBA's president,

that SCBA's Executive Committee intended to address the Zylon ® degradation issue

after it had succeeded in transforming the company into a publicly traded corporation and

sold off the company's stock at a substantial profit.

167.   As part of the efforts of the Executive Committee to transform SCBA into a publically

traded corporation, Mr. Davis was replaced as company president by Paul Banducci in

June of 2003.

168.   On June 13, 2003 Officer Zappatello of the Oceanside, CA Police Department was shot

through a Zylon ® vest supplied by SCBA and died from his wounds.  Subsequent

analysis indicated that the vest, if properly functioning should have stopped the bullet.

169.   On or around June 24, 2003 Officer Limbacher of the Pittsburgh, PA Police Department

was shot through another Zylon-type vest issued by SCBA.  Officer Limbacher was

severely wounded in the shooting.

170.   The harassment of Relator Westrick by individuals within SCBA continued through the

Fall of 2003.  On September 22, 2003, Relator Westrick sent an e-mail to Mark Pickett,

Paul Banducci, and Karla Michanowicz complaining of repeated incidents of harassment

32

and intimidation at the hands of Larry McCraney.

171. On October 10, 2003 Toyobo sent a letter regarding its most recent findings in its ongoing

Zylon ® degradation studies, to its customers within the body armor industry, including

SCBA. This letter and the attachments thereto clearly demonstrate that the Zylon ®

fabric was degrading at an alarmingly fast rate.

172. In response to this disclosure by Toyobo, SCBA issued a press release dated October 22,

2003, in which it made public the information disclosed to SCBA by Toyobo in its

October 10 letter.

173. On October 31, 2003 Relator Westrick contacted Detective A.J. Dolizak of the Oceanside

Police Department. Officer Dolizak was at the time leading the investigation of Officer

Zappatello's murder. Relator Westrick informed Detective Dolizak of his belief that the

degradation of the Zylon ® material in Officer Zappatello's SCBA issued body armor

may have been responsible for the failure of his body armor to stop the bullet that fatally

wounded him.

174. On November 7, 2003, Relator Westrick contacted Sandy Wilkinson (a Senate Judiciary

Committee lawyer working for Senator Leahy) and informed her of his belief that the two

recent police shootings were directly related to SCBA's efforts to conceal the problems of

accelerated degradation of its Zylon-type soft body armor.

175. The harassment of Relator Westrick by officials within SCBA has continued through the

present. Relator Westrick has repeatedly been questioned by officials within SCBA about

his discussions with individuals outside of SCBA regarding the Zylon ® degradation

problem. Additionally, Relator Westrick has been falsely accused by individuals within

SCBA of giving company secrets to competitors.

176.   Because of SCBA actions, Relator Westrick has suffered special damages, including, but not limited to, significant financial, reputational, and emotional damages and physical injury.

177.   Relator Westrick believes that public disclosure, as defined under 31 U.S.C. § 3730(e)(3) and 31 U.S.C. § 3730(e)(4)(A) of the Federal Claims Act, has occurred.

178.   Relator Westrick is the original source of such public disclosure in that he was the primary witness and reporter of the fraudulent actions of SCBA.

## COUNT I

179.   Relator Westrick incorporates by referencing paragraphs 1 through 170, inclusive, and all allegations contained therein.

180.   Defendant SCBA knowingly made and caused to be made false statements and false representations to the United States Government concerning the ballistic capabilities of its Zylon-type body armor.

181.   Beginning on July 5, 2001, when SCBA was first informed by Toyobo of the phenomenon of the accelerated degradation of the Zylon ® fiber, SCBA was aware of such facts as would lead a reasonable person to conclude that SCBA's Zylon-type body armor might be susceptible to accelerated degradation.

182.   The results of Toyobo's additional studies on Zylon ® degradation together with those of SCBA and Relator Westrick's own research studies on this matter confirmed the fact that the Zylon ® fiber was experiencing accelerated degradation, and further confirmed that the Zylon-type vests were experiencing accelerated V-50 degradation.

183.   SCBA expressly warrantied that the Zylon ® inner protective panels to its body armor would meet ballistics requirements for a period of 5 years.

184.   The results of the Toyobo and SCBA accelerated ageing tests demonstrated that SCBA's Zylon-type vests could not meet the terms of this warranty.

185.   SCBA was therefore aware of the fact that their Zylon-type body armor was incapable of meeting the terms of the express warranty under which it was sold. Nevertheless, SCBA continued to sell its Zylon-type body armor to federal, state and local police departments.

