UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States *ex rel.* | : | Civil Action No. 1:04CV00280 |
| | : | |
| Aaron J. Westrick, Ph.D. | : | Judge: Richard W. Roberts |
| 03006 BC-EJ Road | : | |
| Boyne City, MI 49712 | : | Date Received _____ |
| | : | |
| | : | |
| BRINGING THIS ACTION ON BEHALF | : | **AMENDED COMPLAINT** |
| OF THE UNITED STATES OF AMERICA | : | |
| | : | Filed under Seal pursuant to |
| and | : | 31 U.S.C. § 3730(b)(2) |
| | : | |
| c/o John Ashcroft | : | |
| Attorney General of the United States | : | |
| Department of Justice | : | |
| 10th and Constitution Avenues, NW | : | |
| Washington, D.C.  20530 | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| Second Chance Body Armor, Inc. | : | |
| 7915 Cameron St. | : | |
| Central Lake, MI 49622, | : | |
| | : | |
| Second Chance Armor | : | |
| 1501 West Magnolia | : | |
| Geneva, AL 36340 | : | |
| | : | |
| Second Chance Shield, Inc. | : | |
| 404 Nash Road | : | |
| New Bedford, MA 02746 | : | |
| | : | |
| Second Chance Body Armor Canada Co. | : | |
| c/o Second Chance Body Armor, Inc. | : | |
| 7915 Cameron St. | : | |
| Central Lake, MI 49622, | : | |

IAG Manufacturing, s.a.r.l.                          :
c/o Second Chance Body Armor, Inc.                   :
7915 Cameron St.                                     :
Central Lake, MI 49622,                              :
                                                     :
Second Chance Body Armor GmbH                        :
c/o Second Chance Body Armor, Inc.                   :
7915 Cameron St.                                     :
Central Lake, MI 49622,                              :
                                                     :
Second Chance Body Armor, UK                         :
c/o Second Chance Body Armor, Inc.                   :
7915 Cameron St.                                     :
Central Lake, MI 49622,                              :
                                                     :
Second Chance Body Armor, Ltd.                       :
5 Townsend Street                                    :
London, SE 17 1HJ                                    :
                                                     :
Toyobo Co. Ltd.                                      :
2-8, Dojima-Hama 2-chome                             :
Kita-ku, Osaka 530-8230, Japan                       :
                                                     :
Toyobo America, Inc.                                 :
950 Third Ave. 17th Floor                            :
New York, NY 10022                                   :
                                                     :
            Defendants.                              :

## FIRST AMENDED COMPLAINT

This is a *qui tam* action under 31 U.S.C. Sec. 3729, *et al.* of the False Claims Act filed by

Relator Westrick, in the name of the United States Government to recover penalties and damages

arising from Defendants' Second Chance Body Armor, Inc., Toyobo Co. LTD, and their several

subsidiaries actions in making and causing to be made false statements and fraudulent

representations to the United States Government in order to obtain payments under its contracts to

provide body armor to federal, state and local police departments.  Defendant, Second Chance Body

Armor, Inc., and its subsidiaries knowingly sold, and caused to be sold, defective body armor to federal, state and local police agencies under contract, in violation of express and implied warranties of merchantability, thereby placing the health and safety of its law enforcement customers in danger. Defendant Toyobo Co. LTD and its subsidiaries constructively sold and caused to be sold defective Zylon fiber to federal state and local police agencies in violation of express and implied warranties of merchantability thereby placing the health and safety of its law enforcement customers in danger. Defendants continued to sell body armor made from the Zylon fiber after they became aware of chemical problems with the Zylon fiber that resulted in hyper-accelerated degradation of its Zylon-type body armor.  Due to its hyper-accelerated degradation Defendants' Zylon-type body armor could not meet the express terms of the warranty under which it was sold to federal, state, and local police departments.  Furthermore, Defendants' Zylon-type body armor does not meet its warranty of merchantability, failed to meet federal specifications regarding compliance with its warranty, failed to adhere to federal regulations regarding the quality of items obtained with federal financial assistance and poses serious dangers to the health and safety of the police officers by whom it is worn.  Defendants were aware of these facts as early as July of 2001; nonetheless, Defendants continued to sell the defective Zylon-type body armor to federal, state and local police agencies under contract in violation of 31 U.S.C. § 3729.  Defendants Toyobo Co. LTD and Second Chance Body Armor, Inc. conspired to defraud the Government by getting false claims paid in violation of 31 U.S.C. § 3729.  Additionally, Defendant Second Chance Body Armor Inc. engaged in unlawful discrimination in violation of 31 U.S.C. § 3730(h) by subjecting Relator Westrick to a hostile working environment, removing him from the company's investigation of the problem of accelerated degradation of Zylon-type body armor, and removing him from his former position as Director of

Research and Composite Development in retaliation for his protected whistleblower activity.  All factual allegations and claims herein have also been revealed to the Office of the Attorney General in Relator Westrick's disclosure statement pursuant to 31 U.S.C. § 3730(b)(2).

## PARTIES

1. Relator Aaron J. Westrick, Ph.D. is a citizen of the United States and resides in Boyne City, Michigan.  Relator Westrick brings this civil action under the False Claims Act against Defendants Second Chance Body Armor, Second Chance Body Armor Canada Co., IAG Manufacturing s.a.r.l., Second Chance Body Armor GmbH, Second Chance Body Armor UK, Ltd., Second Chance Body Armor, Ltd.

2. Defendant Second Chance Body Armor is a privately owned company, specializing in the production of body armor, with headquarters in Central Lake, Michigan.

3. Second Chance Armor is a subsidiary of Second Chance Body Armor, Inc., with headquarters in Geneva, Alabama.

4. Second Chance Shield, Inc., is a subsidiary of Second Chance Body Armor, Inc., with headquarters in New Bedford, Massachusetts.

5. Defendant Second Chance Body Armor Canada Co. is a subsidiary of Defendant Second Chance Body Armor, with headquarters in Winnipeg, Canada.

6. Defendant IAG Manufacturing s.a.r.l. is a subsidiary of Defendant Second Chance Body Armor, with corporate headquarters in Tangier, Morocco.

7. Defendant Second Chance Body Armor GmbH is a subsidiary of Second Chance Body Armor with corporate headquarters in Brannenburg, Germany.

8. Defendant Second Chance Body Armor UK, Ltd. is a subsidiary of Second Chance Body

Armor with headquarters in Glasgow, Scotland.

9.   Defendant Second Chance Body Armor, Ltd. is a subsidiary of Second Chance Body Armor with headquarters in London, England.

10.   Hereinafter Defendants Second Chance Body Armor, Second Chance Body Armor Canada Co., IAG Manufacturing s.a.r.l., Second Chance Body Armor GmbH, Second Chance Body Armor UK, Ltd., and Second Chance Body Armor, Ltd., shall be referred to as "SCBA".

11.   SCBA conducts business in the District of Columbia, where they have sold and continue to sell body armor to federal law enforcement agencies.

12.   Toyobo Co. LTD is a Japanese corporation with headquarters in Osaka, Japan.  Toyobo is the sole maker and seller of the Zylon ® fiber from which SCBA's Zylon body armor is made.

13.   Toyobo America, Inc. is a subsidiary of Toyobo Co. LTD and has offices in New York, New York.

14.   Both Toyobo America, Inc. And Toyobo Co. LTD conduct business in the District of Columbia.

15.   Hereinafter Defendants Toyobo Co. LTD and Toyobo America, Inc. Shall be referred to collectively as, "Toyobo."

## JURISDICTION AND VENUE

16.   Relator Westrick, brings this complaint against Defendants SCBA and Toyobo under two related causes of action arising from Defendant's misrepresentations to the Government of the United States of America.

