## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel., AARON J. WESTRICK, PH.D., | ) ) ) | CV No. 04-0280 |
| Plaintiffs, | ) ) ) | Judge Richard W. Roberts |
| v. | ) ) ) | **AMENDED COMPLAINT OF THE UNITED STATES OF AMERICA** |
| SECOND CHANCE BODY ARMOR, INC.; SECOND CHANCE ARMOR, INC.; SECOND CHANCE SHIELD, INC.; SECOND CHANCE BODY ARMOR CANADA CO.; IAG MANUFACTURING, s.a.r.l.; SECOND CHANCE BODY ARMOR GmbH; SECOND CHANCE BODY ARMOR UK, LTD.; SECOND CHANCE INTERNATIONAL, INC.; TOYOBO CO., LTD; TOYOBO AMERICA, INC.; THOMAS EDWARD BACHNER, JR., RICHARD C. DAVIS; KAREN McCRANEY f/k/a KAREN DAVIS; and JAMES LARRY McCRANEY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 1   VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1); 2   VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2); 3   VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(3); 4   COMMON LAW FRAUD; 5   PAYMENT BY MISTAKE; 6   UNJUST ENRICHMENT; and 7   BREACH OF CONTRACT. |
| Defendants. | ) ) | |

Plaintiff, the United States of America, alleges as follows:

### OVERVIEW

1.     This is an action brought by the United States to recover damages and civil

penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, and to recover all available

damages for common law fraud, payment under mistake of fact, unjust enrichment, and breach of

contract.  All of these claims are premised upon the Defendants' false claims and statements

submitted or caused to be submitted in connection with the sale of defective Zylon body armor,

primarily ballistic "bulletproof" vests, to the United States and to state and local authorities

RECEIVED

SEP _ 2005

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

. funded in part with United States federal grant funds. The United States alleges that the

Defendants knew, within the meaning of the FCA, that the Zylon body armor was defective and

that the Zylon fabric of which the body armor was made degraded substantially more quickly

(and thus provided less protection to the wearer) than Defendants had represented, warranted

and/or were required by the contract specifications. As a result of the Defendants' conduct and

representations, the United States paid for defective Zylon body armor. Additionally, at least one

police officer, who was wearing a Second Chance Zylon bulletproof vest that was paid for in part

with federal funds, is now dead and a second police officer, whose Second Chance Zylon vest

was also paid for in part with federal funds, is permanently and seriously disabled.

### JURISDICTION

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 &

1331. The Defendants are doing and/or previously did business within this District.

### VENUE

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. §

3732(a). The Defendants are doing and/or previously did business within this District.

### PARTIES

### The United States of America

4.      The plaintiff is the United States of America. The United States brings this

lawsuit on behalf of its agencies, including, but not limited to, the Department of Justice

("DOJ"), the General Services Administration ("GSA"), the Department of Defense ("DoD"), the

Treasury Department, the Department of Homeland Security ("DHS"), and any other federal

agencies or divisions who purchased, or provided funds for the purchase of, ballistic vests made,

- in whole or in part, with Zylon from the Defendants.

5.     The Relator Aaron J. Westrick ("Westrick" or "Relator") filed his original *qui tam*

complaint under the FCA, in February, 2004.  The Relator filed an amended complaint in

August, 2004.  On June 1, 2005, the United States intervened in this case pursuant to 31 U.S.C. §

3730(a)(2) and filed its Complaint on or about July 1, 2005.  The United States' Complaint has

been served on all but one of the Defendants named in the July 1, 2005 Complaint.  In mid-April

2005, the Relator filed a second amended complaint under seal, which was deemed filed by this

Court on or about July 13, 2005.  Pursuant to 31 U.S.C. § 3730 (b), FED. R. Civ. P. 15,  the

Court's Order of June 28, 2005, and 11 U.S.C. § 362(b)(4), the United States hereby files its

amended complaint in the Relator's action.

## **The Defendants**

6:     Defendant Second Chance Body Armor, Inc. (SCBA) is a Michigan corporation

doing business in this District.  SCBA's last known business address is 7915 Cameron Street,

Central Lake, MI 49622.  On or about Sunday October 17, 2004, SCBA filed for the protection

of the bankruptcy court by submitting a petition pursuant to Chapter 11 of the Bankruptcy Code.

In re Second Chance Body Armor, Inc. (Bk. W.D. Mich. 04-12515).  On May 31, 2005, the

United States timely filed its proof of claim in that proceeding and, on July 1, 2005, the United

States will timely file a replacement proof of claim pursuant to the Bankruptcy Court's extension

of the bar date.  At all times relevant to this complaint, SCBA was the United States' largest

manufacturer of bulletproof vests.

7.     Defendant Second Chance Armor, Inc. (SCA) is a Michigan corporation doing

business in this District.  SCA's last known business address is 1501 West Magnolia, Geneva,

. AL 36340. SCA is a wholly owned subsidiary of SCBA.

8.      Defendant Second Chance Shield, Inc. ("SCS") is a Michigan corporation doing business in this District. SCS's last known business address is 404 Nash Road, New Bedford, MA 02746. SCS is a wholly-owned subsidiary of SCBA.

9.      Defendant Second Chance International, Inc. (SCI) is a Michigan corporation doing business in this District. SCI's last known business address is 7919 Cameron Street, Central Lake, MI 49622.

10.     Defendant Second Chance Body Armor Canada, Co.(SCBAC) is a Canadian corporation doing business in this District. SCBAC is located in Winnipeg, Canada. SCBAC is a wholly-owned subsidiary of SCBA.

11.     Defendant Second Chance Body Armor GmbH, (SCBAG) is a German corporation doing business in this District. SCBAG is located in Brandenburg, Germany. SCBAG is a wholly-owned subsidiary of SCBA. In or about January 2005, SCBAG became subject to a German receivership/bankruptcy proceeding for the sale of defective Zylon bulletproof vests to the German government.

12.     Defendant Second Chance Body Armor UK, Ltd. (SCBAUK) is a British corporation doing business in this District. SCBAUK is located in Glasgow, Scotland. SCBAUK is a wholly-owned subsidiary of SCBA.

13.     Defendant IAG Manufacturing s.a.r.l. (IAG) is a Moroccan corporation doing business in this District. IAG is located in Tangier, Morocco. IAG is a wholly-owned subsidiary of SCBA. Defendants SCBA, SCA, SCS, SCI, SCBAC, SCBAG, SCBAUK, and IAG will be referred to collectively as "Second Chance".

