**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES, <u>ex rel</u>.** ) | |
| **WESTRICK,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 04-280 (RWR)** |
| ) | |
| **SECOND CHANCE BODY ARMOR,** ) | |
| **INC., <u>et al.</u>,** ) | |
| ) | |
| **Defendants.** ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

The government, by relator Aaron J. Westrick, filed a
complaint against defendants Second Chance Body Armor, Inc., and
related entities (collectively "Second Chance"), Toyobo Co.,
Ltd., Toyobo America, Inc. (collectively "Toyobo"), and
individual defendants Thomas Bachner, Jr., Richard Davis, Karen
McCraney, and James "Larry" McCraney, alleging violations of the
False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, as well as common
law claims in connection with the sale of Zylon body armor.
Toyobo moved to dismiss the suit by the government for failure to
state a claim and sufficiently plead fraud.  Because the
government has sufficiently alleged its FCA and common law
violations, Toyobo's motion to dismiss will be denied.

<u>BACKGROUND</u>

In May 1996, corporate defendants Second Chance and Toyobo
contracted for Toyobo to supply Second Chance with the synthetic

fiber "Zylon" for use in the manufacture of Second Chance
bulletproof vests.  (Am. Compl. ¶ 32.)  Zylon was believed to be
highly durable, have a long life cycle, and resist heat,
prompting Second Chance to promote its new Ultima/Ultimax
bulletproof vests as the "world's thinnest, lightest, and
strongest armor" featuring the "world's strongest fiber, PBO
Zylon." (<u>Id.</u> ¶¶ 39-40.)  Second Chance sold over 66,000 vests
between 1998 and 2004 to law enforcement agencies throughout the
United States, including over 40,000 to the United States
government.  Each vest carried a five-year warranty. (<u>Id.</u> ¶¶ 27,
30.)

Beginning in July 1998, Toyobo and Second Chance discovered
and exchanged communications about the degradation of Zylon
fibers resulting from the exposure to light, heat and humidity.
However, Toyobo continued to supply Zylon to Second Chance,
which, in turn, sold the vests containing Zylon without warning
purchasers and users about the potential strength loss or issuing
a recall of existing vests. (<u>Id.</u> ¶¶ 45-62.)  The government
alleges that the defendants knew, within the meaning of the FCA,
that the body armor was defective and that Zylon provided less
protection than "[d]efendants had represented [and] warranted
and/or [was] required by the contract specifications." (<u>Id.</u>
¶ 1.)  Additionally, during 2001, Toyobo informed Second Chance
and released additional data showing that it had not found any

- 3 -

serious indication of Zylon strength degradation despite conflicting evidence in its possession.  (Id. ¶¶ 58-59, 63.)

Following a Toyobo report revealing a dramatic drop in Zylon strength (id. ¶ 80), Second Chance and Toyobo held a "Crisis Management Meeting" in which they agreed that all communications related to Zylon "were to be 'pre-emptive, consistent, coordinated, and confidence inspiring.'"  (Id. ¶ 81.)  Second Chance asked Toyobo to remedy the problems with Zylon, as it considered the concerns with the material to be a "Toyobo problem."  (Id. ¶ 85.)  In response, Toyobo offered Second Chance a new volume discount program which resulted in a $6 million payment to Second Chance, retracted data showing dramatic drops in material strength, and assured Second Chance representatives that this strength would eventually level out.  (Id. ¶¶ 86-88.) Despite these promises, Toyobo continued providing updates to Second Chance confirming that Zylon fiber lost strength through heat and moisture exposure.  (Id. ¶ 92.)

In June 2003, a California police officer was shot and killed during a traffic stop when two bullets passed through the Second Chance Zylon vest he was wearing.  (Id. ¶ 101.)  That same month, a Pennsylvania officer was shot in the stomach and disabled when a bullet pierced the Second Chance Zylon vest he was wearing which had been made less than one year earlier.  (Id. ¶ 102.)  Second Chance then discontinued selling vests made of

- 4 -

Zylon, notified purchasers of the degradation problem, offered options including an upgrade of existing vests or discounts on new vests and issued a safety notice calling for removing its vests containing Zylon from service.  (Id. ¶¶ 104-05, 112.)

