UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
UNITED STATES OF AMERICA, *ex rel*.,      )
AARON J. WESTRICK, PH.D.,                 )
                                          )
                Plaintiffs,               )
                                          )
        v.                                )  Civil Action No. 04-0280 (RWR/AK)
                                          )
SECOND CHANCE BODY ARMOR, INC., *et al*., )
                                          )
                Defendants.               )
_____ )

## MEMORANDUM OPINION

Pending before this Court is a Motion by the United States (hereinafter "Plaintiff" or the

"United States") to Compel Production of Documents and Other Tangible Items in the

Possession of James W. Murray and to Compel the Deposition of James W. Murray ("Motion")

[315] and the Memorandum of Points and Authorities in support of the Motion

("Memorandum") [315-1]; Defendants Toyobo Co., Ltd.'s and Toyobo America, Inc.'s

(collectively, "Toyobo" or "Defendants") Opposition to the Motion ("Opposition") [320];

Plaintiff's reply to the Opposition ("Reply") [326]; Defendants' Sur-reply to the Reply ("Sur-

Reply") [329]; and Plaintiff's response to the Sur-Reply ("Response") [333]. The United States

seeks to compel the deposition of and production of documents by James W. Murray

("Murray"), a consulting expert for Toyobo. This Court held a hearing on this Motion on

December 4, 2012.

According to the United States, Murray and his company "were responsible for acquiring

ballistic vests" that were later tested by Toyobo's testifying expert, Allen L. Price ("Price"), who

concluded that "all used ballistic material would fail a particular method of testing." (Motion at

1.) "Specifically, the United States seeks documents relating to the acquisition, storage, care,

evaluation, testing and selection of used vests obtained by James W. Murray and his company,

Shots-M-Stuff Testing . . . , and the vests themselves." (Memorandum at 2.)

## I. **Background**

The United States seeks to recover damages in this civil action pursuant to the False

Claims Act, 31 U.S.C. §§3729-3733, "for the sale of defective Zylon body armor paid for with

federal funds." (Memorandum at 2.)[1]  Plaintiff alleges that Zylon degrades to a larger extent, at a

faster rate and less predictably than disclosed, making it unsuitable for ballistic applications.

(Memorandum at 3.) Toyobo is a manufacturer of Zylon fiber, which was used in ballistic panels

of vests manufactured by several companies, including Second Chance Body Armor.  (*Id.*)

Toyobo's testifying expert is Allen Price, President and Chief Executive Officer of United States

Ballistic Engineering, Inc.  (Memorandum at 3.)  Price performed tests on aramid vests using the

same National Institute of Justice ("NIJ") protocols that were used on Zylon vests and concluded

that the failure rate was comparable or higher. (Memorandum at 4.)  Price opined that "[n]o one

in the industry disputes that aramid is suitable for use in ballistic applications, yet used aramid

vests failed the new vest testing protocols *just like* used Zylon-containing vests." (*Id.*) (emphasis

in original).  Price thus concluded that because the aramid vests would have also failed the

Government's testing in August 2005, the testing employed "is not determinative of Zylon's

suitability for ballistic applications." (*Id.*)

Plaintiff claims that Toyobo has not provided it with information or documents relating to

the acquisition, storage, care, evaluation, pre-testing or selection of the vests tested by Price.

---

[1]In this Background section of the Memorandum Opinion, the citations refer to the
Motion, Opposition and Reply and omit reference to internal citations therein.

(Memorandum at 4.)  Toyobo did however make available for inspection the 128 used aramid

vests [consisting of 256 vest panels] and Plaintiff ascertained that the source of the aramid vests

was the Baltimore Police Department, which sold or gave Murray [Defendants' consulting

expert] a large number of vests over a period of six years.  (Memorandum at 4-5.)[2]  According

to Plaintiff, "Murray and his company, Shots-M-Stuff Testing, have served as expert

consultants" for the Defendants and they "were responsible for acquiring ballistic vests and

selecting the subset of those vests [which were later] tested by Toyobo's testifying expert

witness, Allen L. Price." (Motion at 1.)[3]

On May 7, 2012, Plaintiff subpoenaed documents from Murray, seeking information on

Murray's acquisition, testing, analysis and transfer of the vests, as well as the care, use and

storage histories of the vests and the vests themselves.  (Memorandum at 5.)[4]  On June 5, 2012,