186.   Under the Bullet Proof Vest Partnership Grant Act, the Federal Government of the United States issued grants to federal, state and local police agencies to reimburse these agencies for up to 50% of the costs of supplying their officers with body armor.

187.   By knowingly selling body armor that did not meet the terms of its express warranty to federal, state and local police agencies, SCBA succeeded in obtaining fraudulent payments of moneys from the Government of the United States under the grant program established by the Bullet Proof Vest Partnership Grant Act.

188.   Defendant SCBA breached the warranty of merchantability on its contracts to provide body armor to federal, state and local police departments.

189.   Under the U.C.C. § 2-314, a warranty of merchantability is implied in every sale made by a merchant seller, where the sale in question involves goods of the kind normally sold by the merchant in the course of its business.

190.   The implied warranty of merchantability requires that the goods protected pursuant thereto be fit for the ordinary purposes for which goods of that type are used, and that such goods conform to any promises or affirmations of fact made on their container or

35

labels attached thereto.

191. Defendant SCBA is a merchant within the meaning of U.C.C. § 2-314, because it holds

itself out as having expertise in the design and construction of tactical body armor, and is

regularly engaged in the business of dealing in tactical body armor products.

192. The Zylon-type body armor to which the implied warranty of merchantability attached

falls within the sphere of goods as to which SCBA is a merchant.

193. The Zylon-type armor sold to federal, state and local police agencies by SCBA breached

the implied warranty of merchantability because it (1) did not conform to the promises

and affirmations of fact contained on the express warranty cards attached thereto, (2) was

not fit for the ordinary purposes for which tactical body armor is used, and (3) was

unreasonably dangerous to its users in light of the problem of Zylon's ® accelerated rate

of degradation.

194. By breaching the warranty of merchantability on its contracts to provide body armor to

state and local police departments Defendant SCBA succeeded in obtaining fraudulent

payments of moneys from the Government of the United States under the grant system

created by the Bullet Proof Vest Partnership Act.

195. Defendant SCBA, by and through its officers, agents, and employees authorized its

various officers, agents and employees to take the actions set forth above.

196. The United States Government is entitled to all damages stemming from Defendant's

material breach of contract.

197. As set forth in the preceding paragraphs, Defendant SCBA has knowingly violated 31

U.S.C. § 3729 and has thereby damaged the United States Government by its actions in

an amount to be determined at trial.

## COUNT II

198.    Relator Westrick incorporates by referencing paragraphs 1 through 197, inclusive, and all
allegations contained therein.

199.    Relator Westrick's actions in attempting to pursue the investigation of the problem of
accelerated degradation of Zylon, and attempting to warn SCBA management and its
customers of the potential problems posed by this accelerated degradation were lawful
acts done by Relator Westrick in furtherance of an action under Section 3730 of the False
Claims Act.

200.    Defendant SCBA engaged in unlawful discrimination by subjecting Relator Westrick to a
hostile working environment, by removing him from the company's investigation of the
Zylon degradation issue, and by removing him from his position as Director of Research
and Composite Development.

201.    Defendant's actions set forth above violate 31 U.S.C. § 3730(h) and have damaged
Relator Westrick in amount to be determined at trial.

202.    WHEREFORE, the Relator on behalf of himself and the United States Government
prays:

(a) That this court enter a judgment against defendant in and amount equal to
three times the amount of damages the United States Government has sustained, plus a
civil penalty of $5,000 to $10,000 for each action in violation of 31. U.S.C. § 3729, and
the costs of this action, with interest, including the cost to the United States Government
for its expenses related to this action;

(b) That the Relator be awarded all costs incurred including reasonable attorney's

fees;

(c) That in the event that the United States Government continues to proceed with

this action, the Relator be awarded an amount for bringing this action of at least 15% but

not more than 30%, of the proceeds of the actions or settlement of the claim;

(d) That in the event that the United States Government does not proceed with this action,

the Relator be awarded an amount that the Court decides is reasonable for collecting the

civil penalty and damages, which shall be not less than 25% nor more than 30% of the

proceeds of the action or settlement;

(e) That the Relator be awarded pre-judgment interest;

(f) All special damages, including, but not limited to, compensation for compensatory

damages, compensation for physical injury, compensation for loss of reputation and

double damages for lost wages;

(g) That the United States Government and the Relator receive all relief both at law and at

equity, to which they may reasonably appear entitled.

Respectfully Submitted,

Stephen M. Kohn
DC Bar No. 411513
KOHN, KOHN, COLAPINTO, LLP
3233 P Street, NW
Washington, DC 20007
(Phone) 202-342-6980
(Fax) 202-342-6984

JURY TRIAL DEMANDED

38