17.   Relator Westrick alleges that SCBA violated 31 U.S.C. § 3729-3730 of the False Claims Act

5

("FCA") by making false and fraudulent claims for payments from the United States Federal Government.

18.   Additionally, Relator Westrick alleges that Defendant SCBA violated 31 U.S.C. § 3730(h) of the False Claims Act when it discriminated against him in the terms and conditions of his employment because of lawful acts done by Relator Westrick in furtherance of an action under Section 3730 of the FCA.

19.   Relator Westrick also alleges that Toyobo violated 31 U.S.C. § 3729-3730 of the False Claims Act ("FCA") by constructively making false and fraudulent claims for payments from the United States Federal Government.

20.   Relator Westrick further alleges that Toyobo violated 31 U.S.C. § 3729(a)(3) by conspiring to defraud the Government by getting false or fraudulent claims allowed or paid.

21.   Jurisdiction over Relator Westrick's FCA claims is conferred upon this Court by 31 U.S.C. § 3732 of the FCA and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

22.   Venue is proper in the United States District Court, for the District of Columbia pursuant to 28 U.S.C.§ 1391(b) and (c) and 31 U.S.C. § 3732(a) because the Defendants have and continue to conduct business in the District of Columbia.

## FACTUAL ALLEGATIONS

23.   In 1998 Congress passed the Bullet Proof Vest Partnership Grant Act, 42 U.S.C. § 3796ll et seq., pursuant to which the United States Government agreed to reimburse state and local police departments for up to 50% of the costs of obtaining body armor for their police officers.  Under the Act, state and local police agencies have the authority to select and order

the make and model of body armor with which they supply their police officers. The Federal Government then reimburses these state and local police agencies for up to 50% of the costs of the body armor.

24.   SCBA is a maker of body armor, and between 1999 and 2003 consistently received roughly 39% of all state and federal government funding for body armor. Of the funds received by SCBA for supplying body armor to federal, state and local police agencies, roughly 70% was for Zylon-type "bullet proof vests."

25.   Zylon ® is an industry name for the Poly-p-phenylene-2, 6-benzobisoxazole ("PBO") fiber.

26.   The PBO fiber was first invented by the US Air Force, and was later developed by the Stanford University and South West Research Institute.

27.   Dow Chemical Company ("Dow") further developed the PBO fiber and later sold the production rights to Toyobo Co., Ltd. ("Toyobo"), a Japanese company.

28.   On information and belief, one of the reasons behind Dow's decision to sell the rights to the PBO fiber to Toyobo was that Dow was concerned that the PBO fiber would be limited in its applications due to its rapid rate of degradation.

29.   Toyobo has since produced and marketed a form of the PBO fiber under the name of Zylon ® for use in a wide variety of end products, such as sailcloth, flame suits, and ballistic armor ("bullet proof vests").

30.   There are currently at least two PBO fibers that are commercially available, As Spun ("AS") PBO fibers and High-Modulus ("HM") PBO fibers.

31.   On information and belief there are two additional forms of PBO fiber in existence: the first is US-SB10 (a unidirectional form of Zylon fiber) and High-Modulus+ (HM+).

32. In late 1997/early 1998 Toyobo began to supply SCBA with Zylon ® for use in SCBA's body armor products.

33. On information and belief, the type of Zylon ® supplied to SCBA by Toyobo for use in its body armor end-products was AS Zylon ®.

34. At the time when Toyobo first began to supply Zylon ® for use in body armor it informed its customers including SCBA that, as a fiber producer, it was not in a position conduct ballistic tests on bullet proof vests made with Zylon ®, because it did not have access to the different types or prototypes of body armor containing Zylon ®. Toyobo also requested that the companies seeking to use Zylon ® in their body armor products test the Zylon ® product themselves to determine whether Zylon-type bullet proof vests met industry performance standards.

35. In late 1997/early 1998 SCBA produced its first Zylon-type bullet proof vest from AS Zylon ® supplied by Toyobo.

36. From 1998-1999 SCBA was the exclusive manufacturer of Zylon-type bullet proof vests.

37. SCBA continues to manufacture some Zylon-type vests, and was one of the world's leading manufacturers of Zylon-type body armor.

38. In April of 1996 Relator Westrick was hired by SCBA as the company's Director of Training.

39. In addition to working for SCBA, Relator Westrick has been a police officer since 1981. Relator Westrick remains a fully commissioned police officer.

40. In 1998 Relator Westrick was promoted by SCBA to the position of Director of Research and Composite Development.

41.  As early as December 18, 1998 Mr. Thomas E. Bachner, Jr., Group Vice President for SCBA's Technology, Product Assurance, Spcl. Projects & Corp. Development, and Secretary for the Corporation, was informed by letter from Tadao Kuroki, an employee of Toyobo, that preliminary testing had shown that Zylon ® began to degrade rapidly when exposed to visible and fluorescent light.

42.  SCBA failed to release this information to customer and failed to provide Relator Westrick with this information.

43.  In 2001 Toyobo began conducting tests on Zylon ® to estimate the aging performance of the fiber itself.

44.  Toyobo maintained and continues to maintain that its tests were never intended to assess the actual ballistic performance of any individual manufacturer's final product.

45.  From 2001 through 2003 Toyobo regularly produced reports of its accelerated ageing tests for use by its customers.  These reports indicated that PBO fibers were susceptible to accelerated degradation.

46.  After completing the first round of its aging tests on Zylon ®, Toyobo informed SCBA and other manufacturers of body armor, by letters dated July 5, 2001, that "the strength of Zylon fiber decreases under high temperature and humidity conditions."

47.  In its July 5, 2001 letter, Toyobo included graphs illustrating its findings on Zylon ® degradation.  Toyobo also included information regarding the methodology behind its testing procedures.

48.  As of July 5, 2001, the date on which Toyobo informed SCBA of its preliminary test results on the issue of accelerated aging of the Zylon ® fiber, SCBA was aware that its Zylon-type

body armor might not meet the express or implied warranties under which it was sold.

49.     SCBA expressly warranted that the inner Zylon ® panels of its bullet proof vests would meet ballistics requirements for 5 years.

50.     Beginning on July 5, 2001 SCBA was aware of such information as would reasonably indicate that its Zylon-type bullet proof vests were not capable of meeting the terms of the 5 year warranty on the inner Zylon ® protective panels.

51.     Upon receiving the data contained in the Toyobo study, SCBA downplayed the validity of Toyobo's findings and the study itself.   SCBA management claimed that the study was performed under unrealistic testing conditions, and that there was therefore no cause for concern with SCBA's continued use of Zylon ® in its body armor products.

52.     SCBA issued a statement on July 6, 2001 claiming that the degradation studies performed by Toyobo involved high temperatures that were well above normal use conditions. Furthermore, SCBA claimed in this same July 6, 2001 statement that neither extrapolation of the data provided by Toyobo in its July 5, 2001 letter nor separate accelerated aging studies at temperatures slightly higher than normal use conditions indicated any cause for concern regarding SCBA's Zylon-type vests.

53.     SCBA closed its July 6, 2001 letter by emphasizing the fact that it remained confident that all of its body armor products would continue to meet or exceed design criteria well beyond their stated warranty periods, as long as they were properly cared for.

54.     The representations made on July 6, 2001 were not true.

55.     Relator Westrick was first informed by upper management officials within SCBA of the problem of accelerated degradation of the Zylon ® fiber in July of 2001, on or about the date

that SCBA received the letter regarding Toyobo's preliminary tests on Zylon ® degradation.