14.     Defendant Toyobo Co., Ltd. (Toyobo) is a Japanese corporation doing business in this District. Toyobo's last known business address is 2-8 Dojima-Hama 2-chome, Kita-ku, Osaka 530-8230, Japan.

15.     Defendant Toyobo America, Inc. (Toyobo-Am) is a New York corporation doing business in this District. On information and belief, the United States alleges that Toyobo-Am is a wholly owned subsidiary of Toyobo. Toyobo-Am's last known business address is 950 Third Avenue, 17th Floor, New York, NY 10022. Defendants Toyobo and Toyobo-Am will be referred to collectively as "Toyobo" or the "Toyobo Defendants."

16.     Defendant Thomas E. Bachner, Jr. a/k/a "Ed: Bachner is an individual who resides in the State of Michigan and who does business in this District. Bachner's last known address is 3020 Torch Point Lane, East Port, Michigan 49627. Since at least 1996, Bachner was an officer and director of Defendant SCBA and also served on the Executive Committe of SCBA.

17.     Defendant Richard C. Davis (Davis) is an individual who resides in the State of Michigan and who does business in this District. Davis' last known address is 7840 Darman Road, Central Lake, Michigan 49622. Since at least 1972, Davis was an officer and director of Defendant SCBA and also served on the Executive Committee of SCBA.

18.     Defendant James Larry McCraney (Larry McCraney) is an individual who resides in the State of Michigan and who does business in this District. Larry McCraney's last known address is 2320 North Intermediate Lake Road, Central Lake, Michigan 49622. Since at least 1996, Larry McCraney was an officer and director of Defendant SCBA and also served on the Executive Committee of SCBA.

19.     Defendant Karen McCraney f/k/a Karen Davis (Karen McCraney) is an individual

who resides in the State of Michigan and who does business in this District. Karen McCraney's last known address is 2320 North Intermediate Lake Road, Central Lake, Michigan 49622. Since at least 1996, Karen McCraney was an officer and director of Defendant SCBA and also served on the Executive Committee of SCBA.

### Alter Ego Relationships

20.   At all times relevant to the allegations herein, Defendants SCBA, SCA, SCS, SCI, SCBAC, SCBAG, SCBAUK, and IAG were acting as alter egos of each other and are jointly and severally liable in this action for each other's conduct. Second Chance created these separate legal entities, generally S corporations, and used them in connection with the manufacture and sale of Second Chance Zylon bulletproof vests. The United States anticipates that a reasonable opportunity for further investigation and discovery will establish that the purpose of this complex corporate organization was to insulate Second Chance and their principals, officers and shareholders from any scrutiny of their business decisions, practices, and assets.

21.   Defendant SCBA manufactured and sold Zylon body armor through SCA, SCS, SCI, SCBAC, SCBAG, SCBAUK, while dominating and controlling them, operating them in an integrated manner, and disregarding their separate corporate form. On information and belief, the United States alleges that these entities shared common ownership, board membership and management, as well as corporate, group and divisional resources to perform operational, administrative, manufacturing, and financial functions. SCBA precluded these entities from conducting business other than that which was directed by and in the interests of the ultimate owner, SCBA. SCBA operated these entities as mere shell corporations through which corporate directives flowed from SCBA to SCA, SCS, SCI, SCBAC, SCBAG, SCBAUK, and IAG, and

-6-

- profits and other revenue flowed between SCBA and SCA, SCS, SCI, SCBAC, SCBAG, SCBAUK, and IAG.

22.     At all times relevant to the allegations herein, Defendants Toyobo and Toyobo-Am were acting as alter egos of each other and are jointly and severally liable in this action for each other's conduct.  Toyobo created a separate legal entity, Toyobo-Am.  The United States anticipates that a reasonable opportunity for further investigation and discovery will establish that the purpose of this separate corporation was to insulate Toyobo, and its principals, officers and shareholders from any scrutiny of its business decisions and practices.

23.     Defendant Toyobo created separate corporate entities, including but not limited to Defendant Toyobo-Am, whereby Toyobo ultimately provided Zylon to Second Chance, while it dominated and controlled Toyobo-Am, operated Toyobo and Toyobo-Am in an integrated manner, and disregarded Toyobo-Am's corporate form.  On information and belief, the United States alleges that Toyobo and Toyobo-Am shared common ownership, board membership and management, as well as corporate, group and divisional resources to perform operational, administrative, manufacturing, and financial functions.  Toyobo precluded Toyobo-Am from. conducting business other than that which was directed by and in the interests of the ultimate owner, Toyobo.  Toyobo operated Toyobo-Am as a mere shell corporation through which corporate directives flowed to Toyobo-Am and profits and other revenue flowed from business operations to Toyobo.

## BACKGROUND

### A.     The False Claims Act

24.     The FCA provides, in pertinent part that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

* * *

is liable to the United States Government . . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

**B.    GSA Program**

25.    The General Services Administration (GSA) is an agency of the federal government with responsibility for administering the Multiple Award Schedule (MAS) contracting program (also known as the Federal Supply Schedule (FSS) program).

26.    Under the MAS program, GSA negotiates contracts for commonly used, commercial off-the-shelf items with contractors. Federal agencies can then purchase products under MAS contracts directly from contractors at pre-negotiated prices and terms and conditions. Products are grouped under predesignated Special Item Numbers (SINs) which connote broad categories of commercial products or services.

27.    The GSA Schedule included Second Chance Body Armor, Inc. From

-8-

approximately 1998, the United States Government purchased at least 40,549 Zylon bulletproof

vests from Second Chance pursuant to the supply schedule under Contract No. GS 07F-8799D,

including Tri-Flex, Bi-Flex, Simulite, and Ultima/Ultimax models of vests.  Second Chance

submitted at least 3,725 invoices to the United States seeking payment for these vests under the

GSA contract.  All Second Chance Zylon vests carried a five-year warranty.  By these actions,

Defendants knowingly caused all of these invoices for false claims to be presented.

## C.    The Federal Grant Program

28.    In late 1997, after two state troopers were killed, Congress created a grant

program called the Bullet Proof Vest Grant Partnership Act (BPVGPA), 42 U.S.C. § 3796ll, *et*

*seq.*  Under the BPVGPA, the United States reimburses state and local authorities up to fifty

percent of the cost of ballistic vests.  The exact amount local and state law enforcement agencies

are reimbursed for any specific vest varies based on the entitlement cap for each such agency for

that fiscal year.  The BPVGPA grant program is administered by a division of the Department of

Justice.