Aaron Westrick, a former employee of Second Chance, filed a qui tam complaint against Second Chance and Toyobo under the FCA, 31 U.S.C. §§ 3729-33.  (Id. ¶ 5.)  The government intervened under 31 U.S.C. § 3730(a)(2), and filed an amended complaint, adding four Second Chance executives as individual defendants -- Thomas Bachner, Jr., Richard C. Davis, Larry McCraney, and Karen McCraney.  (Id. ¶¶ 5, 16-19.)  The amended complaint asserted claims against all defendants for (1) violations of the FCA through presenting fraudulent claims, making false statements and conspiring to defraud, (2) common law fraud, and (3) unjust enrichment.  (Id. ¶¶ 113-15, 116-18, 119-21, 122-30, 136-39.) Claims for payment by mistake and breach of contract were asserted against only Second Chance.  (Id. ¶¶ 131-35, 140-43.) Toyobo filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) claiming that the government failed to plead fraud with the specificity required by Federal Rule of Civil Procedure 9(b), failed to plead factual allegations that Toyobo presented a false claim for payment or a false record or statement to the United States, failed to plead the existence of a conspiracy, and failed to plead factual allegations that

- 5 -

supported any of its common law claims.[1]  (Defs.' Mem. in Supp.
of Mot. to Dismiss ("Defs.' Mem.") at 1-2.)

## DISCUSSION

In evaluating a Rule 12(b)(6) motion, a court "may consider
only the facts alleged in the complaint, any documents either
attached to or incorporated in the complaint and matters of which
[a court] may take judicial notice."  Trudeau v. FTC, 456 F.3d
178, 183 (D.C. Cir. 2006) (quoting EEOC v. St. Francis Xavier
Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997)).  A court
considering a Rule 12(b)(6) challenge must accept as true any
facts alleged by the plaintiff and grant him all reasonable
inferences drawn from those facts, but need not accept either
inferences unsupported by the facts or legal conclusions cast in
the form of factual allegations.  Browning v. Clinton, 292 F.3d
235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a
complaint must contain sufficient factual matter, acceptable as
true, to 'state a claim to relief that is plausible on its
face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting
Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A
plaintiff must plead "factual content that allows the court to

---

[1]     Both the government and relator Westrick filed oppositions
to Toyobo's motion to dismiss.  Under the qui tam provisions of
the FCA, though, "[i]f the Government proceeds with the action,
it shall have the primary responsibility for prosecuting the
action[.]"  31 U.S.C. 3730(c)(1).

- 6 -

draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

Rule 9(b), which applies to FCA actions,[2] requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be averred generally."  Fed. R. Civ. P. 9(b).  Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b) to "ensure that defendants have adequate notice of the charges against them to prepare a defense," United States ex rel. McCready v. Columbia/HCA Healthcare Corp., 251 F. Supp. 2d 114, 116 (D.D.C. 2003), discourage "suits brought solely for their nuisance value" or as "frivolous accusations of moral turpitude[,]" United States ex rel. Joseph v. Cannon, 642 F.2d 1373, 1385 (D.C. Cir. 1981), and "protect reputations of . . . professionals from scurrilous and baseless allegations of fraud[.]"  Id. at 1385 n.103 (quoting Felton v. Walston & Co., 508 F.2d 577, 581 (2d Cir. 1974)).

Rule 9(b) "does not abrogate Rule 8," and must be read in light of Rule 8's requirement that averments be "simple[,]

---

[2]   United States ex rel. Totten v. Bombardier Corp. ("Totten I"), 286 F.3d 542, 551-52 (D.C. Cir. 2002) (noting that every circuit to consider the issue has held that Rule 9(b) applies to FCA complaints).

concise and direct" and "short and plain statement[s]" of each claim.  Joseph, 642 F.2d at 1386 (quoting Fed. R. Civ. P. 8); see also United States ex rel. Poque v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d 258, 269 (D.D.C. 2002) ("While . . . Rule 9(b) requires more particularity than Rule 8, . . . Rule 9(b) does not completely vitiate the liberality of Rule 8.").  In a qui tam case, Rule 9(b) requires that the pleader "'state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud[,]' . . . [and] individuals allegedly involved in the fraud." United States ex rel. Williams v. Martin-Baker Aircraft Co., 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting Kowal v. MCI Comm'ns Corp., 16 F.3d 1271, 1278 (D.C. Cir. 1994)).  "In sum, although Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud when a scheme spans several years, defendants must be able 'to defend against the charge and not just deny that they have done anything wrong.'" Id. at 1259 (quoting United States ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1052 (9th Cir. 2001); accord McCready, 251 F. Supp. 2d at 116 ("A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery

evidence of those facts." (quoting <u>Harrison v. Westinghouse Savannah River Co.</u>, 176 F.3d 776, 784 (4th Cir. 1999))).