Plaintiff served Toyobo's counsel with a deposition subpoena for Murray. (*Id.*)  Toyobo claims

that responsive documents and testimony are shielded from discovery "by the attorney work

product doctrine and/or the consulting expert privilege," *id.*, and  Plaintiff thereafter filed the

instant Motion to compel Murray's deposition and production of documents concerning the

_____

[2]*See* May 22, 2012 letter from Defendants' counsel to Plaintiff's counsel confirming that "all the vests tested by Mr. Allen Price in his expert reports, . . . , were acquired from the Baltimore City Polict Department ('BPD') and provided to Mr. Price by counsel for Toyobo." (Reply, Exh. [326-3].) This Court notes that the Plaintiff's Memorandum at 4 references 102 vests but counsel referenced 128 vests during the December 4, 2012 hearing.

[3]Plaintiff's statement that Murray was responsible for selecting the subset of vests that were later tested by Price is inaccurate.  Toyobo asserts that "[c]ontrary to the Government's assertion in its motion, Toyobo's counsel - not Mr. Murray - selected the used Kevlar vests for Mr. Price to test." (Opposition at 2 n.1.)

[4]At the December 4, 2012 hearing, counsel acknowledged that the United States is not seeking information about the storage and care of the vests while in the custody of the BPD.

vests.  Information sought by the United States may be summarized as follows: 1) storage and care of the vests while in Murray's custody and control; 2) pre-testing of the vests by Murray; and 3) selection of the vests that were tested by Price.

## II. Legal Standard

Plaintiff moves pursuant to a Fed. R. Civ. P. 45(a) subpoena to James W. Murray to compel the production of documents and other tangible items as well as Murray's deposition. Plaintiff's Motion relies upon Fed. R. Civ. P. 45(c)(2)(B)(i) which states that "[a]t any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection."[5]

Pursuant to Fed. R. Civ. P. 26(b)(3)(A) a party may not ordinarily "discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative [which includes consultants]."  These materials may however be discovered if they are not privileged and relevant to a party's claims or defenses and "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A)(i) & (ii); *see also* Fed. R. Civ. P. 26(b)(1).

Similarly, Fed. R. Civ. P. 26(b)(4)(D) provides that "[o]rdinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial

---

[5]Rule 45(a) provides in relevant part that a subpoena must "command each person to whom it is directed to . . . : attend and testify; produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control; . . . ." Fed. R. Civ. P. 45(a)(1)(A)(iii).

and who is not expected to be called as a witness at trial."  There are however certain exceptions

to this Rule, including "[a] showing [of] exceptional circumstances under which it is

impracticable for the party to obtain facts or opinions on the same subject by other means."  Rule

26(b)(4)(D)(ii).

### III. <u>Analysis of work product doctrine and consulting expert immunity</u>

In the instant case, Toyobo contends that "[c]ounsel has spent over six years developing

and testing a variety of legal theories with Mr. Murray under the well-settled protections of the

consulting expert privilege for this and other Zylon-related litigation" and such work "implicates

the mental impressions, conclusions, opinions and legal theories of counsel in developing its

litigation strategy, including its used vest testing strategy." (Opposition at 1.)  Toyobo further

asserts that such information was [specifically] not shared with Mr. Price nor was it "in any way

relied upon or considered by Mr. Price in forming his opinions."  (Opposition at 2.)

Plaintiff alleges however that, "Toyobo has frustrated the purposes of expert discovery, however,

by having its non-testifying consultant, Murray, apparently play an integral role in the testing

conducted by its expert witness, Price, and then claiming that consulting expert immunity and

the work product doctrine protect Murray's work and knowledge from discovery."

(Memorandum at 9.)

### A. <u>Work product doctrine</u>

The party who seeks work product doctrine protection is responsible for establishing

applicability of the protection and that there has not been a waiver.  *U.S. Airline Pilots Ass'n v*

*Pension Benefit Guaranty Corp.*, 274 F.R.D. 28, 31 (D.D.C. 2011). Plaintiff argues that the work

product protection is not absolute but is instead qualified because it is "designed to balance the

needs of the adversary system to promote an attorney's preparation against society's general interest in revealing all facts relevant to the resolution of a dispute." (Memorandum at 22-23); *In re Sealed Case*, 856 F.2d 268, 273 (D.C. Cir. 1988) (citation omitted). Documents and other tangible items prepared in anticipation of litigation that reveal factual information may be discovered if a party shows a "substantial need for the materials to prepare its case and [it] cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii); *see also In re Veiga*, 746 F. Supp. 2d 27, 35 (D.D.C. 2010) (distinguishing "fact" work product from "opinion" work product).