56.   In light of the information revealed to him by SCBA's upper management, Relator Westrick, acting as Director of Research for SCBA, recommended that SCBA obtain samples of its Zylon-type body armor from police officers who wore the armor frequently and test this armor for signs of accelerated degradation.

57.   On July 10, 2001, Relator Westrick sent a letter to the Long Boat Key Police Department of Long Boat Key, Florida requesting that the department send SCBA the Zylon-type body armor used by ten of its officers who wore their armor the most frequently.

58.   Similar letters were later sent to other police agencies in United States by SCBA, requesting the return of worn body armor for purposes of testing.

59.   Shortly after sending the letter to the Long Boat Key Police Department, SCBA received the armor worn by ten of the department's officers who most frequently wore their armor.

60.   SCBA then performed a series of "V-50" tests on the armor sent to them by the Long Boat Key Police Department.

61.   As Director of Research and Composite Development, Relator Westrick supervised the Zylon-type body armor testing.

62.   The "V-50" tests were conducted at U.S. Test Labs, a private armor testing company.

63.   The "V-50" tests were designed to measure the degree of degradation in the worn body armor.  "V-50" testing essentially involves two steps.  First, the tester fires shots at a new, unused vest until 50% of the shots penetrate.  Second, the tester fires shots at used vests until 50% of the shots penetrate.  The results of the new vest shootings and the used vest shootings are then compared to determine the degree of degradation of the body armor.

11

64. Following the completion of the initial round of "V-50" tests on the armor returned by the Long Boat Key Police Department, SCBA continued to receive samples of the worn armor from police agencies across the country. This armor was sent for "V-50" testing at U.S. Test Labs, as with the armor submitted by the Long Boat Key Police Department.

65. Despite his status as Director of Research and Composite Development for SCBA, some upper management officials within SCBA did not want to share with Relator Westrick the data from these "V-50" tests. Relator Westrick's own life had been saved by a SCBA product, and Relator was therefore extremely vocal in his concerns for police officer safety.

66. Despite the reluctance of some officers of SCBA to share information with Relator Westrick, Richard C. Davis, President of SCBA (and, at this time, Mr. Bachner) informed Relator that the data from the early "V-50" tests was not favorable to SCBA, and that there was cause for concern about the problem of accelerated degradation of Zylon-type vests.

67. Relator Westrick was also informed by Richard Mouser, President of U.S. Tests Labs, that the data from the "V-50" tests indicated that there was cause for concern about the problem of accelerated degradation of the Zylon-type vests.

68. In a series of letters to SCBA and other body armor manufacturers dated July 19, 2001, Toyobo reiterated its findings regarding the degradation of Zylon ®, and reminded body armor manufacturers to bear in mind the degradation properties of Zylon ® when designing and testing their end product Zylon-type bullet proof vests.

69. Additionally, in its letters dated July 19, 2001, Toyobo noted that Dutch State Mines ("DSM") had informed Toyobo that its use of Zylon UD-SB10 in bullet proof vests may not be justified due to the accelerated degradation of that fiber.

70.     In this same July 19, 2001 report, Toyobo indicated that its own research had indicated that the V50 drop observed by DSM in the Zylon UD-SB10 was a characteristic unique to Zylon UD-SB10.

71.     In July/August of 2001 SCBA won a bid for the supply of Zylon-type body armor to the German Government after a competing manufacturer of body armor, BSST, withdrew its bid for the supply of such vests.  SCBA's Executive Committee was, at the time, aware that BSST had withdrawn its bid because it had determined that Zylon ® was not safe for use as a ballistic material.

72.     On information and belief SCBA added an additional two layers to the Zylon-type body armor sold to the German Government because of its fears that without the two layer upgrade the armor might fail initial testing by the Germans, due to the problem of Zylon's ® accelerated degradation.  No changes were made to the vests sold in the United States markets.

73.     Furthermore, based on its bid for the supply of Zylon-type body armor to the German Government, SCBA had a significant financial motive to downplay the Zylon ® degradation problem and hinder Relator Westrick's efforts to research and document this problem.

74.     Relator Westrick continued to request access to the data from the "V-50" tests conducted by U.S. Test Labs on the worn SCBA Zylon-type vests.  His requests were, however, repeatedly denied by upper management officials within SCBA.

75.     On August 7, 2001 Relator Westrick was informed, during a meeting with Mr. Bachner, that SCBA's preliminary "V-50" tests on a set of "Ultima" Zylon-type vests used by Pennsylvania State police indicated that the vests were degrading at a rate of 2-5% per year.  Soon after

Relator Westrick was advised by Mr. Davis and Mr. Bachner that one set of "Ultima" armor had lost as much as 20 to 25% in "V-50" tests.

76.     The rates of degradation being reported in these tests demonstrated that the Zylon-type vests could fail under normal usage. The reported degradation rates obtained by SCBA after these results reinforced this finding.

77.     On August 28, 2001 Toyobo made a supplemental disclosure to SCBA containing new data on the issue of the accelerated degradation of the Zylon ® fiber. This supplemental disclosure contained new data from Toyobo's Zylon ® aging tests demonstrating that the fiber was degrading at an abnormally accelerated rate.

78.     In its August 28, 2001 letter to SCBA, Toyobo requested that SCBA share the data from the Toyobo studies with its customers.

79.     In late August/early September of 2001 Relator Westrick was informed by SCBA upper management personnel of the August 28, 2001 letter from Toyobo.

80.     On September 11, 2001, during a meeting with Paul Banducci, General Manager of SCBA, and Mr. Davis, Relator Westrick was told that the test data from SCBA's "V-50" tests had shown a rate of degradation in the Zylon-type bullet proof vests of 3-9% per year. Management within SCBA characterized these results as "inconclusive," despite the fact that even a 3% rate of annual degradation is an abnormally high for tactical body armor.

81.     On September 21, 2001, during a meeting with Mr. Davis, Relator Westrick was again informed that the results of SCBA's preliminary "V-50" tests indicated a degradation rate in the Zylon-type armor of 3-9% per year. Although the test data were scattered, even the low end of SCBA's V-50 degradation test results on its Zylon-type armor (3%) were roughly

14

three times the average rate of degradation in non-Zylon-type vests. It was therefore Relator Westrick's professional opinion at the time that there was cause for concern regarding the problem of accelerated degradation in Zylon-type vests.

82. During the September 21, 2001 meeting with Mr. Davis, Relator Westrick was also informed that one of the tested vests showed a degradation rate of 16% over a 2 year period.

83. As of late October of 2001, upper management at SCBA were actively looking for a fabric or spray on material to cover the Zylon ® material used in SCBA's body armor products, so as to slow the seemingly accelerated degradation of Zylon-type body armor. SCBA's then General Manager, Paul Banducci, informed Relator Westrick, in an October 17, 2001 meeting, of these efforts on behalf of SCBA to devise a solution to the problems of accelerated degradation of the Zylon ® material.

84. On November 20, 2001 during a meeting in Mr. Bachner's office, officials of SCBA including Relator Westrick discussed the fact that Dutch State Mines ("DSM"), a European manufacturer of Zylon ® material used by BSST and other manufacturers of body armor, had announced that it would no longer engage in the manufacture of its Zylo-Shield product because of safety concerns related to the accelerated degradation rate of Zylon ®.

85.  The Zylo-Shield product essentially consists of Zylon ® fabric coated in a protective laminate designed to slow the aging process of the Zylon ® fiber.

86. The principle concern of DSM was that the Zylon ® fabric, due to its accelerated rate of degradation, was not ballistically reliable.

87. At the November 20, 2001 meeting, upper management officials of SCBA continued to assert that the safety concerns of DSM were due entirely to a problem with the lamination

process used to create Zylo-Shield.