29.    Purchasers under the BPVGPA grant program included state and local law

enforcement agencies, as well as law enforcement agencies of Indian tribes.  Under the

applicable law, claims to the federal government for reimbursement by these purchasers could

not be made until after the vests had been received by them.

30.    From fiscal year 1999 to fiscal year 2004, Second Chance sold approximately

66,007 vests to state, local, and Indian law enforcement agencies and Indian tribes under the

BPVGPA.  The federal government reimbursed the local and state law enforcement agencies for

these Second Chance vests under the BPVGPA.  At least 10,253 claims for reimbursement for

Second Chance Zylon vests were submitted under the grant program during this time period. By these actions, Defendants knowingly caused all of these claims for reimbursement for false claims to be presented.

**D.     Other Federal Purchases**

31.     Other federal agencies purchased Zylon bulletproof vests directly from Second Chance or from Second Chance distributors. From approximately 1998 on, the federal government purchased approximately 11,455 Second Chance vests. The United States alleges that further investigation will identify additional Second Chance vests purchased by various Government agencies. By these actions, Defendants knowingly caused all of these invoices for false claims to be presented.

## THE DEFENDANTS' SCHEME

**A.     Toyobo and Second Chance Form A Partnership to Manufacture and Sell Zylon Body Armor**

32.     Beginning in about May 1996, Second Chance and Toyobo began what they referred to as a "partnership" to use Toyobo's synthetic PBO [Poly p-phenylene-2, 6-benzobisoxazole] fiber, commonly referred to as "Zylon," in bulletproof vests. Zylon is manufactured as continuous filament yarn which is converted into fabric by weaving or into resin by layering.

33.     From May 1996 until at least 2003, Second Chance and Toyobo were in frequent contact with each other, primarily by e-mail and facsimile transmissions. The primary point of contact with Toyobo for Second Chance was Bachner.

34.     On or about August 7, 1996, a representative of Toyobo came from Japan to

-10-

Second Chance's office in Michigan to discuss the suitability of Zylon for ballistic vests. On information and belief, the United States alleged that Bachner, Larry McCraney and Karen McCraney were present at all or some of these meetings.

35.     In or about September 1996, Second Chance and Toyobo entered into a confidentiality agreement to facilitate the exchange of information and fiber samples to evaluate the use of fibers in ballistic applications. Under this agreement, Toyobo had "sole discretion to select the composition, quantity and quality of fibers that it" supplied to Second Chance. By this agreement, Toyobo also prohibited for a period of time Second Chance from conducting any chemical analysis of Zylon fiber needed to determine any strength degradation.

36.     At the same time, at Toyobo' request, Second Chance introduced representatives of Toyobo to representatives of Hexcel Texas, a weaver of ballistic fabrics, located in Austin, Texas.

37.     During this development phase of Zylon body armor, Toyobo worked closely with Second Chance, Hexcel, and other weavers to design specifications to optimize weaves of Zylon fiber into ballistic fabrics.

38.     In December 1996, representatives of Toyobo, Second Chance and Hexcel met in Austin, Texas, to discuss the joint development of Zylon bullet proof vests. During this meeting, they discussed the need for ballistic testing of the fabric. Bachner attended this meeting on behalf of Second Chance.

39.     From 1996 on, Toyobo extolled the superiority of Zylon fiber properties, durability, "longer life cycle," and heat resistance, for use in body armor but made no mention of any fiber defects.

-11-

40.     In 1997, Second Chance began advertising its Ultima/Ultimax bulletproof vest as the "world's thinnest, lightest, and strongest armor" and as being 35% lighter and thinner than fourth-generation armor. Second Chance claimed that its Ultima/Ulitmax vests featured proprietary technology and fabric made from the world's strongest fiber, PBO Zylon.

41.     In September 1997, representatives of Toyobo Japan introduced Itochu International Trading in New York to both Second Chance and Hexcel. Itochu was to be Toyobo's Zylon distributor in the United States.

42.     In April 1998, Second Chance forwarded a draft of the critical materials specification for the Zylon fabric in its bullet proof vests to Toyobo and asked Toyobo to "fill in the blanks." Toyobo responded with input on the critical material standards. In July 1998, Second Chance faxed a revised critical material standard to Toyobo for comments and Bachner on behalf of Second Chance thanked Toyobo for its previous comments on the standard.

43.     Also in April 1998, Second Chance and Toyobo discussed Second Chance's ongoing ballistic testing of the Zylon bullet proof vests and fiber and Toyobo's participation therein.

44.     Due to the close relationship between the two companies, Toyobo's 1998 brochure for Zylon products featured a photograph of Relator Westrick, then an employee of Second Chance, in the bulletproof vest he had worn as a police officer. The photograph was furnished to Toyobo by Bachner on behalf of Second Chance.

**B.     Second Chance and Toyobo's Knowledge of Problems with Zylon Vests**

45.     In July 1998, Toyobo communicated to Second Chance that the exposure of Zylon to light resulted in strength loss, and forwarded the test results to Second Chance. This

-12-

· information was faxed to Bachner, whom the United States is informed and believes, distributed it to other Second Chance management.

46.    In August 1998, Toyobo informed Second Chance that the test results for the exposure of Zylon fabric to light were worse than expected. Toyobo claimed this degradation was due to yarn damage to the Zylon fabric during the weaving process.

47.    Toyobo expanded its production of Zylon fabric after completing construction of a multi-million dollar facility in Tsuruga, Japan. Commercial production of PBO Zylon fiber for use in body armor commenced October 1, 1998 at Toyobo's new Tsuruga Plant.

48.    In October 1998, representatives of Second Chance and Toyobo attended the International Association of Chiefs of Police Conference in Salt Lake City, Utah and promoted Zylon fabric and Second Chance vests.

49.    In late 1998, Second Chance began to sell Tri-flex, Bi-flex, Simulite, and Ultima/Ultimax vests to the federal government through direct contracts and the GSA supply schedule contract No. GS-07F-8799D. Second Chance provided a five-year warranty to the federal government for these Zylon vests. Each vest generally was priced at $528 through $704. None of the product care tags on the Zylon vests warned the purchaser or user not to expose the vest to light or humidity.

50.    In early December 1998, Second Chance informed Toyobo that the early market reaction to the Zylon vests was "unprecedented." Toyobo agreed that it would support Second Chance, and ultimately entered into a one-year exclusivity agreement, whereby only Second Chance could use Zylon in body armor sold to state and local law enforcement authorities in the United States. Bachner faxed this letter to Toyobo after his visit to Toyobo in Japan.