I.   PRESENTMENT OF FALSE CLAIMS

The FCA allows a private individual -- a relator -- to bring a cause of action seeking penalties and treble damages against anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval[.]"  31 U.S.C. § 3729(a)(1) (1994).[3]  <u>See</u> <u>United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.</u>, 214 F.3d 1372, 1374 (D.C. Cir. 2000).  "[T]he elements of section 3729(a)(1) are (1) the defendant submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false."  <u>United States ex rel. Harris v. Bernad</u>, 275 F. Supp. 2d 1, 6 (D.D.C. 2003).  The FCA does not require proof of a specific intent to deceive when a defendant presents false or fraudulent claims to the government.  31 U.S.C. § 3729(b) (1994); <u>United States v. TDC Mgmt. Corp., Inc.</u>, 24 F.3d 292, 296 (D.C. Cir. 1994).  After relator Westrick filed his initial complaint, the government filed an amended complaint claiming that Second Chance made --

---

[3]   Congress amended the FCA in 2009, altering slightly the language in the presentment provision.  The amendment of the presentment provision took "effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment[.]"  P.L. 111-21, at 1625.  Since the alleged conduct occurred prior to 2009, the provision as amended in 2009 does not apply here.

and that Toyobo caused to be made -- fraudulent claims seeking payment from the government and its grantees.   (Am. Compl. ¶ 114.)

Toyobo moves to dismiss arguing that the complaint fails to provide the specific allegations required by Rule 9(b) to support liability under § 3729(a)(1).  It contends that the government has not factually alleged that Toyobo knew of Second Chance's false claims for payment or that it acted in deliberate ignorance or reckless disregard for the truth.  (Defs.' Mem. at 9.) Indeed, Toyobo contests that it presented any false statements to the government and asserts that liability is vested solely in Second Chance.  (Id. at 10 ("Plaintiffs do not allege any facts demonstrating that Toyobo knew that Second Chance's Zylon-containing vests would not satisfy the five-year warranty.  To the contrary, Plaintiffs' own account of the facts shows that Toyobo provided absolutely no warranties and refused requests by Second Chance that Toyobo provide a warranty on Zylon fiber.").) Toyobo insists that it updated Second Chance as to Zylon's degradation under certain conditions and that all fraudulent claims for presentment must be attributed solely to Second Chance.

A.   Presentment

A "claim" includes "any request or demand, whether under a contract or otherwise, for money . . . which is made to a

- 10 -

contractor, grantee, or other recipient if the United States Government provides any portion of the money . . . which is requested or demanded, or if the Government will reimburse such contractor . . . for any portion of the money . . . which is requested or demanded." 31 U.S.C. § 3729(c) (1994).[4] The FCA covers claims presented directly to the government as well as claims presented to grantees who are subsequently reimbursed by the government. United States ex rel. Totten v. Bombardier Corp. ("Totten II"), 380 F.3d 488, 493 (D.C. Cir. 2004) ("[L]iability will attach if the Government -- . . . upon presentment of the claim -- reimburses the grantee for funds that the grantee has already disbursed to the claimant.").

The government alleges that Second Chance presented false or fraudulent invoices or claims for reimbursement through direct sales by Second Chance to federal agencies, sales to federal agencies through the government's supply schedule ("FSS"), and sales to state and local law enforcement agencies under a federal grant program, the Bulletproof Vest Partnership Grant Act ("BPVPGA").[5] (Am. Compl. ¶¶ 25-27, 30-31, 49, 54.) Second

---

[4] Congress also amended this provision in 2009. Because the amended provision does not apply retroactively, P.L. 111-21, at 1625, the unamended provision applies here.

[5] Toyobo also moves to dismiss the claims against it based on purchases made under the BPVPGA program claiming that vests purchased under this program need only meet standards described by the National Law Enforcement and Corrections Technology Center of the National Institute of Justice ("NIJ"). See 42 U.S.C.

- 11 -

Chance also directly presented invoices to the government for two types of requests for reimbursement -- direct sales and FSS sales.  Second Chance submitted invoices from the BPVGPA sales to state and local law enforcement agencies first to non-federal entities and then to the United States.  (Id. ¶¶ 27, 30.)