      1. <u>Relationship between testifying and non-testifying expert</u>

      Plaintiff asserts that because of the close connection between Price and Murray, the application of work product protection in this case warrants stricter scrutiny and weighs in favor of disclosure. *See Trigon Insurance Company v. United States*, 204 F.R.D. 277, 280 (E.D.Va. 2001) (wherein defendant retained the same firm as a non-testifying expert litigation consultant and a testifying expert). Plaintiff argues that Murray, Toyobo's non-testifying consultant, is "Price's former business partner and retains ownership interests in Ballistic Engineering, Inc., Price's company. . . . " (Motion at 1.)[6] Defendants explain however that "Murray owns less that 2% of stock in [Price's] company, USBE" and "he has no role in the day-to-day operations of USBE and does not do any work on behalf of USBE." (Price Declaration ¶14.) Furthermore, Murray "does not receive any payments or compensation from USBE." (Price Declaration ¶15.) In light of the record in this case, this Court finds that the current business relationship between

---

      [6] Plaintiff's counsel also noted that Murray and Price are friends and neighbors. (December 4, 2012 hearing.)

Price and Murray does not warrant stricter scrutiny or, on its face, weigh in favor of disclosure.

## 2. Disclosure by Murray to Price may be a waiver of work product protection

A party who selectively and deliberately discloses work product to gain a tactical advantage during litigation waives the protection as to the entire subject matter of the disclosure. *See Bowles v. Nat'l Ass'n of Home Builders*, 224 F.R.D. 246, 259 (D.D.C. 2004) (finding a subject matter waiver of opinion work product which would likely "ensur[e] that the evidence in the record will not reflect only one side or a part of a privileged communication.")[7] Plaintiff claims that Toyobo waived any work product protection when Murray provided a subset of vests to Price (Memorandum at 21), but that argument fails because Murray did not select the subset of vests that was provided to Price nor did Murray share any information about the vests with Price. *See* Murray Declaration ¶¶8-9 (explaining that Murray was explicitly instructed not to disclose any information to Price and affirming that he never did).

In the instant case, Plaintiff has proffered nothing more than speculation to support its assertion that Price relied upon information from Murray. Toyobo asserts that "counsel's retention of Mr. Murray as a consulting expert was completely independent of Toyobo's retention of Mr. Price as a testifying expert." (Opposition at 4.) "Both were instructed not to discuss each other's activities, and neither expert has ever shared or discussed the results of any work they have conducted on behalf of counsel or Toyobo." (Opposition at 5.)

Price's Declaration supports these statements by Toyobo. Price asserts that "[i]n forming [his] opinions in this case, [he] did not see, consider, or in any way rely upon any information

---

[7]In *Bowles*, the subject matter waiver did not extend to information relating to trial preparation or litigation strategy. 224 F.R.D. at 258.

from Mr. Murray.  Indeed, [he] never received any information from Mr. Murray about any work

he may have performed for Toyobo or its counsel, nor ha[s] [he] ever had any discussions with

Mr. Murray about any work he may have done for them."  (Price Declaration ¶7.)  Price further

states that [s]pecifically, [he] never received any information from Mr. Murray, Toyobo, or

Toyobo's counsel about how the used Kevlar vests [he] tested were obtained [and] [he] had no

information from any source as to how the used Kevlar vests [he] tested were selected or any

pre-testing that had been done on them."  (Price Declaration ¶10.)[8]  Accordingly, this Court finds

that there has not been a waiver of work product protection based on any disclosure by Murray

to Price.