88.   Relator informed management at this meeting, and during informal conversations, that the Zylon problem could not be explained away by lamination.  This concern was based both on the data obtained by Relator concerning the testing which had been conducted and the Relators expert belief that the degradation problem was innate to the fiber.  This belief was also supported by the reports from Toyobo, which were based on tests conducted on unlaminated fiber.

89.   On or about November 26, 2001 Relator attended a meeting in which Mr. Davis, Ed Bachner and Paul Banducci, in which a concern was voiced that Toyobo (based on the advice of Toyobo's lawyers)  was going to contact a German police department about the problems with Zylon ®.  This was a significant concern for SCBA, because SCBA was attempting to sell a large quantity of vests to a German police department.  SCBA objected to Toyobo's contacts with the German police, and, according to information obtained by the Relator, Toyobo agreed not to contact SCBA's German customers.

90.   On November 29, 2001 upper management of SCBA held a meeting in which Relator was not invited to attend.  At numerous times prior to this meeting, Relator had communicated to these members of upper management, including  Mr. Davis, Ed Bachner, Jim Young, Larry McCraney and Paul Banducci, that he was gravely concerned for the company's customer's well being, and that he was concerned that a customer could be killed due to faulty armor.

91.   On November 29, 2001, after the meeting of upper management of SCBA, Mr. Davis informed Relator Westrick that SCBA's management had insisted that Relator Westrick not

be informed about any new developments or ongoing research related to the problem of the accelerated aging of Zylon ®.

92.     The removal of Relator Westrick from his job duties related to body armor research, and the specific attempt to prohibit Relator from accessing information about the  accelerated aging of Zylon ® and Zylon's degradation, was in retaliation for the numerous concerns Relator raised on these issues, and the fact that some of  SCBA managers intended on covering up any problem with Zylon.

93.     The only member of upper management who did not comply with this directive was Mr. Davis.

94.     During their November 29, 2001 conversation, Mr. Davis informed Relator Westrick that the data pulled from SCBA's V-50 tests run on the armor returned to SCBA by police agencies across the country indicated that the average rate of degradation of SCBA's Zylon-type vests over a two year period was between 9 and 13%.

95.     On this same day, Relator Westrick was informed by Mr. Davis that new data released by Toyobo cast serious doubt on the continued viability of the use of Zylon ® within the body armor industry.  Mr. Davis also informed Relator that the more the armor was worn by a police officer, the more the armor degraded.

96.     On or about November 29, 2001, based on the information available to him as part of his official duties, Relator Westrick drew the conclusion that the continued use of the Zylon ® material in body armor posed serious risks to the health and safety of the law enforcement officers wearing the armor.  Relator Westrick therefore recommended to upper management officials within SCBA that the company recall its Zylon-type bullet proof vests.

97.    Mr. Davis agreed with my assessment, and informed Relator that he was the "only one standing up for the right thing."  Mr. Davis informed Relator that Davis had attempted to cancel the sales to the German police due to the safety problems, but management said "no."

98.    From the date Relator was removed from his research duties, to the date in which Mr. Davis stepped down as President of SCBA, he continuously agree with Relator's safety concerns and made statements which gave Relator an indication that he would take appropriate action within the company to respond to Relator's concerns.   Unfortunately, Mr. Davis never took (or was able to take) appropriate corrective action.

99.    On or about December 13, 2001 representatives from both SCBA and Toyobo met in Los Angeles to discuss problems related to the recent discovery of the accelerated degradation of the Zylon ® fiber.

100.    At this meeting SCBA representatives informed the representatives of Toyobo that the problems recently discovered in the Zylon ® fiber had reduced the value of Zylon ® to it's business of constructing flexible, light-weight body armor.

101.    Specifically SCBA officials informed the representatives of Toyobo that the AS Zylon used in SCBA's bullet proof vests was subject to accelerated degradation, and further informed the representatives of Toyobo that due to the accelerated rate of degradation of the AS Zylon, SCBA's vests would not meet the requirements of the warranty under which they were sold.

102.    Additionally, SCBA informed Toyobo that Toyobo would have to expend over $8,000,000 to remedy the problems caused by the accelerated rate of degradation of its AS Zylon.

103.    On information and belief, Toyobo subsequently refused to take any corrective action with regard to the problem of the accelerated degradation of AS Zylon.

18

104.    In response to Toyobo's failure to take action with regard to the accelerated degradation of AS Zylon, Richard Davis (then President of SCBA) drafted a December 20, 2001 letter to a Mr. Nojima of Toyobo Co. LTD.  In this letter, Mr. Davis informed Mr. Nojima of the various defects in the AS Zylon ® used in SCBA's vests and proposed various measures that Toyobo could take to resolve these problems.

105.    Mr. Davis explicitly informed Mr. Nojima in this letter that, given the accelerated rate of degradation of the AS Zylon fiber, SCBA's Zylon body armor products could not meet the terms of the five year warranty under which they were sold.

106.    On December 18, 2001 Mr. Davis showed a copy of this draft letter to Relator Westrick, and informed him that according to tests conducted by SCBA and Toyobo, the average degradation rate for the Zylon ® vests was 3-5% per year, and in some cases was as high as 9% per year.

107.    On information and belief, Toyobo took no measures to resolve the product deficiencies in its AS Zylon ® mentioned in Mr. Davis's December 20 letter.

108.    Furthermore, regardless of the fact that officials within Toyobo were aware of the fact that the SCBA bullet proof vests constructed from Zylon supplied by Toyobo did not meet the terms of the warranty under which they were sold, Toyobo continued to supply SCBA with Zylon fiber for use in its bullet proof vests.

109.    On or around December 18, Mr. Davis met with Relator Westrick and informed Relator Westrick of his concerns that Karen McCraney, Senior Vice President of SCBA, Larry McCraney, Vice President of SCBA, and possibly the entire management group of SCBA wanted to conceal the problems with the Zylon-type body armor until after the following year

19

when SCBA's Executive Committee planed on transforming SCBA into a publicly traded company.

110.   During this meeting, Relator informed Mr. Davis that the failure of the company to act on the data could result in the death of policeman and result in "millions lost."  Mr. David informed Relator that "there are approximately 80,000 Ultima vest out, we [Second Chance] are still making them" and that it would cost "20 million to recall the Zylon vests."  Mr. Davis informed Relator that he agreed with Relator that the vests should be recalled, but his management did not agree with this.

111.   On or about December 18, 2001, based on his direct first hand review of the facts and circumstances surrounding the Zylon ® degradation issue, Relator Westrick concluded that SCBA's bullet proof vests could not meet the terms of the warranty under which they were sold.

112.   In addition, by December 18, 2001 Relator had obtained information directly from the President of SCBA which demonstrated that SCBA would attempt to cover-up the issues.

113.   On December 18, 2001, Relator Westrick submitted a formal memorandum to Mr. Davis. This memorandum recapped the positions taken by Relator at the meeting between Relator and Mr. Davis and was submitted in order to fully clarify, without any doubt, the position of Relator on the safety issues posed by the use of Zylon ®.

114.   In this formal memorandum, which was hand delivered to Mr. Davis on December 18, 2001, the Relator stated that SCBA should immediately notify its customers of the degradation problems in its Zylon-type body armor, clarify these problems with any customers who had placed orders for the armor, and cancel any pending orders of Zylon-type armor if so

20

requested by the customers.