-13-

· **C.**     **Toyobo and Second Chance Engaged In A Conspiracy To Conceal Evidence of Zylon's Accelerated Degradation**

51.     On or about December 18, 1998, Toyobo informed Second Chance that Toyobo's preliminary testing showed that the strength of Zylon fiber began to deteriorate rapidly when exposed to visible and fluorescent light. Toyobo told Second Chance that there was a 23% degradation of Zylon fabric when exposed to a fluorescent lamp for over 200 hours. Toyobo faxed this material to Bachner and Second Chance.

52.     Second Chance responded to the information about the accelerated degradation of the Zylon fabric by telling Toyobo that they both "must avoid even the perception of a possible problem" with Zylon.

53.     From October 1998 until at least July 2001, Toyobo and Second Chance kept silent as to the ever-mounting information in their possession that the Zylon fabric degraded substantially faster than expected, especially when exposed to sunlight, elevated temperatures, and humidity. Despite this mounting evidence, Second Chance continued to manufacture and sell these Zylon bullet proof vests to the United States, made with Zylon provided by Toyobo, knowing that these vests were defective.

54.     During this period, Second Chance entered into contracts with the United States Government for the sale of ballistic Zylon vests, and with state, local, and Indian law enforcement agencies for the sale of Zylon vests that were reimbursed in part by the BPVGPA grant program. During this period, Second Chance and Toyobo knew that the vests that Second Chance was selling to the United States Government degraded when exposed to sunlight, elevated temperatures, and humidity but did not disclose this information to the United States

-14-

· Government.

55.    By letter dated July 4, 2001, Dutch State Mines (DSM), a German body armor manufacturer, informed Toyobo that it had determined that Zylon was not justified for use in bullet-resistant vests. Previously, DSM had submitted a bid to sell Zylon vests to the Bavarian police. DSM ultimately withdrew its bid, upon concluding that Zylon was not safe for use in body armor.

56.    Prior to July 5, 2001, a Zylon vest manufactured by Mehler, another German manufacturer, failed ballistic testing required by the Bavarian police. Despite learning of the failure of that Mehler Zylon vest, Second Chance and Toyobo made no disclosures to the United States Government concerning the large number of Second Chance Zylon vests that had been and were being sold to the United States.

57.    By letter dated July 5, 2001, Toyobo informed Second Chance and other body armor manufacturers that its internal testing of Zylon fibers indicated that there was a strength decrease of Zylon at elevated temperature and humidity. Toyobo recommended that Second Chance reconfirm its product designs to insure that they met customer requirements and to determine product lifetime. Additionally, Toyobo informed Second Chance that Toyobo provided no warranty and assumed no liability for Zylon fiber.

58.    By letter dated July 6, 2001, Toyobo informed Second Chance that DSM had decided to put on hold its market introduction of PBO fiber containing Zylon. Toyobo assured Second Chance that it had not found any serious indication of Zylon strength degradation from its aging tests using Zylon fiber, but stated that it assumed no liability for any use of Zylon fiber.

59.    On information and belief, the United States alleges that these Toyobo

· representations were misleading, as Toyobo knew that its Zylon manufacturing process may be

causing a loss of strength in Zylon.  Toyobo knew of this problem in 1998, before Second

Chance sold its first Zylon vest.  Additionally, Toyobo knew that exposure to light resulted in a

loss of strength in Zylon.

60.      On July 6, 2001, Second Chance issued a statement which contended that the

degradation tests on Zylon by Toyobo involved high temperatures and above normal use.

Therefore, Second Chance publicly reported that Toyobo's studies were not cause for concern.

Second Chance's statement was false and, due to the information provided to Second Chance by

Toyobo, Second Chance knew that this statement was false at the time it was made.  This

statement was prepared by Davis and Bachner.

61.      However, contrary to Second Chance's public statements about Zylon, Second

Chance internally was very concerned about the Zylon degradation.  On or about July 10, 2001,

Second Chance began collecting used Zylon vests for its own degradation studies.  Davis and

Bachner, executives of Second Chance, informed another Second Chance executive that the

degradation data from Toyobo was not favorable to Second Chance and that they were concerned

about accelerated degradation.

62.      On or about July 12, 2001, representatives of Second Chance and Toyobo met to

discuss the problems with the Bavarian police, the failure of the Mehler Zylon vest, and the

decrease in strength of Zylon.  During this meeting, Toyobo refused to accept any liability and

refused Second Chance's request that Toyobo provide Second Chance with a ten-year warranty.

Present at this meeting were Bachner, Davis, Larry McCraney and Karen McCraney.

**C.      Toyobo Released Information About the Degradation of Zylon, But Continued to**

**Sell Zylon to Second Chance for Use in Bullet Proof Vests.**

63.      On or about July 19, 2001, Toyobo released additional data that estimated a loss

of less than 5 percent strength by Zylon over 10 years at ambient temperatures and humidity and

a loss of less than 10 percent strength of Zylon at 40 degrees Celsius and 80 percent relative

humidity.  This data conflicted with the evidence in Toyobo and Second Chance's possession

concerning the degradation of Zylon when exposed to light and humidity.  Copies of this data

and the accompanying letter were provided by Toyobo to Bachner, Larry McCraney and Karen

McCraney.

64.      On or about August 2, 2001, management of Second Chance held an emergency

meeting of the Executive Committee concerning the degradation of Zylon vests.  During this

meeting, Second Chance's management discussed the problem and expressed a desire to get a

cheaper price on Zylon from Toyobo.  Thus, despite Second Chance's knowledge of the

degradation of Zylon, Second Chance sought to keep purchasing Zylon for use in its vests, but

wanted to reduce its materials costs for these vests.  Bachner, Davis, Larry McCraney and Karen

McCraney were members of Second Chance's Executive Committee and,  on information and

belief, the United States alleges that they attended this meeting.

65.      On or about August 7, 2001, Second Chance informed the Relator that a test on

Zylon vests used by Pennsylvania state troopers revealed that the Zylon fabric was degrading at a

rate of 2 to 5 percent per year.  Additionally, one such vest had lost 20 to 25 percent of its

strength.