Toyobo contends that the government does not allege that Toyobo itself presented any false claims to the government. (Defs.' Mem. at 10.)  However, as is discussed below, the government has factually alleged a fraudulent scheme in which Toyobo played a part.  "An argument that the presentation of the claims was the work of another is unavailing as a means to avoid liability under the False Claims Act."  Poque, 238 F. Supp. 2d at 266 (further noting that the "False Claims Act extends beyond the person making a false claim to 'one who engages in a fraudulent course of conduct' that induces payment by the government"

---

3796ll-2(1).  Because the NIJ standards do not require product warranties and the government has not alleged that Toyobo itself warranted the vests, Toyobo claims that the government has not stated a claim for fraudulent activity as to the BPVGPA indirect purchases.  (Defs.' Mem. at 29-32.)  The government counters that even if the vests for which claims were submitted passed NIJ certification, they were fraudulent under Second Chance's own warranty.  (Gov't Opp'n to Defs.' Mot. to Dismiss ("Gov't Opp'n") at 42.)  Accepting the government's allegations as true, even if the vests met NIJ requirements, the government has factually alleged that the vests failed to comply with Second Chance's warranty due to joint conduct by Toyobo and Second Chance. Because the government claims that the vests were deficient under Second Chance's warranty and Toyobo does not suggest that NIJ certification should supplant Second Chance's warranty as to BPVGPA purchases, Toyobo has not established that it cannot be liable for fraudulent claims under the BGPVA program.

- 12 -

(quoting <u>United States v. Raymond & Whitcomb Co.</u>, 25 F. Supp. 2d 436, 445 (S.D.N.Y. 1999))); <u>see also</u> <u>United States v. Bornstein</u>, 423 U.S. 303, 306 (1976) (acknowledging that a subcontractor may be liable under the FCA where the contractor presented false claims for payment to the government).[6]  Although Toyobo never warranted the Zylon material and Second Chance submitted the claims for payment (Defs.' Mem. at 11), the government has pled that Toyobo engaged in activity in concert with Second Chance that induced presentment of the false claims.  Accordingly, submitting direct claims and reimbursed claims satisfies the FCA's presentment requirement.  <u>See</u> <u>Totten II</u>, 380 F.3d at 493.

B.   <u>Fraud</u>

Rule 9(b) requires that a complaint allege facts regarding a fraudulent request for payment with a higher degree of particularity.  The FCA attaches liability not to underlying fraudulent activity unrelated to the claim for payment or to the

---

[6]   Toyobo relies on <u>United States ex rel. Grynberg v. Ernst & Young LLP</u>, 323 F. Supp. 2d 1152 (D. Wy. 2004), for the proposition that the government must allege affirmative action by Toyobo to establish that Toyobo caused the presentment of a false claim.  (Defs.' Reply to Gov't Opp'n at 7.)  "Courts have previously held, in addressing Rule 12(b)(6) motions, that allegations that a defendant had direct and concrete knowledge of a fraud on the government but did nothing to stop it are not enough to state a claim under the FCA."  <u>Grynberg</u>, 323 F. Supp. 2d at 1155.  However, the <u>Grynberg</u> court also recognized that "the word 'cause' in § 3729(a) has been used to reach persons or firms that do not deal directly with the government but receive a financial benefit indirectly from the government by motivating an intermediary to file a false report."  <u>Id.</u>

- 13 -

government's wrongful payment, but to the claim for payment submitted.  See United States ex rel. Totten v. Bombardier Corp. ("Totten I"), 286 F.3d 542, 551 (D.C. Cir. 2002).  While, by itself, "the bare assertion that defendants *delivered* goods that did not conform to contractual specifications is not enough to state a violation of the FCA," id. (emphasis added), fraud is pled if a plaintiff alleges fraud in the inducement for payment. See John T. Boese, Civil False Claims and Qui Tam Actions 2-18 to 2-19 (3d ed. 2006).  "[E]ven in the absence of evidence that the claims were fraudulent in themselves," claims that were submitted under a contract procured by fraud can be actionable.  United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc., 393 F.3d 1321, 1326 (D.C. Cir. 2005) (stating that Congress intended that "each and every claim submitted under a contract . . . or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct . . . constitutes a false claim" (quoting S. Rep. No. 99-345, at 9 (1986))); see also United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d 196, 199 (D.C. Cir. 1995) (allowing FCA liability to attach because the defendant made an initial misrepresentation about its ability to comply with contractual terms, inducing the government to enter into the contract, and finding that "this original misrepresentation tainted every subsequent claim made in relation to the contract, including [the

- 14 -

defendant's] claims for payment"). At the Rule 12(b)(6) stage, the government is required merely to allege with factual specificity that defendants duplicitously induced the government to pay for a product, not to prove the "specific fraudulent scheme upon which the Complaint is based." (Defs.' Mem. at 15.) See McCready, 251 F. Supp. 2d at 118 ("[A] plaintiff need not plead his legal theory of fraud in the complaint; the complaint must only plead the facts that form the basis for the fraud.").[7]