### 3. **Plaintiff's substantial need for the requested documents which are available only from Murray**

Work product protection is not absolute but rather, it is a qualified immunity "designed to

balance the needs of the adversary system to promote an attorney's preparation against society's

general interest in revealing all facts relevant to the resolution of a dispute."  *In re Sealed Case*,

856 F.2d 268, 273 (D.C. Cir. 1988).  Therefore, documents and other tangible items prepared in

anticipation of litigation that *reveal factual information* may be discoverable if "the party shows

that it has *substantial need* for the materials to prepare its case and cannot, without undue

hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A)(ii); *see

also In re Veiga*, 746 F. Supp.2d 27, 35 (D.D.C. 2010) (emphasis added).

---

[8]During oral argument, Plaintiff asserted that certain billing entries/invoices referencing "vest harvesting" lend support to its argument that Price has additional knowledge about vest selection.  (December 4, 2012 hearing; Response at 7.)  There is no evidence however that Price acquired any of the vests from the BPD or otherwise participated in the selection of the 128 vests that he subsequently tested.

Plaintiff seeks information about Murray's storage and care of the vests, any pre-testing of the vests conducted by Murray, and the selection of vests that were ultimately tested by Price.[9] (Memorandum at 23; December 4, 2012 hearing.) As a preliminary matter, this Court distinguishes between the types of information sought by Plaintiff. Information regarding any pre-testing of vests and the ultimate selection of vests, by its very nature, encompasses opinions, legal theories and/or litigation strategies and it is work product that should not be provided to the Plaintiff.[10] Information regarding the storage and care of the vests by Murray, however, is purely factual information which may be obtained upon Plaintiff's showing of "substantial need."

There is no dispute that Price's testimony on the application of NIJ testing protocols is relevant to the Plaintiff's case.  The parties agree that the nature of storage and care of the vests impacts the condition of the vests and is relevant to degradation of the vests. (December 4, 2012 hearing). Plaintiff asserts that vest storage and care information may be used to cross-examine Price and prepare rebuttal witnesses (Memorandum at 23) and this Court finds this assertion to be plausible.[11]  Plaintiff contends that "Murray is likely the only source of th[e] information [being sought], and the United States cannot obtain the substantial equivalent at all except from

---

[9]The results of any pre-testing of the vests by Murray and the manner in which the subset of vests was selected do not bear on the Price's classification and testing of vests using the NIJ protocols.

[10]Plaintiff's counsel has alleged that Toyobo "cherry-picked" the vest sample selected for testing by Price. (December 4, 2012 hearing.)   The Plaintiff's inspection of vests that were tested by Price should have provided information as to whether Toyobo's counsel selected "light and thin" vests, as suggested by Plaintiff's counsel during the hearing. Toyobo's counsel indicated that all vests that were tested by Price were: used; made of materials other than Zylon; and were "NIJ certified."  (December 4, 2012 hearing.)

[11]At the December 4, 2012 hearing, Plaintiff indicated its intention to pose a *Daubert* challenge to Price's testimony/conclusions.  *Daubert v. Merrell Dow Pharmaceuticals*, *Inc*., 509 U.S. 579 (1993).

him." (Memorandum at 23.) Toyobo does not dispute that Murray is the only source of information about storage and care of the vests received from the BPD.

The Plaintiff argues that, contrary to Toyobo's assertions, the "wear condition" assigned by Price to each vest does not necessarily capture the storage and care conditions (December 4, 2012 hearing) and the Court agrees with this assessment.[12] Accordingly, the Court finds that the Government has demonstrated a substantial need for factual information about the storage and care of the vests for purposes of evaluating the test results obtained by Price and preparing rebuttal witnesses. This information is thus found to be discoverable despite work product protection.

## B. Consulting Expert Immunity

In addition to work product protection, Toyobo relies upon consulting expert immunity pursuant to Rule 26(b)(4)(D), which shields from discovery facts known or opinions held by an expert retained by a party to prepare for trial and who is not expected to be called as a witness at trial.  Four commonly stated policy considerations underlying Rule 26(b)(4)[(D)] are:

> (1) the interest in allowing counsel to obtain the expert advice they need in order [to] properly evaluate and present their clients' positions without fear . . .; (2) the view that each side should prepare its own case at its own expense; (3) the concern that it would be unfair to the expert to compel its testimony and also the concern that experts might become unwilling to serve as consultants if they suspected their testimony would be compelled; and (4) the risk of prejudice to the party who retained the expert as a result of the mere fact of retention.