115.   This memorandum stated, in relevant part,  as follows:

> **Second Chance should immediately notify our customers of the degradation problems we are experiencing with Ultima armor.  Second Chance should clarify this issue with major customers that have placed orders and after clarification, cancel orders if requested.  Second Chance should make the right difficult decisions regarding this issue.  Lives and our credibility are at stake. You should cease all bonuses' etc. to keep funds within the company.  We will only prevail if we do the right things and not hesitate.  This issue should not be hidden for obvious safety issues and because of future litigation.**

116.   In spite of Relator Westrick's repeated efforts to persuade the management of SCBA to publicize the problems that had surfaced regarding Zylon-type armor degradation, the management of SCBA refused to inform its customers of the degradation problems in its Zylon ® vests.

117.   On December 20, 2001 Mr. Davis issued a revised letter to Mr. Nojima of Toyobo recapping the December 13, 2001 meeting, proposing temporary solutions to the Zylon degradation problem, and reiterating SCBA's requests that Toyobo remedy the problems in SCBA's Zylon ® armor immediately.

118.   Toyobo responded to SCBA by stating that Toyobo was not responsible for the problems of accelerated degradation in SCBA's Zylon-type body armor.

119.   Toyobo also informed SCBA that it had disclosed the problem of Zylon ® degradation when Toyobo and SCBA had first entered their business agreement for the supply of Zylon ®

21

material in 1998.  Furthermore, Toyobo stated that it had informed SCBA that because it was not a producer of ballistic end products, it was not in a position to guarantee that SCBA's Zylon ® end products would not experience accelerated degradation, and that SCBA would bear any risk involved in its continued use of Zylon ® in the manufacture of its body armor end products as early as 1998, when it first began to supply Zylon ® for use in body armor end products.

120.  Toyobo continued to send SCBA quarterly updates on its research on the subject of Zylon ® degradation throughout 2002 and 2003.  The quarterly updates confirmed that the Zylon ® fiber lost its tensile strength rapidly when exposed to heat and moisture.

121.  In late 2001/early 2002 SCBA discontinued its longstanding practice of performing ballistics testing on samples of the Zylon ® fabric sent to SCBA by fabric weavers for use in SCBA's bullet proof vest end products.

122.  These tests were discontinued in bad faith, and were part of an effort by SCBA to eliminate documentation of the Zylon failures for which they knew existed.

123.  Although it discontinued ballistics testing of the raw Zylon ® fabric used in its Zylon-type "soft" body armor, SCBA continues to perform ballistics testing on the raw materials used in its "hard" body armor.

124.  SCBA was motivated, in whole or in part,  to stop its practice of performing ballistics testing on the raw Zylon ® fabric used in its Zylon-type vests because of company concerns related to the abnormal failure rates of the testing samples.

125.  Relator Westrick continued to press Mr. Davis and other management officials within SCBA to continue research on the issue of Zylon ® degradation through the end of 2001 and into

2002.

126. Ultimately, Mr. Davis agreed that academic research on the problem of accelerated degradation of Zylon ® body armor should be conducted.

127. Due to the fact that Relator Westrick's sister worked as a chemist at Lake Superior State University, Relator Westrick determined that the academic study on Zylon ® degradation could be performed by his sister, Dr. Judy Westrick, at Lake Superior State University for a fraction of the cost of performing the same study elsewhere.

128. Mr. Davis agreed with this conclusion, and consented to allowing Dr. Judy Westrick to perform a study on the accelerated degradation of Zylon ® at Lake Superior State University.

129. Lake Superior State University's attorneys drafted the contract for Dr. Judy Westrick's research project.

130. During the negotiation of this contract both SCBA and Lake Superior State University were fully aware of Relator Westrick's relation to Dr. Judy Westrick. Neither Relator Westrick nor Dr. Judy Westrick in any way attempted to conceal their relation; nor did they mislead SCBA or Lake Superior State University as to the nature of their relation.

131. At the time that the contract was signed neither SCBA nor Lake Superior State University objected to entering the contract on the grounds that Dr. Judy Westrick was the sister of Relator Westrick.

132. Jim Young, J.D., a member of SCBA's Board of Directors and an attorney for SCBA, reviewed the contract drafted by Lake Superior State University's attorneys and made such additions and alterations to the agreement as were deemed necessary by SCBA.

133. Ultimately, in late March of 2002, Mr. Davis and Robert Arbuckle, President of Lake

Superior State University, signed the final contract agreement between SCBA and Lake Superior State University pursuant to which Dr. Judy Westrick would perform a research study on the problem of accelerated degradation of Zylon ®.

134.   On April 3, 2002, Toyobo released a brief report containing additional results of its accelerated degradation tests on the Zylon ® fabric to SCBA.  The data contained in the report released by Toyobo demonstrated that the Zylon ® fiber degraded at abnormally high rates when exposed to heat and moisture.

135.   On or around May 29, 2002, in a meeting with representatives from Dupont, Mr. Bachner falsely informed the representatives of Dupont that SCBA had determined that accelerated degradation of the Zylon ® fabric was not a problem that required SCBA's immediate attention and that SCBA saw no need for testing the material.

136.   On July 10, 2002, Dr. Judy Westrick of Lake Superior State University completed her preliminary study of the accelerated degradation of Zylon ® in accordance with the contract between Lake Superior State University and SCBA.  On this date Dr. Judy Westrick also issued a draft report containing the findings of her preliminary research and recommending certain avenues of future research that would shed light on the question of Zylon ® degradation.

137.   Dr. Judy Westrick's preliminary study analyzed data published by Toyobo regarding the accelerated aging of the Zylon ® material under conditions of high heat and/or humidity.

138.   In the draft report of Dr. Judy Westrick's 2002 study, Dr. Westrick described the testing procedures used by Toyobo in its 2001 study on the issue of accelerated degradation of Zylon ® fiber.

139.   Dr. Westrick noted that given the data released by Toyobo, high humidity and temperature appeared to degrade the Zylon ® material at a much faster rate than normal conditions.  Dr. Westrick's study notes in particular that over a 40 day time interval, the materials held under milder conditions, 80 C and 0% humidity, and 40 C with 80% humidity appeared to retain only 93-95% of their strength.  Dr. Westrick then pointed out that if the 40 day experiment was extrapolated to 5 to 10 years, the Zylon ® material would have degraded by roughly 15%.  This represented an abnormally high rate of degradation.

140.   Dr. Westrick's draft of the study then mentions that one potential reason for Zylon's ® accelerated degradation was because of a process called hydrolysis.  Hydrolysis occurs where water and a portion of the Zylon molecule react to break the polymer chain of the Zylon ® material.  Dr. Westrick noted that such a change in the physical characteristic of the Zylon polymer could have resulted in the decreased fiber strength noted in the Toyobo study of 2001.

141.   In conclusion, Dr. Westrick's study noted that for hydrolysis to occur, there was likely an acid catalyst present in the Zylon ® fibers, and that the presence of such an acid catalyst was likely due to a quality control problem in the production of the body armor end products.

142.   Dr. Judy Westrick also noted that a preliminary review of the available information on the different forms of Zylon ® fibers indicated that the HM and HM+ Zylon fibers were less susceptible to degradation than the AS Zylon fibers.  Dr. Westrick then suggested that SCBA investigate the possibility of constructing its bullet proof vests from HM and HM+ Zylon.

143.   Dr. Westrick then proposed that additional research be performed by Lake Superior State University, in conjunction with individuals at the University of Kentucky, to follow up on

the question of accelerated degradation of Zylon ® body armor.  Dr. Westrick proposed that

SCBA perform a series of tests on the fibers of its vests under a variety of conditions so as

to measure changes in the Zylon ® fiber's strength, strain, modulus and density under each

set of conditions.  Dr. Westrick first proposed that a control group be established in order to

measure the new Zylon ® fiber's strength, strain, modulus, and density.  The control group

would be established by testing new fibers that have only been exposed to room temperature

and low humidity.  Once a control group had been established, Dr. Westrick proposed that

old fibers exposed to three sets of environmental conditions be tested.  The first group of old

fibers (preferably at least 3 years old) would have only been exposed to room temperatures

and low humidity.  The second group were to be drawn from body armor that had been worn

by persons living in an area where the climate is temperate.  The third group was to be drawn

from vests worn by persons living in hot and humid areas, such as Florida or California.