**D.      Toyobo and Second Chance Further Their Conspiracy of Non-Disclosure**

66.      On or about August 8, 2001, Second Chance sought Toyobo's help in determining

-17-

the cause of any Zylon performance changes and proposing that Second Chance and Toyobo enter into a confidentiality agreement providing that any public announcement of Zylon studies be first agreed to by both companies. Second Chance noted that a large number of other manufacturers were "barking" about the Zylon problem and, if Toyobo did not respond to these attacks on Zylon, as stated in a Second Chance email, "the dogs would eat the golden rabbit."

67.     On or about August 20, 2001, Second Chance acknowledged to Toyobo that concerns by German vest manufacturers raised questions of the suitability of Zylon fiber for body armor. Second Chance cited to Toyobo's accelerated aging studies that indicated, under certain high temperature and humidity conditions beyond normal operating conditions, Zylon fiber lacked the same relative durability as other body armor fibers.

68.     At Second Chance's urging, Toyobo also gave assurances to Second Chance's Zylon vest customers in Germany that there was no cause for alarm by their procurement of Zylon vests.

69.     On or about August 24, 2001, Second Chance e-mailed Toyobo with additional information of the failure of the Mehler Zylon vest in Germany. Second Chance informed Toyobo that DSM had stated that the Zylon vest lost 20 percent of its strength. Second Chance informed Toyobo that there was 100 million in Marks in German business available, now that DSM had withdrawn its bid, and Second Chance was the only Zylon manufacturer poised to take that business. Second Chance ultimately obtained a contract to supply Zylon armor to the German government. Second Chance added two layer upgrades to the German body armor for fear of vest failure, but did nothing to add layer upgrades to body armor that it sold in the United States.

-18-

70.     On or about August 28, 2001, Toyobo reported to Zylon vest manufacturers, including Second Chance, test data that showed a significant degradation in Zylon strength in less than 100 days at high temperatures and humidity. However, Toyobo further stated that it "may be able to estimate less than 5% strength loss for 10 years at room temperature . . . . "

71.     Second Chance began its own V-50 testing of used vests after Toyobo indicated Zylon fibers deteriorated under extreme heat and humidity. V-50 testing is a statistical test using ten bullets that identifies a velocity at which a projectile has a fifty-percent chance of penetrating armor. Second Chance test results showed that some of the Zylon vests could not achieve their five-year warranty.

72.     In response, on or about August 28, 2001, Second Chance asked Toyobo for help in defining the causes of performance changes in Zylon over time and shipped nineteen Second Chance vests to Toyobo for evaluation. Second Chance informed Toyobo that while these issues were important, they were manageable. Additionally, Second Chance provided Toyobo with a more favorable interpretation of Toyobo's data and suggested that Toyobo had misread the data.

73.     Second Chance offered advice on how Toyobo should respond to the crisis – and was emphatic that Toyobo should never release any of this deterioration data to the public.

74.     On or about September 11, 2001, Second Chance's V-50 tests showed Zylon vests degrading at 3-9% per year, a rate of degradation that was three times that of non-Zylon vests. One of the vests had lost over 16 percent of its strength in over 2 years.

75.     On or about September 14, 2001, Toyobo published a technical bulletin describing Zylon properties under extreme conditions and announcing that there was a strength decrease up to 65% after six months in sunlight. Toyobo also announced that there was a 25-

· 35% loss of Zylon strength when Zylon was exposed to fluorescent lamps for several weeks, but failed to state that this 25-35% loss of Zylon strength had not occurred under extreme conditions.

76.     In an undated memorandum to Second Chance, Toyobo also stated that there was no relationship between loss of yarn strength and performance.  However, Toyobo was unable to explain how a twenty-percent drop in strength had no correlation to performance.  The United States alleges on information and belief that Second Chance's management had reason to suspect that Toyobo's statement about unaffected performance was not reliable.

77.     In November 2001, Toyobo's accelerated aging data showed a dramatic drop in Zylon fiber strength.

78.     On or about  November 26, 2001, Second Chance met with Toyobo representatives and convinced Toyobo not to disclose Zylon problems to the German police authorities. Bachner and Davis were present at this meeting on behalf of Second Chance.

79.     Prior to late November 2001, Second Chance management was informed that the Relator was gravely concerned with the possibility that customers could be killed due to faulty armor made of Zylon.

80.     On November 29, 2001, Second Chance's V-50 test results showed Zylon strength degradation at a rate of 9-13% over two years and that increased degradation occurred the longer the Zylon armor was worn.  The Relator recommended that Second Chance recall all vests made of Zylon and Davis initially agreed.

81.     On or about December 13, 2001, Second Chance and Toyobo met in Los Angeles for a  "Toyobo & Second Chance Zylon Crisis Management Meeting" to discuss the accelerated degradation of Zylon fiber.  Second Chance told Toyobo representatives that Toyobo and Second

Chance "must act together and immediately to deal properly with this <u>industry</u> problem." Toyobo and Second Chance agreed that "Partnership communications" by Toyobo and Second Chance to others concerning Zylon were to be "pre-emptive, consistent, coordinated, and confidence inspiring."

82.  Second Chance complained that Zylon degradation caused a reduced value of Zylon to its business and requested compensation from Toyobo. Later, Toyobo gave Second Chance a rebate worth $6 million.

83.  On or about December 18, 2001, Davis told the Relator that Toyobo and Second Chance testing showed that the average degradation for Zylon vests was 3-5% per year, and as high as 9% per year. Davis also told the Relator that Vice Presidents Karen and Larry McCraney, and much of the Second Chance management group, wanted to conceal Zylon problems until the following year when Second Chance planned to become a publicly-held company. Davis told the Relator that management did not want to conduct any recall of Zylon vests since 80,000 Ultima/Ultimax vests had already been sold and it would cost $20 million to recall them.

84.  On or about December 18, 2001, the Relator recommended to Davis that Second Chance immediately inform its customers of the Zylon degradation problems and cancel all pending orders for Zylon vests.

85.  By letter dated December 20, 2001, Second Chance asked Toyobo to remedy the inherent problems with Zylon and proposed a three-part solution to the Zylon problem consisting of: 1) the recertification of new re-engineered Ultima/Ultimax 2002 vests with 6 extra layers to insure that protection would last five years, 2) offering Ultima/Ultimax owners a warranty adjustment after three years at discounts greater than 50% to buy new re-engineered

-21-

Ultima/Ultimax 2002 vests, and 3) offering a pair of free six-layer upgrade pads in lieu of options 1 and 2. Second Chance stated that the Zylon problem was a "Toyobo problem" and that Zylon's failure to meet industry standards violated the warranty of merchantability. Second Chance stated that failing to take the foregoing steps would doom the Zylon product and that all other paths led to government interference and legal action. The letter communicating these requests to Toyobo was signed by Davis.