Here, the government alleges that Second Chance predicated each Zylon vest sale and each consequent invoice submission upon a fraudulently represented five-year warranty despite the fact that Second Chance and Toyobo knew the vests lost strength when exposed to sunlight, high temperatures and humidity (Am. Compl. ¶¶ 27, 30-31, 54), inducing the government to pay the claims.[8]

---

[7]     Toyobo cites to the Totten I holding that a relator's complaint did not include a sufficiently detailed description of any actionable claims. (Defs.' Mem. at 15.) The court stated that "the bare assertion that defendants delivered goods that did not conform to contractual specifications is not enough to state a violation of the FCA. Instead, in the sections relevant here, the statute proscribes only false 'claims' -- that is, actual demands for money or property[.]" Totten I, 286 F.3d at 551. However, the government clearly has alleged not only the fraudulent activity but also that claims were submitted to the government for payment. (Am. Compl. ¶¶ 30-31.) Cf. Totten I, 286 F.3d at 551 (finding that the relator had not alleged that defendants "actually made false demands or submitted false records" to anyone).

[8]     Toyobo argues that the government must prove that Toyobo had a duty to disclose information related to Zylon strength loss to the government. (Defs.' Mem. at 20-21.) However, the government has adequately alleged that Toyobo, in concert with Second

The government has pled fraudulent requests for payment with sufficient particularity such that Toyobo is more than able to "defend against the charge[s] and not just deny that [it] ha[s] done anything wrong." Lee, 245 F.3d at 1052 (quoting Neubronner v. Milken, 6 F.3d 666, 671 (9th Cir. 1993)).

As it must, the government also sets out in detail "the time, place and content" of the fraud, "identif[ies] individuals allegedly involved in the fraud[,]" and makes plain what was "retained or given up as a consequence of the fraud." Williams, 389 F.3d at 1256 (citations omitted); accord Totten I, 286 F.3d at 552 (requiring a relator to "set forth an adequate factual basis for his allegations [regarding the submission of false claims] . . . , including a more detailed description of the specific falsehoods that are the basis of his suit"). For example, contents of the alleged fraud -- that Toyobo retracted negative data contemporaneously with its offer of a $6 million rebate or discount program for continued purchase of Zylon fibers, and made promises to Second Chance that degradation studies would "level out" after Toyobo's "fiber strength tests on woven Zylon fabric . . . showed a greater and more serious

_____

Chance, engaged in a "fraudulent course of conduct" in violation of the FCA. See Pogue, 238 F. Supp. 2d at 266. The government does not need to allege any duty by Toyobo to report if it alleges that Toyobo knowingly assisted in causing false claims to be submitted to the government. See United States ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 378 (5th Cir. 2004).

- 16 -

degradation than Toyobo's previously published data of unused

Zylon fiber" -- are averred with detail.  (Am. Compl. ¶¶ 87-89,

107.)  Toyobo's actions may constitute the underlying fraudulent

conduct leading to Second Chance's submission of false claims.

See United States ex rel. Marcus v. Hess, 317 U.S. 537, 544-45

(1943) (finding several contractors liable because the language

of the FCA "indicate[s] a purpose to reach any person who

knowingly assisted in causing the government to pay claims which

were grounded in fraud, without regard to whether that person had

direct contractual relations with the government").

     The government further alleges the time span -- from May

1996 until October 2003 -- during which Toyobo partnered with and

supplied defective Zylon fiber to Second Chance.[9]  (Am. Compl.

¶¶ 32-33, 107.)  Cf. Williams, 389 F.3d at 1257 (finding that the

complaint only "nebulously allege[d]" the period in question and

did not allege a start date).  Additionally, it was during a

three-year period from October 1998 until at least July 2001 that

_____

[9]     Some courts have held that in cases involving complex or
extensive fraud schemes, the Rule 9(b) standard requiring
particularity may be relaxed.  See, e.g., Harris, 275 F. Supp. 2d
at 8 (collecting cases and explaining that due to the complexity
of the scheme and the period of time during which the scheme
allegedly occurred, an allegation of a span of time is
sufficient).  However, the D.C. Circuit has not adopted
explicitly the standard articulated by these courts.  Williams,
389 F.3d at 1258.  Here, the government did more than meet these
relaxed requirements; it provided "exact dates, named individual
defendants, noted where the fraud took place, [and] alleged facts
that exemplified the fraudulent scheme[.]"  Id.