*Long Term Capital Holdings, L.P. v. United States*, No. 01-CV-1290 (JBA), 2003 WL

---

[12] A more rapid deterioration of the vests due to the type of care given to the vests and conditions under which they were stored may not be readily apparent through mere visual examination of the vests.

21269586, at *2 (D. Conn. May 6, 2003) (citations and internal quotations omitted).[13]

### 1. Exceptional Circumstances Exception

In order to bypass the protection offered by Fed. R. Civ. P. 26(b)(4)(D),  Plaintiff must demonstrate the existence of "exceptional circumstances." Rule 26(b)(4)(D)(ii). Exceptional circumstances "may exist when a non-testifying expert's report is used by a testifying expert as the basis for an expert opinion, or where there is evidence of substantial collaborative work between a testifying expert and a non-testifying expert." *Long Term Capital Holdings,* 2003 WL 21269586, at *2 (citations omitted).  In the *Long Term Capital* case, the court permitted limited depositions of the non-testifying experts who "prepared all of the quantitative analysis that was included in the expert reports" and "drafted portions of the expert reports" and "presented substantive analysis and conclusions to the [t]estifying [e]xperts."  2003 WL 21269586 *1.  *See also Derrickson v. Circuit City Stores, Inc.*, No. DKC 95-3296, 1999 WL 1456538 *7 (D. Md. Mar. 19, 1999) (requiring the disclosure of expert's assistant's work where such work was relied upon by the expert and incorporated into tables in his report).  In *Derrickson*, the court found that the defendant was unable to properly cross-examine the expert until defendant understood how the expert's non-testifying assistant manipulated the data the expert relied upon.  *Id.*

In the case of collaboration, the non-testifying expert can be deposed to determine whether the work that formed the basis of the testifying expert's opinion was performed in a competent manner and if reliance on such work is common.  *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002).   In the *Dura Automotive* case, the plaintiff's expert

---

[13]The *Long Term Capital* quote references Rule 26(b)(4)(B), which was later renumbered (D) and (E) .  Fed. R. Civ. P. 26 (2010 Amendments).

relied on work performed by [non-testifying] employees of his consulting firm when he formulated his opinions.  285 F.3d at 611-612.  Affidavits from the non-testifying employees were subsequently submitted to validate the reliability of the models used by these employees but the court characterized these affidavits as expert reports and excluded them nor was the expert permitted to testify.  *See also Herman v. Marine Midland Bank*, 207 F.R.D. 26, 30-32 (W.D.N.Y. 2002) (permitting deposition of non-testifying expert where there was "substantial collaborative work" between testifying and non-testifying experts in preparation of expert report).

Plaintiff argues that Murray "played a role comparable to that of the assistants discussed in *Derrickson* and *Dura Automotive*."  (Memorandum at 17.)[14]  This Court finds however that the relationship between testifying experts and non-testifying experts in the *Derrickson* and *Dura Automotive* cases is factually inapposite from the relationship between Murray and Price in this case where both experts have provided sworn statements that they did not share any information about the vests or otherwise collaborate.

Plaintiff argues that "Toyobo cannot use consulting expert immunity as both a sword and a shield whereby they disclose negative test results on vests tests by Price . . . while failing to provide information about the larger population of vests that may have been pre-tested by

---

[14]In its Motion, Plaintiff argues that "Price based his statistics and his conclusions regarding the validity of NIJ testing protocols on the subset provided by Murray, and Price is unable to testify as to the methods and analyses performed by Murray in putting together that subset."  (Memorandum at 17.)  These arguments based upon Murray's alleged selection of the subset have been discredited by Toyobo's assertion that it was counsel rather than Murray who selected the subset.  (Opposition at 2 n.1.)

Murray . . . ."  (Memorandum at 19-20.)[15]  *See S.E.C. v. Lavin*, 111 F.3d 921, 933 (D.C. Cir.

1997) ("The prohibition against selective disclosure of confidential materials derives from the

appropriate concern that parties do not employ privileges as a sword and as a shield.")  Plaintiff

asserts that in the instant case "[t]he validity of the opinion Price offers based on the failure rates

of the aramid vests he tested *could depend* on the representativeness of those vests as compared

to vests generally used for ballistic protection, *i.e.*, certified, non-recalled, non-expired vests."