144.    Anticipating SCBA's approval of additional research on the subject of Zylon ® degradation,

Dr. Westrick began to test both old and new SCBA Zylon-type vests and the individual

Zylon ® fibers from such vests for signs of advanced degradation.  Dr. Westrick compiled

data from these tests, indicating that the Zylon ® fibers as well as the Zylon-type body armor

were experiencing noticeably advanced degradation due to heat and humidity.

145.    Before Dr. Westrick or Relator Westrick had the opportunity to run statistical analyses of the

data compiled in Dr. Westrick's second study, however, SCBA's executive committee

terminated all future funding for any further research on this matter.

146.    Additionally, when Relator Westrick attempted to raise the findings of the Lake Superior

State University research with Mr. Bachner he was harshly criticized and threatened by Mr.

Bachner and other SCBA upper management officials.

147.   On or about July 28-29, 2002 Mr. Davis provided Relator with a memorandum he intended on providing individually to SCBA's Executive Committee members  concerning the Zylon ® degradation issue.

148.   This document reflected, in large part, some of the concerns Relator had raised with Mr. Davis prior to July 29th, but did not cover all of the issues and did not fully address the facts which demonstrated that SCBA's product was deficient and could not perform as warranted or required.  However, the document was drafted in such a manner as to provide clear guidance to the Executive Committee that prompt corrective action needed to be taken.

149.   On July 29, 2002, after discussing the memorandum with Relator, Mr. Davis provided the memorandum individually to every member of the Executive Committee.  Relator personally saw Mr. Davis provide the memorandum to two members of the committee.

150.   In relevant part, the memorandum stated as follows:

**Second Chance Body Armor is currently facing two problems: (1)  Zylon ® seems to be degrading much faster than Twaron ® or Kevlar ®. . . .**

**Possible Solutions**

*Solution #1)* **We continue operating as though nothing is wrong until one of our customers is killed or wounded . . . .**

**Downfalls) Either a Law Enforcement Officer will be killed wearing one of our vests, or an involuntary exposure will lead to gross exaggeration.  In either case, we will be forced to make excuses as to why we didn't recognize and correct the problem . . .**

> How many of us are willing to sign the following statement: *"I the undersigned, knowing full well about the problems with Zylon ® and Level 2A vests want to continue to produce and sell Level 2A vests, and 100%   Zylon ® vests to unsuspecting American Law Enforcement Officers, without telling them about these problems?"*
>
> **Solution # 2) We publish and circulate an ad denouncing all 2A vests and decline to make them anymore . . .**

151.    Shortly after this memorandum was distributed to SCBA management officials, Mr. Young ordered that it be collected from all SCBA officials who received copies and destroyed. The destruction of this document included going into the computer in which the document was drafted and erasing the document from the hard drive of the computer.

152.    Relator saved a copy of this document.

153.    In the July 29, 2002 letter, Mr. Davis proposes two solutions to the Zylon ® degradation problem.  The first solution proposed by Mr. Davis is that SCBA could continue on the path it had adopted since it first became aware of the Zylon ® degradation problem and "continue operating as though nothing is wrong until one of our customers is killed or wounded."  The second proposed solution is that SCBA discontinue the manufacture of Level 2 and 2A Zylon ® vests, and fill all future Level 2 and 2A Zylon ® vest orders with "Bi-Flex" Level 2 vests (composite vests consisting of 18 layers of Zylon ® material and 12 levels of Twaron, a similar ballistic material less susceptible to accelerated degradation).

154.    In this July 29, 2002 letter Mr. Davis admits knowing that the Zylon ® vests appeared to be degrading at a rate of 4% per year, whereas Kevlar and Twaron (competing ballistic

materials) were degrading at a rate of less than 1% per year.

155. Mr. Davis went on to admit, in this same letter, that given the average rate of degradation of the Zylon ® vests SCBA's Level 2A vests would fall well below acceptable standards for field use in less than 5 years.

156. Upon presenting this letter to the members of SCBA's executive board, including Mr. Young, Mr. Davis was harshly criticized for documenting his concerns on paper.  Shortly after Mr. Davis presented this letter to SCBA's Executive Board, in an effort to conceal the statements contained in this letter, Mr. Young collected all existing copies of the letter of which he was aware and destroyed them.  Relator personally witnessed the documents being shredded.

157. The recommendations in the memorandum were never followed, the recommended notifications were never given and the potential threat to human life was not acted upon by the Company.

158. In early August of 2002 Relator Westrick and Dr. Judy Westrick were informed that SCBA's Executive Committee would not support any additional research on the issue of Zylon ® degradation.

159. The reason for the Executive Committee's decision not to pursue any future research on the issue of Zylon ® degradation was the fact that the studies conducted by Toyobo, SCBA, and Dr. Westrick in 2001 and 2002 had all returned unfavorable results.

160. On or around early August of 2002, members of SCBA's upper management and Executive Committee began to deny any knowledge of Dr. Westrick's study on Zylon ® or SCBA's agreement with Lake Superior State University to perform research on this matter.

161.   On August 15, 2002 Karen McCraney e-mailed Relator Westrick falsely claiming that she had no knowledge of the fact that SCBA and Lake Superior State University had entered a formal contract to perform academic research on the issue of accelerated degradation of Zylon ®.

162.   From August 2002 through February of 2003 Relator Westrick repeatedly attempted to solicit the opinions of SCBA officials on the draft report on Zylon ® degradation prepared by Lake Superior State University.  Relator Westrick also continued to question these officials as to whether additional research would be performed to "follow up" on the 2002 Lake Superior State University study.  In response to his repeated inquiries on these matters Relator Westrick was informed that the Executive Committee of SCBA would not support additional research and that Relator Westrick was to cease analyzing data from the Lake Superior State University studies.

163.   In mid to late August of 2002 Relator Westrick was informed that the Executive Committee of SCBA, at the request of Mr. Davis, was interested in sending the Lake Superior State University draft report to officials at Toyobo to solicit their opinion and cooperation in further research on the issue of Zylon ® degradation.

164.   However, on August 26, 2002, Mr. Young informed Relator Westrick via e-mail that the Executive Committee would not in fact send the report produced in the Lake Superior State University study to Toyobo, nor would it support any further research on the matter of Zylon ® degradation.

165.   On or around September 4, 2002 Mr. Davis prepared a memorandum on the question of Zylon's ® durability.  The memorandum admits that accelerated ageing studies of Zylon ®

at high temperatures and humidity levels indicated that it may lose strength faster over time than competing products.

166.   This memorandum was written by Mr. Davis with the intent of distributing it to SCBA's Zylon-type armor dealers at a Regional Sales Meeting for SCBA, for purposes of discussing the issue of Zylon's ® apparent accelerated degradation.

167.   The memorandum was, however, not discussed at the Regional Sales Meeting.  Instead the Executive Committee of SCBA, acting through Paul Banducci, directed that all copies of the memorandum be collected from the individuals who had received it.  Once the copies of the memorandum were collected, Mr. Banducci directed that they be discarded.

168.   On September 5, 2002 Relator Westrick informed Mr. Banducci that Dr. Judy Westrick of Lake Superior State University had conducted a follow up study on the issue of the possible accelerated degradation of the Zylon ® fabric in coordination with the University of Kentucky.