86.     On or about December 20, 2001, Toyobo e-mailed Larry McCraney of Second Chance and offered Second Chance a new volume discount program for Second Chance to promote Zylon. This "discount program" resulted in a $6 million payment to Second Chance.

87.     In January 2002, Toyobo retracted its November, 2001 data showing a dramatic drop in Zylon fiber strength.

88.     During a February 1, 2002 meeting at Osaka, Japan, Toyobo assured Second Chance representatives that Zylon fiber strength would not drop dramatically in further testing, but would level out. Toyobo sought to enhance its Zylon business relationship with Second Chance "more deeply than before" and "confirm [sic] to face and overcome difficulties with understanding and supporting [sic] each other." Toyobo also informed Second Chance that Toyobo was working on a fix to solve Zylon's "stability problem." Larry McCraney attended this meeting on behalf of Second Chance.

89.     On or about February 2, 2002, Toyobo also agreed to engage in a new $6,000,000 rebate program intended to help Second Chance resolve its problems with Zylon.

90.     By early 2002, Second Chance discontinued at least some ballistic testing on Zylon fabrics used in vests because the results were not favorable to Zylon, but continued to test

-22-

materials other than Zylon.

91.     On or about February 4, 2002, Second Chance signed a contract for the Relator's sister, Dr. Judy Westrick, a chemist at Lake Superior State University, to study accelerated degradation of Zylon.

92.     During 2002 and 2003, Toyobo provided Second Chance with quarterly updates on its Zylon research that confirmed Zylon fiber lost its tensile strength when exposed to heat and moisture.

93.     In a March 11, 2002 Zylon vest update session, Second Chance's Executive Committee was apprized that: (1) Zylon vests were wearing out at a 3.7%-per-year rate; (2) some of the Zylon vests would go out of express warranty before five years; 3) some vests were clearly leaving the implied warranty sooner than five years; (4) Second Chance believed that it was entering a failure to warn area, and 5) pro-active corrective action was essential. The United States alleges on information and belief that all members of Second Chance's Executive Committe, including but not limited to Larry McCraney and Karen McCraney, were present at this meeting and were provided with this information.

94.     In May 2002, Bachner told representatives of Dupont, an earlier developer of Zylon fiber, that Zylon acceleration degradation was not a problem.

95.     On July 10, 2002, preliminary results of the study funded by Second Chance at Lake Superior State University over 40 days showed that there was a high rate of degradation with a strength loss of 5-7%. After learning of the preliminary results, Second Chance cut off funding for further proposed testing. The United States alleges on information and belief that Larry McCraney and Karen McCraney were provided with a draft report which contained these

-23-

preliminary results.

96.     On July 28-29, 2002, Davis showed the Relator a memorandum that Davis had

prepared for Second Chance's Executive Committee that sought action to remedy the problems

with Zylon. The memorandum acknowledged that Zylon degraded 4 four times faster than other

body armor materials. The memorandum stated that one solution was "to do nothing" until a vest

customer was killed or wounded, or until Germany, Japan, or Dupont publicly exposed the Zylon

problem. The memorandum stated that a second solution was to denounce all Zylon vests and

decline to make them any more. The memorandum went on to ask if the Executive Committee

members were willing to sign the following statement:

> KNOWING FULL WELL ABOUT THE PROBLEMS WITH
> ZYLON AND LEVEL 2A VESTS [YOU] WANT TO CONTINUE
> TO PRODUCE AND SELL LEVEL 2A VESTS AND 100%
> ZYLON VESTS TO UNSUSPECTING AMERICAN LAW
> ENFORCEMENT OFFICERS, WITHOUT TELLING THEM
> ABOUT THESE PROBLEMS?

The United States alleges on information and belief that Bachner, Larry McCraney and Karen

McCraney, all members of Second Chance's Executive Committee, were provided with this

memorandum.

97.     The Davis memorandum further stated that Toyobo would not admit that it sold

Second Chance a semi-defective product and that Second Chance should take corrective action in

spite of Toyobo's dishonorable lack of corrective action. Though Second Chance executives

wanted all copies of this memorandum to be destroyed, the Relator retained a copy. The United

States alleges on information and belief that Bachner, Larry McCraney and Karen McCraney, all

members of Second Chance's Executive Committee, were provided with this memorandum.

98.     On or about August 15, 2002, Second Chance entered into a contact with the

-24-

- United States for the Internal Revenue Service of the Department of Treasury (contract GS-07F-
8799D, Order no. TIRNO-02-K-00320) for twelve ULTIMA Body Armor Vests (LEVEL II), K-
30 Armor plate, at $726.00 per vest (total $8,712).

99.     On or about September 4, 2002, Second Chance executive Paul Banducci objected
to, and ordered destroyed, another memorandum authored by Davis and intended for use at
regional sales meetings, that admitted that aging studies indicated that Zylon may lose strength
faster over time than competing products.

100.     In February 2003, Second Chance removed the Relator from work relating to
Zylon. Davis told the Relator that the Executive Committee planned to address the problems
with Zylon after Second Chance converted to a publicly-held company and sold its stock at a
profit.

101.     On or about June 13, 2003, Officer Zeppetella, of the Oceanside, CA police force,
was killed during a traffic stop while wearing a Second Chance vest made of Zylon. On
information and belief, the United States alleges that two bullets passed through the vest and
caused Officer Zeppetella's death. Also on information and belief, the United States alleges that
it paid for a portion of the purchase price of this vest through the BPVGPA grant program.

102.     Ten days later, on June 23, 2003, Officer Ed Limbacher of Forest Hills, PA was
shot in the stomach wearing a Second Chance Zylon vest made less than one year before. On
information and belief, the United States alleges that a bullet pierced his vest leaving him
disabled. Also on information and belief, the United States alleges that it paid for a portion of
the purchase price of this vest through the BPVGPA grant program.

103.     On July 8, 2003, subsequent testing of Zylon vests by Second Chance showed

-25-

Zylon performed inconsistently and suffered a marked loss of strength after use in field.

104.    In about July 2003, Second Chance stopped selling Ultima/Ultimax vests made of

Zylon, a decision a Second Chance spokesman stated was unrelated to any police officer

shooting.