Toyobo and Second Chance were allegedly silent about the increasing research showing the high rates of Zylon fabric degradation.  The government provides numerous dates of specific memos, faxes, meetings, and sales events at or during which the parties agreed to withhold or downplay the discoveries regarding Zylon.  (See, e.g., Am. Compl. ¶¶ 67, 68, 70, 75, 107.)

While the government claims that fraud was committed broadly throughout the United States, it specifically alleges the location of meetings at which the fraudulent scheme was planned or furthered.  (See, e.g., id. ¶¶ 81, 88.)  The government also specifies the identities of Second Chance executives, named as individual defendants, who were involved in presenting false claims and were present at specific meetings and signed letters or sent faxes warranting -- or causing their subordinates to falsely warrant -- Second Chance Zylon vests for five years.  (See, e.g., id. ¶¶ 60-62, 64, 88, 93, 96-97.)  Although the government does not name Toyobo executives who participated in the fraudulent scheme, this has not frustrated Toyobo's ability thus far to plead responsively or defend itself, as is clear from the extensive arguments on the merits propounded in its briefs.[10]

---

[10]    Toyobo accurately argues that the government does not specifically identify "a single Toyobo employee involved in the alleged fraud."  (Defs.' Mem. at 17.)  However, as the government notes, even though "Toyobo argues that it cannot determine who at Toyobo made the false statement or participated in the conspiracy, . . . Toyobo itself attached copies of the Toyobo memoranda and letters referred to in the complaint to its motion

- 18 -

While the D.C. Circuit "require[s] pleaders to identify individuals allegedly involved in the fraud" under Rule 9(b), <u>Williams</u>, 389 F.3d at 1256, the <u>Williams</u> court disapproved of that complaint's failure to identify individual defendants involved where the relator had worked with both defendant companies for five years.  <u>Id.</u> at 1257.  There is no similar allegation here that relator Westrick, a Second Chance employee, had ever worked with Toyobo over an extended period of time.  Further, the <u>Williams</u> court found that the government's failure to identify specific individuals was but one of multiple shortcomings of the complaint.  <u>Id.</u>; <u>see also</u> <u>Lee</u>, 245 F.3d at 1051 ("[Relator] did not specify the types of tests implicated in the alleged fraud, identify the [defendant's] employees who performed the tests, or provide any dates, times, or places the tests were conducted.").  Under these circumstances, the absence of named Toyobo employees should not render the otherwise detailed complaint deficient under Rule 9(b).  <u>See</u> <u>United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.</u>, 501 F.3d 493, 509 (6th Cir. 2007) ("[W]here the corporation is the defendant in a FCA action, we hold that a relator need not *always* allege the specific identity of the natural persons within the defendant corporation that submitted the false claims.  Instead, such information is merely relevant to the inquiry of whether a

---

to dismiss."  (Gov't Opp'n at 38 n.15.)

- 19 -

relator has pled the circumstances constituting fraud with particularity." (emphasis added)).

Finally, the government makes clear that all monies paid by the government either directly or as reimbursement for falsely-warranted Zylon vests were "given up as a consequence of the fraud."  Williams, 389 F.3d at 1256; see Corsello v. Lincare, Inc., 428 F.3d 1008, 1013 (11th Cir. 2005) (reasoning that plaintiff's complaint did not satisfy Rule 9(b) because it used vague allegations which "failed to provide a factual basis to conclude fraudulent claims were ever actually submitted to the government in violation of the False Claims Act").  Given that numerous contracts and purchases by disparate entities are involved in this action, it is sufficient that the government demands "the return of all payments by the United States directly or indirectly to Second Chance for Zylon vests . . . for fiscal years 1998 to the present time."  (Am. Compl. ¶ 138.)  The government's averments of fraud satisfy the requirements of Rule 9(b).

    C.    Knowledge

A person acts knowingly if he acts with "actual knowledge, deliberate ignorance or reckless disregard of the truth or falsity of information."  31 U.S.C. § 3729(b).  Because Rule 9(b) permits knowledge to be pled generally, there is no basis for dismissal for failure to plead knowledge with particularity.  The

government maintains that although Toyobo knew of Zylon's deficiencies, Toyobo continued in its partnership with Second Chance to market Zylon-fiber vests, while concealing evidence of and issuing misleading statements about degradation.  Toyobo maintains that the government has not pled facts adequate to meet the knowledge requirement because it has not shown that Toyobo knowingly made fraudulent claims or that it knew that Second Chance presented any claims to the government.  (Defs.' Mem. at 11.)  However, the government has factually alleged that Toyobo knew of and participated in making Second Chance's warranty to the government.  (See Am. Compl. ¶ 54.)  The government's allegations as to knowledge are sufficient.