(Memorandum at 11 (emphasis added)).[16]  Furthermore, background information about the vests

"necessarily relate[s] to the foundation and basis of Price's opinions" and is required by Plaintiff

for cross-examination of Price and preparation of its own experts.  (*Id.*)[17]

     Toyobo asserts however that "[b]ecause Mr. Price's opinions relate only to the protocols

utilized by the Government to test used vests as part of its Body Armor Safety Initiative

("BASI") (rather than performance of the vests themselves), he neither needed to, nor did he,

rely upon or consider the selection and sampling of the vests he tested."  (Opposition at 2; Price

Declaration ¶13.)  *See also* Murray Declaration ¶¶7, 9 (stating that any work he performed was

---

[15]Plaintiff overlooks the fact that Price did not rely on Murray's pre-test results and in fact was not even privy to such results.  (Price Declaration ¶7.)

[16]Plaintiff asserts that "one-third of all the panels tested by Price, . . ., were expired." (Memorandum at 7 n.7.)  During the hearing, Toyobo's counsel pointed out that while 33% of the non-Zylon vests tested by Price were out of warranty, 25% of the Zylon vests tested by the Untied States were out of warranty.  (December 4, 2012 hearing.)  Plaintiff also notes that several of the vests tested "were Second Chance models that Mr. Price had previously opined were poorly designed, one model was recalled, and one model never was certified by the NIJ." (Response at 1 n.1.)  This information may be used by Plaintiff to challenge Price's test results.

[17] Plaintiff argues that it is not "'seek[ing] to build its own case' with Murray's work, but instead intends to use it to expose the unscientific and faulty methodology Toyobo used to select the subset of vests tested by Price and the resulting unsound foundation of Price's opinions." (Memorandum at 19); *see Derrickson*, 1999 WL1456538, at *6.

on behalf of Toyobo's counsel and disclosed exclusively to counsel and not to Price.) Toyobo concludes that "[w]hether Mr. Price *should* have relied upon or considered the sampling and the selection process used by Toyobo's counsel is - at best- fodder for cross examination readily available to the Government already."  (Opposition at 2.)[18]

Plaintiff candidly admits that it wants to depose Murray and obtain his test results to impeach Price's conclusions in his report.  Plaintiff asserts that Price relied on Murray's test results without one shred of evidence to support its assertion.  Both Murray and Price in their declarations deny any sharing of data of the tested vests.  The undersigned finds that even assuming *arguendo* Plaintiff is correct that the vests tested by Price were "cherry-picked," the Plaintiff had the opportunity to view the vests and can challenge Price's conclusions by way of a *Daubert* hearing, his deposition and by cross-examination if Price testifies at trial.  In the absence of any evidence suggesting that Price collaborated with Murray or that Price relied upon or used Murray's test data, Plaintiff has not shown the exceptional circumstances to depose Murray or require him to produce his test results.

This Court finds however that while Price did not rely on any testing that Murray performed or otherwise collaborate with him, what Murray did with the vests in terms of storage and care conditions may have affected the results obtained by Price.  Putting these conditions within Murray's control effectively precludes Plaintiff from obtaining information [regarding storage and care], pursuant to a claim of consulting expert immunity, when these are factual inquiries that would normally be disclosed during discovery.  This Court finds that with regard to

---

[18]Toyobo focuses its argument on the sampling and selection processes, which involve legal strategy and trial preparation.

facts about the storage and care of the vests by Murray, the Plaintiff is entitled to obtain such

information under the exceptional circumstances exception to consulting expert immunity

because it is "impracticable for the [Plaintiff] to obtain [these] facts . . . on the same subject by

other means."  *See* Fed. R. Civ. P. 26 (b)(4)(D)(ii).  Such information should be provided to the

United States in the form of a sworn declaration by Murray.[19]


DATE: December 18, 2012                          _____/s/_____
                                                ALAN KAY
                                                UNITED STATES MAGISTRATE JUDGE

---

[19]Counsel for Toyobo has indicated repeatedly that it selected the vests for testing by Price.  The Price Declaration states that "[he] understand[s] that the used Kevlar vests [he] tested were obtained for [him] by counsel for Toyobo."  (Price Declaration ¶6.)  For purposes of making a more complete record in this case, the Court directs Murray to confirm in his sworn declaration that he did not select the vests that were provided to Price.