169.   The data obtained during the course of this study demonstrated that the Zylon ® fabric was experiencing accelerated degradation.

170.   Relator Westrick then made repeated attempts to obtain permission from Mr. Banducci to have the data analyzed.  Relator Westrick's efforts to raise this issue were, however, ignored by Mr. Banducci.

171.   On October 11, 2002, Relator Westrick twice e-mailed Mr. Young requesting that SCBA analyze the data returned from Dr. Judy Westrick's follow up research on the question of Zylon ® degradation.  Relator Westrick included printable forms containing this data as attachments to these e-mails.

172.   Despite his repeated efforts to obtain permission to analyze the data returned by Dr. Westrick's follow up study on Zylon ® degradation, Relator Westrick received no response regarding this matter from either Mr. Young or Mr. Banducci for several months.

173.   On January 16, 2003 Relator Westrick again contacted Mr. Young to inquire whether SCBA intended to follow up on the data returned from the follow up research to Dr. Judy Westrick's preliminary research on Zylon ® degradation.

174.   On January 17, 2003 Relator Westrick was informed by Mr. Young that this data had not ever been discussed by SCBA's Executive Committee.

175.   On February 5, 2003 Relator Westrick was called into a meeting in Paul Banducci's office. In attendance were Mr. Davis, Mr. Young, Paul Banducci, and Relator Westrick.  In the course of this meeting Relator Westrick was told not to talk to individuals outside of SCBA regarding the Zylon ® degradation problem.

176.   In the February 5, 2003 meeting Relator Westrick complained that he had been refused access to data from SCBA's September, 2001 study on Zylon ® degradation, and that he had otherwise been restricted from participating in SCBA's investigation of the Zylon ® degradation issue.  In response Mr. Banducci informed Relator Westrick that if he were given access to the data he requested, Relator Westrick would become a liability to SCBA.

177.   Relator Westrick also complained, in a February 5, 2003 Memo, of threats he had received from Mr. Bachner and other SCBA management officials related to his investigation of the Zylon ® degradation problem.

178.   In spite of his complaints, Relator Westrick continued to receive threats from members of SCBA's upper management.

179.    In retaliation for his continued efforts to bring to light potential problems with SCBA's Zylon-type armor related to the accelerated degradation of Zylon ®, Relator Westrick was removed as Director of Research and Composite Development for SCBA's "soft" body armor, and was placed in the position of Director of Research-Composite Development for SCBA's "hard" body armor products.  By removing Relator Westrick his former position, SCBA attempted to limit Relator's "research" duties to exclude research related to "soft" body armor, and effectively prevented Relator Westrick from having any company sanctioned access to new data on the issue of Zylon ® degradation.

180.    Members of SCBA's upper management also continued to block Relator Westrick's access to company data on the issue of Zylon ® degradation.

181.    SCBA's Executive Committee began moving forward with a plan to transform SCBA from a privately held company into a publically traded corporation in April and May of 2003.

182.    During the Spring of 2003, Relator Westrick was informed by Mr. Davis that SCBA's Executive Committee had established a plan of action for SCBA in the event that one of its Zylon-type vests was penetrated.

183.    Relator Westrick was informed by Mr. Davis that the SCBA Executive Committee's plan for addressing any questions related to a Zylon-type vest failure was to shift the subject of the investigation from the quality of the vest to ballistics variables, including the type of bullet used in the shooting.

184.    Relator Westrick was informed by Mr. Davis, prior to his removal as SCBA's president, that SCBA's Executive Committee intended to address the Zylon ® degradation issue after it had succeeded in transforming the company into a publicly traded corporation and sold off the

33

company's stock at a substantial profit.

185.   As part of the efforts of the Executive Committee to transform SCBA into a publically traded corporation, Mr. Davis was replaced as company president by Paul Banducci in June of 2003.

186.   On June 13, 2003 Officer Zappatello of the Oceanside, CA Police Department was shot through a Zylon ® vest supplied by SCBA and died from his wounds.  Subsequent analysis indicated that the vest, if properly functioning should have stopped the bullet.

187.   On or around June 24, 2003 Officer Limbacher of the Pittsburgh, PA Police Department was shot through another Zylon-type vest issued by SCBA.  Officer Limbacher was severely wounded in the shooting.

188.   The harassment of Relator Westrick by individuals within SCBA continued through the Fall of 2003.  On September 22, 2003, Relator Westrick sent an e-mail to Mark Pickett, Paul Banducci, and Karla Michanowicz complaining of repeated incidents of harassment and intimidation at the hands of Larry McCraney.

189.   On October 10, 2003 Toyobo sent a letter regarding its most recent findings in its ongoing Zylon ® degradation studies, to its customers within the body armor industry, including SCBA.  This letter and the attachments thereto clearly demonstrate that the Zylon ® fabric was degrading at an alarmingly fast rate.

190.   In response to this disclosure by Toyobo, SCBA issued a press release dated October 22, 2003, in which it made public the information disclosed to SCBA by Toyobo in its October 10 letter.

191.   On October 31, 2003 Relator Westrick contacted Detective A.J. Dolizak of the Oceanside

Police Department.  Officer Dolizak was at the time leading the investigation of Officer Zappatello's murder.  Relator Westrick informed Detective Dolizak of his belief that the degradation of the Zylon ® material in Officer Zappatello's SCBA issued body armor may have been responsible for the failure of his body armor to stop the bullet that fatally wounded him.

192.    On November 7, 2003, Relator Westrick contacted Sandy Wilkinson (a Senate Judiciary Committee lawyer working for Senator Leahy) and informed her of his belief that the two recent police shootings were directly related to SCBA's efforts to conceal the problems of accelerated degradation of its Zylon-type soft body armor.

193.    The harassment of Relator Westrick by officials within SCBA has continued through the present.  Relator Westrick has repeatedly been questioned by officials within SCBA about his discussions with individuals outside of SCBA regarding the Zylon ® degradation problem.  Additionally, Relator Westrick has been falsely accused by individuals within SCBA of giving company secrets to competitors.

194.    Because of SCBA actions, Relator Westrick has suffered special damages, including, but not limited to,  significant financial, reputational, and emotional damages and physical injury.

195.    Relator Westrick believes that public disclosure, as defined under 31 U.S.C. § 3730(e)(3) and 31 U.S.C. § 3730(e)(4)(A) of the Federal Claims Act, has occurred.

196.    Relator Westrick is the original source of such public disclosure in that he was the primary witness and reporter of the fraudulent actions of SCBA.  Additionally Relator Westrick is the original source as to the violations of the FCA committed by Toyobo in that he is the first individual to disclose Toyobo's affirmative knowledge of the fact that the Zylon it supplied

35

to SCBA for use in its body armor products was so defective in nature that SCBA's body armor products could not meet the terms of the warranty under which they were sold to state and federal agencies within the U.S.

## COUNT I

197.  Relator Westrick incorporates by referencing paragraphs 1 through 196, inclusive, and all allegations contained therein.

198.  Defendant SCBA knowingly made and caused to be made false statements and false representations to the United States Government concerning the ballistic capabilities of its Zylon-type body armor.

199.  Beginning on July 5, 2001, when SCBA was first informed by Toyobo of the phenomenon of the accelerated degradation of the Zylon ® fiber, SCBA was aware of such facts as would lead a reasonable person to conclude that SCBA's Zylon-type body armor might be susceptible to accelerated degradation.

200.  The results of Toyobo's additional studies on Zylon ® degradation together with those of SCBA and Relator Westrick's own research studies on this matter confirmed the fact that the Zylon ® fiber was experiencing accelerated degradation, and further confirmed that the Zylon-type vests were experiencing accelerated V-50 degradation.