105.    On or about September 8, 2003, Second Chance disclosed to purchasers of its

Ultima/Ultimax vests that Zylon vests wore out sooner than expected and that there was a

potential safety issue with respect to them.  Second Chance also initiated a program whereby

Zylon vest purchasers could receive a free "Performance Pac" upgrade to their previously-

purchased vests, or participate in a warranty adjustment and vest replacement program, at a

discount.

106.    On or about September 15, 2003, Second Chance issued a letter stating that the

early degradation of Zylon fiber was not predicted by anyone in the industry.  This letter was

signed by Davis and Paul Banducci, the President of Second Chance.  At the time when Second

Chance made this statement, Second Chance knew that this statement was false.

107.    On or about October 8, 2003, Second Chance's representatives told Toyobo that it

was "hard to be partners when things go bad."  Concerned with avoiding an outcome similar to

the then-highly publicized, ongoing Ford Motor Company and Firestone tires litigation and

recall, Second Chance made a last effort to act in concert with Toyobo, stating "We can't

conflict."  At the conclusion of the meeting, Toyobo disclosed to Second Chance that it had

conducted fiber strength tests on woven Zylon fabric beginning in 2001 that showed a greater and

more serious degradation than Toyobo's previously published data of unused Zylon fiber.  The

United States alleges on information and belief that Bachner attended this meeting on behalf of

-26-

Second Chance.

108.    On or about October 8, 2003 Second Chance issued a press release saying that Toyobo revealed new test results at manufacturers' meetings which started in February 2003, showing a significant loss of Zylon fiber strength.

109.    On or about October 10, 2003, Toyobo issued a statement stating, in part, that: (1) Toyobo did not know why Second Chance determined that its vests were inadequate; (2) other manufacturers had not reported problems with Zylon vests; (3) since 2001 it had been well understood in the industry that Zylon fiber might be susceptible to degradation under certain extreme temperatures and humidity for prolonged periods of continuous exposure; and (4) Toyobo's tests estimated aging performance of Zylon fiber, not actual ballistic performance of the final product.

110.    On or about October 22, 2003, Second Chance issued another press release which stated Second Chance met with Toyobo in October. Second Chance stated that Toyobo had made new disclosures to Second Chance in October concerning Toyobo's accelerated aging studies on Zylon fabric. The studies had been performed on Zylon manufactured in May 2000 and tested from June 2001 - July 2003 at Toyobo Research Center. The newly disclosed Toyobo research showed a 25% degradation of Zylon stored at at 104 degrees Fahrenheit and 80% relative humidity.

111.    In December, 2004, the National Institute of Justice issued a report that stated that Zylon can degrade and reduce safety margins and that Second Chance's upgrade kits ("Performance Pac" upgrade) were inadequate.

112.    In June, 2005, Second Chance issued a safety notice that stated that it was not

confident that its Tri-flex products, which contain up to 31 percent Zylon by weight, performed

to expectation for the life of their original warranty period. Second Chance stated that it believed

that "hydrolysis" was the failure mechanism that was a form of degradation that inherently

occurred in individual Zylon fibers. Second Chance called for the removal from service of its

Ultima/Ultimax vests, with enhanced "Performance Pac" protection.

## COUNT 1

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)
### AGAINST ALL DEFENDANTS

113.   The United States re-alleges and incorporates herein by reference paragraphs 1

through 112.

114.   All Defendants knowingly presented or caused to be presented false or fraudulent

claims to the United States for payment, in violation of the FCA, 31 U.S.C. § 3729 (a)(1).

Specifically, all Defendants presented or caused to be presented claims for payment under the

BPVGPA for Second Chance Zylon vests which Defendants knew, recklessly disregarded or

deliberately ignored were defective. Additionally, all Defendants presented or caused to be

presented claims for payment under the GSA FAS Schedule for Second Chance Zylon vests

which Defendants knew, recklessly disregarded or deliberately ignored were defective.

Moreover, all Defendants presented or caused to be presented additional false claims for payment

to the United States for purchases outside of the GSA contract for Second Chance Zylon vests

which Defendants knew, recklessly disregarded or deliberately ignored were defective. All of

these claims were knowingly false claims under the FCA.

115.   By virtue of these false or fraudulent claims, the United States suffered damages

in an amount to be determined at trial.

## COUNT 2
## VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2)
## AGAINST ALL DEFENDANTS

116. The United States re-alleges and incorporates herein by reference paragraphs 1 through 112.

117. All Defendants knowingly made or caused to be made false statements in order to get a false claim paid by the United States for payment, in violation of the FCA, 31 U.S.C. § 3729(a)(2). Specifically, all Defendants made or caused to be made false statements in connection with false claims for payment under the BPVGPA for Second Chance Zylon vests which Defendants knew, recklessly disregarded or deliberately ignored were defective. Additionally, all Defendants made or caused to be made false statements in connection with false claims for payment under the GSA FAS Schedule for Second Chance Zylon vests which Defendants knew, recklessly disregarded or deliberately ignored were defective. Moreover, all Defendants made or caused to be made false statements in connection with additional false claims for payment to the United States for purchases outside of the GSA contract for Second Chance Zylon vests which Defendants knew, recklessly disregarded or deliberately ignored were defective. All of these claims were knowingly false claims under the FCA.

118. By virtue of these false statements, the United States suffered damages in an amount to be determined at trial.

## COUNT 3

## VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(3)
## AGAINST ALL DEFENDANTS

119. The United States re-alleges and incorporates herein by reference paragraphs 1 through 112.

120.   All Defendants conspired to defraud the United States by getting false or

fraudulent claims paid by the United States, in violation of the FCA, 31 U.S.C. § 3729 (a)(3). As

more specifically alleged in paragraphs 29 through 110, Defendants engaged in a conspiracy to

manufacture and sell defective Second Chance Zylon vests with knowledge within the meaning

of the FCA that the Zylon fabric in these vests was defective.  Despite knowledge from

approximately 1998 on that the strength of the Zylon fabric in these vests degraded more quickly

than the Defendants had represented to the United States and local and state law enforcement,

Defendants agreed to  disclose the information about the Zylon fabric degradation and agreed to

continue to sell these vests.  From at least 1996, Toyobo acted in concert with Second Chance

knowing that Toyobo's provision of Zylon to Second Chance resulted in Second Chance selling

defective Zylon vests to the United States and state and local law enforcement agencies.  As part

of this conspiracy, Defendants presented and caused to be presented to the United States false

claims for Second Chance Zylon vests, and all such claims were knowingly false under the FCA.