II.  FALSE STATEMENTS

The government alternatively pleads a claim under 31 U.S.C. § 3729(a)(2) (1994), which created a cause of action against anyone who "knowingly makes, uses, or causes to be made or used, a false statement to get a false or fraudulent claim paid or approved by the Government."  Section 3729(a)(2) attaches FCA liability to a defendant who prepares in support of a claim a statement that it knows to be a misrepresentation, even if that defendant did not actually submit either the claims or the statement to the government.  Totten II, 380 F.3d at 501 (noting that "(a)(2) is complementary to (a)(1), designed to prevent those who make false records or statements . . . from escaping

liability solely on the ground that they did not *themselves* present a claim for payment or approval").

Congress amended § 3729(a)(2) in the Fraud Enforcement and Recovery Act of 2009 ("FERA").  The amended provision, 31 U.S.C.A. § 3729(a)(1)(B) (West 2010), creates a cause of action against anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  FERA provided for § 3729(a)(1)(B)'s retroactive application "to all claims under the False Claims Act . . . that are pending on or after" June 7, 2008.  P.L. 111-21, at 1625.  Because this suit was pending on June 7, 2008, the amended provision applies here.  The amended provision "'legislatively overrules' the holding" of <u>Allison Engine Co., Inc. v. United States ex rel. Sanders</u>, 128 S. Ct. 2123 (2008). <u>United States v. Sci. Applications Int'l Corp.</u>, 653 F. Supp. 2d 87, 106 (D.D.C. 2009).  <u>Sanders</u> held that the original false statements provision, § 3729(a)(2), required the government to prove that "a defendant must intend that the Government itself pay the claim."  128 S. Ct. at 2128.  Congress intended for the amended provision to eliminate any intent requirement, S. Rep. No. 111-10 (2009), and instead for liability to attach when a record or statement has "a natural tendency to influence" or "is capable of influencing[] the payment or receipt of money or property."  31 U.S.C.A. § 3729(b)(4) (West 2010).  Additionally,

to state a claim under § 3729(a)(1)(B), the plaintiff must show that the created statement or record was false and that the defendant knew the statement or record was false.  <u>Harris</u>, 275 F. Supp. 2d at 6.  The government alleges that Toyobo knowingly misrepresented and concealed facts, creating a false record that in part caused Second Chance to submit a false claim to the government.  This more than satisfies the materiality requirement.  Because the government has pled with sufficient particularity the fraud involved, it has stated a cognizable § 3729(a)(1)(B) claim as to Toyobo.

III. CONSPIRACY TO DEFRAUD

Anyone who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" may be subject to 31 U.S.C. § 3729(a)(3) (1994) liability.[11]  The FCA does not define a conspiracy, but courts have held that general civil conspiracy principles apply to FCA conspiracy claims.  <u>See United States ex rel. Durcholz v. FKW, Inc.</u>, 189 F.3d 542, 545 n.3 (7th Cir. 1999); <u>United States v. Bouchey</u>, 860 F. Supp. 890, 893 (D.D.C. 1994) ("the government must show: (1) that defendant conspired with one or more persons to have a fraudulent claim paid by the

---

[11]   Congress also amended this provision in FERA.  The amended provision imposes liability on anyone who "conspires to commit a violation" of any substantive section of § 3729(a).  31 U.S.C. § 3729(a)(1)(C).  However, this provision does not apply retroactively, P.L. 111-21 (2009), and the claim will be analyzed under the unamended statute.

- 23 -

United States, (2) that one or more of the conspirators performed any act to have such a claim paid by the United States, and (3) that the United States suffered damages as a result of the claim.").[12]

Arguing that Toyobo and Second Chance together intended to defraud buyers of Zylon vests, the government cites Toyobo's six million dollar "rebate" payment to Second Chance for the continued use of Zylon fiber and Toyobo's January 2002 retraction of its earlier data showing a dramatic drop in Zylon fiber strength as conspiratorial activities. (Gov't Opp'n to Defs.' Mot. to Dismiss ("Gov't Opp'n") at 37-38.) Despite Toyobo's claim that the government's complaint contains no factual allegations supporting an inference of conspiracy (Defs.' Mem. at 24), the government specifically alleges that the parties acted with intent to defraud consumers when they decided not to warn customers in December 2001 as they originally proposed to do (Am. Compl. ¶¶ 83, 120), and Second Chance continued selling vests with a five-year warranty until September 2003 when it offered customers options to replace defective vests. (Id. ¶¶ 104-05; see also Gov't Opp'n at 37-38.) The detailed

---

[12] While there is disagreement among courts and commentators as to whether damages are a necessary element of a Section (a)(3) claim, here damages are clearly alleged because the government paid the claims at issue. Compare United States ex rel. Finney v. Nextwave Telecom, Inc., 337 B.R. 479, 489 (S.D.N.Y. 2006) with Boese at 2-29 n.62.