201.  SCBA expressly warrantied that the Zylon ® inner protective panels to its body armor would meet ballistics requirements for a period of 5 years.

202.  The results of the Toyobo and SCBA accelerated ageing tests demonstrated that SCBA's Zylon-type vests could not meet the terms of this warranty.

203.  SCBA was therefore aware of the fact that their Zylon-type body armor was incapable of

meeting the terms of the express warranty under which it was sold.  Nevertheless, SCBA continued to sell its Zylon-type body armor to federal, state and local police departments.

204. Under the Bullet Proof Vest Partnership Grant Act, the Federal Government of the United States issued grants to federal, state and local police agencies to reimburse these agencies for up to 50% of the costs of supplying their officers with body armor.

205. By knowingly selling body armor that did not meet the terms of its express warranty to federal, state and local police agencies, SCBA succeeded in obtaining fraudulent payments of moneys from the Government of the United States under the grant program established by the Bullet Proof Vest Partnership Grant Act.

206. Defendant SCBA breached the warranty of merchantability on its contracts to provide body armor to federal, state and local police departments.

207. Under the U.C.C. § 2-314, a warranty of merchantability is implied in every sale made by a merchant seller, where the sale in question involves goods of the kind normally sold by the merchant in the course of its business.

208. The implied warranty of merchantability requires that the goods protected pursuant thereto be fit for the ordinary purposes for which goods of that type are used, and that such goods conform to any promises or affirmations of fact made on their container or labels attached thereto.

209. Defendant SCBA is a merchant within the meaning of U.C.C. § 2-314, because it holds itself out as having expertise in the design and construction of tactical body armor, and is regularly engaged in the business of dealing in tactical body armor products.

210. The Zylon-type body armor to which the implied warranty of merchantability attached falls

within the sphere of goods as to which SCBA is a merchant.

211. The Zylon-type armor sold to federal, state and local police agencies by SCBA breached the implied warranty of merchantability because it (1) did not conform to the promises and affirmations of fact contained on the express warranty cards attached thereto, (2) was not fit for the ordinary purposes for which tactical body armor is used, and (3) was unreasonably dangerous to its users in light of the problem of Zylon's ® accelerated rate of degradation.

212. By breaching the warranty of merchantability on its contracts to provide body armor to state and local police departments Defendant SCBA succeeded in obtaining fraudulent payments of moneys from the Government of the United States under the grant system created by the Bullet Proof Vest Partnership Act.

213. Defendant SCBA, by and through its officers, agents, and employees authorized its various officers, agents and employees to take the actions set forth above.

214. The United States Government is entitled to all damages stemming from Defendant's material breach of contract.

215. As set forth in the preceding paragraphs, Defendant SCBA has knowingly violated 31 U.S.C. § 3729 and has thereby damaged the United States Government by its actions in an amount to be determined at trial.

**COUNT II**

216. Relator Westrick incorporates by referencing paragraphs 1 through 216, inclusive, and all allegations contained therein.

217. Relator Westrick's actions in attempting to pursue the investigation of the problem of accelerated degradation of Zylon, and attempting to warn SCBA management and its

customers of the potential problems posed by this accelerated degradation were lawful acts done by Relator Westrick in furtherance of an action under Section 3730 of the False Claims Act.

218.   Defendant SCBA engaged in unlawful discrimination by subjecting Relator Westrick to a hostile working environment, by removing him from the company's investigation of the Zylon degradation issue, and by removing him from his position as Director of Research and Composite Development.

219.   Defendant's actions set forth above violate 31 U.S.C. § 3730(h) and have damaged Relator Westrick in amount to be determined at trial.

## COUNT III

220.   Relator Westrick incorporates by referencing paragraphs 1 through 216, inclusive, and all allegations contained therein.

221.   At all times relevant to the instant action, Toyobo was aware that SCBA's Zylon vests would be sold to State and Federal Government Police agencies.

222.    On or around the week of December 13, 2001 officials of SCBA met with representatives of Toyobo in Los Angeles.

223.   During the course of this meeting SCBA officials informed the representatives of Toyobo that the AS Zylon used in SCBA's bullet proof vests was subject to accelerated degradation, and further informed the representatives of Toyobo that due to the accelerated rate of degradation of the AS Zylon, SCBA's vests would not meet the requirements of the warranty under which they were sold.

224.   Additionally, SCBA informed Toyobo that Toyobo would have to expend over $8,000,000

to remedy the problems caused by the accelerated rate of degradation of its AS Zylon.

225.  On information and belief, Toyobo subsequently refused to take any corrective action with regard to the problem of the accelerated degradation of AS Zylon.

226.  In response to Toyobo's failure to take action with regard to the accelerated degradation of AS Zylon, Richard Davis (then President of SCBA) drafted a December 20, 2001 letter to a Mr. Nojima of Toyobo Co. LTD.  In this letter, Mr. Davis informed Mr. Nojima that, given the accelerated rate of degradation of the AS Zylon fiber, SCBA's Zylon body armor products could not meet the terms of the five year warranty under which they were sold.

227.  Toyobo was, as of December 20, 2001 aware of the fact that the AS Zylon fiber, which it supplied to SCBA for use in body armor, was susceptible to accelerated degradation, and was therefore not suitable for use in SCBA's body armor end-products.  Toyobo was also aware, as of this date, that the body armor end-products in which its defective AS Zylon fiber was being used would not meet the terms of the warranty under which they were sold.

228.  Despite its awareness of these facts, Toyobo took no corrective action to remedy the problem of accelerated degradation of AS Zylon, and continued to sell its defective AS Zylon to SCBA for use in body armor end products purchased with monies from the United States Federal Government.

229.  By continuing to sell its defective AS Zylon to SCBA for use in body armor end products despite its knowledge of the fact that the defects in its AS Zylon prevented these body armor end products from meeting the terms of the warranty under which they were sold, Toyobo knowingly caused to be presented to an officer or employee of the United States Government or member of the Armed forces of the United States false or fraudulent claims for payment

or approval.

230. Defendant Toyobo's actions as set forth above violate 31 U.S.C. § 3729(a)(1).

231. Additionally, Toyobo's actions as set forth above violate 31 U.S.C. § 3729(a)(3).  By continuing to sell its defective AS Zylon to SCBA despite its knowledge of the fact that the defects in its AS Zylon prevented these body armor end products from meeting the terms of the warranty under which they were sold to the United States Government, Toyobo also conspired with SCBA to defraud the Government by getting false or fraudulent claims allowed or paid.

232. WHEREFORE, the Relator on behalf of himself and the United States Government prays:

(a) That this court enter a judgment against Defendants in and amount equal to three times the amount of damages the United States Government has sustained, plus a civil penalty of $5,000 to $10,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(b) That the Relator be awarded all costs incurred including reasonable attorney's fees;

(c) That in the event the United States Government continues to proceed with this action, the Relator be awarded an amount for bringing this action of at least 15% but not more than 30%, of the proceeds of the actions or settlement of the claims;

(d) That in the event that the United States Government does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil

penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds

of the action or settlement;

(e) That the Relator be awarded pre-judgment interest;

(f) All special damages, including, but not limited to, compensation for compensatory

 damages, compensation for physical injury, compensation for loss of reputation and double

damages for lost wages;

(g) That the United States Government and the Relator receive all relief both at law and at

equity, to which they may reasonably appear entitled.

Respectfully Submitted,

_____
Michael D. Kohn
DC Bar No. 425617
Stephen M. Kohn
DC Bar No. 411513
KOHN, KOHN, COLAPINTO, LLP
3233 P Street, NW
Washington, DC 20007
(Phone) 202-342-6980
(Fax) 202-342-6984

**JURY TRIAL DEMANDED**