121.   By virtue of this conspiracy, the United States suffered damages in an amount to

be determined at trial.

### COUNT 4

### COMMON LAW FRAUD
### AGAINST ALL DEFENDANTS

122.   The United States re-alleges and incorporates herein by reference paragraphs 1

through112.

123.   Defendants falsely represented that the Zylon vests, which were being paid for

either: (1) in whole by the United States through the GSA and other federal purchased, or (2) in

part by the United States under the BPVGPA, were "bulletproof" and would remain "bulletproof"

-30-

for five years

124. Defendants failed to inform the United States and the various state and local law enforcement agencies who received vests under the BPVGPA that the Zylon vests were defective. At the time when the defendants failed to make this disclosure, Defendants had a duty to disclose due to their superior knowledge and the life threatening nature of this defect.

125. These Defendants knew that their representations, both direct and implied, that the Second Chance Zylon vests complied with the contractual requirements and its warranties were false.

126. These misrepresentations were material.

127. Defendants knew that the United States would rely, and intended the United States to rely, on these false representations.

128. The United States justifiably relied upon these false representations and material omissions.

129. By virtue of Defendants' fraud, the United States suffered damages in an amount to be determined at trial.

130. The actions of Defendants in making these false representations and material omissions with the intent that the United States and its agencies would rely on these false representations and material omissions, was malicious, wanton, and reprehensible conduct. Therefore, punitive damages sufficient to punish and deter these Defendants should be assessed against these Defendants, in an amount to be established at trial.

## COUNT 5

### PAYMENT BY MISTAKE
### AGAINST DEFENDANT SECOND CHANCE

131.    The United States re-alleges and incorporates herein by reference paragraphs 1 through 112.

132.    For fiscal years 1998 – 2005, the United States made payments to Defendant Second Chance in the erroneous belief that this Defendant was entitled to reimbursement, without knowing that Defendant's claims were made as part of a scheme to sell the United States defective bulletproof vests.  These payments included direct payments to Second Chance under the GSA FAS schedule and the other federal purchases, as well as indirect payments to Second Chance under the BPVGPA.

133.    The United States' erroneous beliefs were material to the amount of the payments made by the United States.

134.    Because of these mistakes of fact, this Defendant received funds to which it was not entitled.

135.    By reason of the overpayments, the United States is entitled to damages in an amount to be established at trial.

## COUNT 6

### UNJUST ENRICHMENT
### AGAINST ALL DEFENDANTS

136.    The United States re-alleges and incorporates herein by reference paragraphs 1 through112.

137.    From 1998 to 2005, the United States paid for defective Second Chance

bulletproof vests made of Zylon due to false statements and omissions by all Defendants.

138.    The United States is entitled to the return of all payments by the United States directly or indirectly to Second Chance for Zylon vests due to the false claims presented for fiscal years 1998 to the present time.

139.    By reason of the above-described payments, Defendants have received money, directly or indirectly, to which they were not entitled. They therefore have been unjustly enriched in an amount to be established at trial.

## COUNT 7

## BREACH OF CONTRACT
## AGAINST DEFENDANT SECOND CHANCE

140.    The United States re-alleges and incorporates herein by reference paragraphs 1 through112.

141.    Second Chance entered into contracts with the United States, including but not limited to the GSA contract and direct contracts with other federal agencies. These contracts imposed obligations on Second Chance, including but not limited to, a five-year warranty on the Zylon bullet proof vests provided to the United States under these contracts.

142.    Second Chance breached its contractual obligations (including its express warranty and implied warranty of merchantability and fitness) to:  a) provide Zylon bullet proof vests that were free of all defects in material and workmanship, b) comply with the warranty requirements of these contracts; c) take adequate corrective action upon the discovery of the defects in the Zylon fabric, and d) adequately identify nonconforming material.

143.    As a result of Second Chance's breach of contract, the United States has been damaged by the defective Zylon bullet proof vests at issue in an amount to be determined at trial.

-33-

## PRAYER FOR RELIEF

**AS TO COUNT 1:**

As against all Defendants, judgment in an amount equal to:

1.　statutory damages in an amount to be established at trial;

2.　civil penalties for each false claim or false statement as provided by law;

3.　the cost of this action, plus interest, as provided by law; and

4.　any other relief that this Court deems appropriate.

**AS TO COUNT 2:**

As against all Defendants, judgment in an amount equal to:

1.　statutory damages in an amount to be established at trial;

2.　civil penalties for each false claim or false statement as provided by law;

3.　the cost of this action, plus interest, as provided by law; and

4.　any other relief that this Court deems appropriate.

**AS TO COUNT 3:**

As against all Defendants, judgment in an amount equal to:

1.　statutory damages in an amount to be established at trial;

2.　civil penalties for each false claim or false statement as provided by law;

3.　the cost of this action, plus interest, as provided by law; and

4.　any other relief that this Court deems appropriate.

**AS TO COUNT 4**

As against all Defendants, judgment be in an amount equal to:

1.　compensatory damages in an amount to be established at trial;

-34-

2.     punitive damages;

3.     the cost of this action, plus interest, as provided by law; and

4.     any other relief that this Court deems appropriate.

## AS TO COUNT 5:

As against Defendant Second Chance judgment in an amount equal to:

1.     the money paid by the United States to Second Chance, plus interest;

2.     the cost of this action, plus interest, as provided by law; and

3.     any other relief that this Court deems appropriate.

## AS TO COUNT 6:

As against all Defendants judgment in an amount equal to:

1.     the money paid by the United States to, or received by, these Defendants, plus interest;

2.     the cost of this action, plus interest, as provided by law; and

3.     any other relief that this Court deems appropriate.

## AS TO COUNT 7:

As against Second Chance, judgment in an amount equal to:

1.     all damages caused by Second Chance's breach of their contractual obligations in an amount to be established at trial;

2.     all reasonably foreseeable damages which flowed Second Chance's breach of their contractual obligations in an amount to be established at trial;

3.     the cost of this action, plus interest, as provided by law; and

4.     any other relief that this Court deems appropriate.

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

KEITH V. MORGAN
ASSISTANT UNITED STATES ATTORNEYS
(D.C. Bar No. 422665)

By:   _____

MICHAEL F. HERTZ
MICHAEL D. GRANSTON
DENNIS L. PHILLIPS
ALICIA J. BENTLEY
CALLIE R. OWEN
ATTORNEYS
U.S. Department of Justice
    Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel:    202-616-9854
Fax:    202-514-0280

DATED:   September 6, 2005

-36-