- 24 -

assertion about the meetings between Toyobo and Second Chance
fulfills the requirements for a conspiracy claim under
§ 3729(a)(3) at the motion to dismiss stage in the litigation.
Cf. United States ex rel. El Amin v. George Washington Univ., 26
F. Supp. 2d 162, 165 (D.D.C. 1998) (citing the complaint's
failure to "identify any agreement between the parties to defraud
the government or to engage in any act that could constitute an
attempt to defraud the government" (emphasis omitted)); Corsello,
428 F.3d at 1014 (rejecting a plaintiff's conspiracy claim where
he failed to provide specific allegations of an agreement or
overt act).

IV.   COMMON LAW FRAUD

     A plaintiff in an FCA action may plead -- if not ultimately
recover upon -- alternative common law theories.  See Fed. R.
Civ. P. 8(d)(3) (allowing a party to plead "as many separate
claims or defenses as it has regardless of consistency"); United
States ex rel. Purcell v. MWI Corp., 254 F. Supp. 2d 69, 79
(D.D.C. 2003).  A successful claim for common law fraud requires
"(1) a false representation (2) in reference to material fact (3)
made with knowledge of its falsity (4) and with the intent to
deceive (5) with action taken in reliance upon the
representation."  Pence v. United States, 316 U.S. 332, 338
(1942).  The government has alleged that Toyobo failed to
disclose or misrepresented evidence of, among other things, the

material fact of Zylon's degradation, with knowledge of the misrepresentation of its data and intention to deceive both Second Chance and consumers.  (See Am. Compl. ¶¶ 1, 54, 63, 75, 107.)  The United States has adequately alleged that Second Chance and Zylon vest buyers relied upon Toyobo's misrepresentations.  (Id. ¶¶ 127-28.)

V.   UNJUST ENRICHMENT

A plaintiff claiming unjust enrichment must show that a benefit was conferred upon a defendant, the defendant accepted the benefit, and it would be unjust for the defendant not to pay the plaintiff the value of the benefit.  Miller v. Holzmann, Civil Action No. 95-1231 (RCL), 2007 WL 710134, at *7 (D.D.C. Mar. 6, 2007).  "[U]njust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next."  4934, Inc. v. D.C. Dep't of Employment Servs., 605 A.2d 50, 56 (D.C. 1992); accord In re Lorazepam & Clorazepate Antitrust Litig., 295 F. Supp. 2d 30, 50-51 (D.D.C. 2003).  The In re Lorazepam court refused to dismiss an action for unjust enrichment brought by a group of plaintiffs, including insurance companies, against drug manufacturers for payments made to reimburse subscribers for prescriptions.  295 F. Supp. 2d at 51.  The court held that the theory of unjust enrichment could apply to indirect payments

- 26 -

because plaintiffs had properly alleged defendants' enrichment to the plaintiffs' own detriment and not just to the detriment of plaintiffs' subscribers.  Id.

Toyobo argues that the government never conferred any benefit upon it because all federal monies were paid to Second Chance.  (Defs.' Mem. at 28-29.)  However, the government alleges that payment for Second Chance's submissions was based upon Toyobo's false statements and omissions, and Toyobo, as an indirect recipient of the government's payments, was unjustly enriched to the government's disadvantage.  (Am. Compl. ¶ 139.) Toyobo does not dispute that it has retained all monies from Zylon sales to Second Chance and the subsequent sales of Zylon vests to the government and its grantees.

## CONCLUSION AND ORDER

Because plaintiffs have stated claims under the FCA and the common law for fraud and unjust enrichment, Toyobo's motion to dismiss will be denied.  Plaintiffs have pleaded their allegations regarding fraud with sufficient particularity to meet the standards articulated under Rule 9(b).  Accordingly, it is hereby

ORDERED that Toyobo's motion [25] to dismiss be, and hereby is, DENIED.

- 27 -

SIGNED this 23rd day of February, 2010.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge