UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————————————  )
                                            )
UNITED STATES OF AMERICA,    )
ex rel. WESTRICK,                    )
                                            )
                Plaintiffs,          )
                                            )
                v.                      )  Civil Action No. 04-280 (RWR)
                                            )
SECOND CHANCE BODY ARMOR    )
INC., et al.,                            )
                                            )
                Defendants.         )
————————————————————)
                                            )
UNITED STATES OF AMERICA,    )
                                            )
                Plaintiff,            )
                                            )
                v.                      )  Civil Action No. 07-1144 (RWR)
                                            )
TOYOBO CO. LTD, et al.          )
                                            )
                Defendants.         )
————————————————————)


<u>MEMORANDUM OPINION AND ORDER</u>

The government brought these actions against defendants
Second Chance Body Armor, Inc. and related entities
(collectively "Second Chance"), Toyobo Co., Ltd. and Toyobo
America, Inc. (collectively "Toyobo"), and individual defendants
Thomas Bachner, Jr., Richard Davis, Karen McCraney, and Larry

McCraney alleging violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and common law claims, in connection with allegedly defective body armor material made or sold by the defendants involving federally-funded purchases.

Toyobo and the government each move for partial summary judgment on various claims in both actions.[1]  In Civil Action 04-280, Toyobo's first motion for partial summary judgment "seeks dismissal of the United States' claims under the False Claims Act, 31 U.S.C. § 3729(a)-(c), in Counts 1, 2, and 3 of the Amended Complaint that are premised on the 'at least 40,549' Zylon-containing bullet-resistant vests purchased by federal agencies off of the General Service Administration's ('GSA') Multiple Award Schedule ('MAS')."  Defs.' Toyobo Co., Ltd. and Toyobo America Inc.'s Mem. of P. & A. in Supp. of Their Mot. for Partial Summ. J., Civil Action No. 04-280, ECF No. 270-1 ("Toyobo's Mot. for Partial Summ. J. [270]") at 1.  Toyobo filed a second motion for partial summary judgment seeking dismissal of "the United States' claims under the False Claims Act in Counts 1, 2, and 3 of the Amended Complaint related to vests purchased by state, local, and tribal law enforcement agencies

---

[1] Toyobo Co., Ltd. and Toyobo America, Inc. are defendants in both related actions, Civil Action No. 04-280 and Civil Action No. 07-1144, and the issues presented by the parties in the cross-motions for partial summary judgment are similar in both actions. The motions will be treated together in this opinion.

for which the United States partially reimbursed those agencies under the [Bullet Proof Vest Grant Partnership Act][.]"  Toyobo Co., Ltd. and Toyobo America Inc.'s Mem. of P. & A. in Supp. of Their Mot. for Partial Summ. J., Civil Action No. 04-280, ECF No. 343-1 ("Toyobo's Mot. for Partial Summ. J. [343]") at 2. The government filed a motion for partial summary judgment, or in the alternative summary adjudication of issues, on liability for "sales of the Ultima vest to the United States pursuant to the GSA Schedule[,]" and on "Toyobo's liability for its false statements in the form of its false and misleading degradation reports."  United States' Mot. for Partial Summ. J. Against Defs. Toyobo Co. Ltd. and Toyobo America, Inc., Civil Action No. 04-280, ECF No. 344-1 ("Gov't Mot. for Partial Summ. J.") at 1 n.1 and at 2.

In Civil Action 07-1144, Toyobo moves for partial summary judgment on "the United States' claims under the False Claims Act (Counts 1, 2, and 3 of the Amended Complaint)" which includes the claims related to the bullet proof vests sold on the General Services Administration Schedule and those reimbursed by the United States through the Bullet Proof Vest Grant Partnership Act.  Toyobo Co., Ltd. and Toyobo America Inc.'s Mem. of P. & A. in Supp. of Their Mot. for Partial Summ. J., Civil Action No. 07-1144, ECF No. 95-1 ("Toyobo's Mot. for Partial Summ. J. [95]") at 1.  The government moves for partial

summary judgment as to "only those vests which were sold to the
United States by the Zylon Vest Manufacturers pursuant to the
GSA Multiple Award Schedule[,]" and does not address vests sold
through the Bulletproof Vest Grant Partnership Act.  United
States' Mem. of P. & A. in Supp. of its Mot. for Partial Summ.
J. Against Defs. Toyobo Co. Ltd. and Toyobo America, Inc., Civil
Action No. 07-1144, ECF No. 97-1 ("Gov't Mot. for Partial Summ.
J. [97]") at 2 n.3.

Because a genuine dispute as to material facts exists
regarding claims for Zylon vests sold off of the General Service
Administration's Multiple Award Schedule after a 2002 contract
modification took effect, summary judgment will be denied to
both the defendants and the government as to those claims.  As
the undisputed facts entitle defendants to judgment as a matter
of law on the claims for the remaining Zylon vests sold off of
that Schedule, summary judgment will be granted to the
defendants and denied to the government as to those claims.
Because a genuine dispute as to material facts exists regarding
whether Toyobo disseminated false information into the market,
summary judgment will be denied to both the government and the
defendants regarding claims for Zylon vests reimbursed through
the Bullet Proof Vest Grant Partnership Act.

BACKGROUND

The background of this case is set forth in <u>United States</u> <u>ex rel. Westrick v. Second Chance Body Armor, Inc.</u>, 685 F. Supp. 2d 129, 132-33 (D.D.C. 2010) and <u>United States v. Toyobo Co.,</u> <u>Ltd.</u>, 811 F. Supp. 2d 37, 41-44 (D.D.C. 2011).  Briefly, the government alleges that Second Chance and Toyobo contracted for Toyobo to supply Second Chance with the synthetic fiber "Zylon" for use in manufacturing Second Chance bulletproof vests. <u>Second Chance</u>, 685 F. Supp. 2d at 132; <u>Toyobo</u>, 811 F. Supp. 2d at 41-42.  These Zylon vests were then sold to, or paid for by, the federal government through two different programs – – the General Services Administration contracting program and the Bullet Proof Vest Grant Partnership Act program.  The government claims that Toyobo's false and fraudulent actions under each program give rise to liability under the False Claims Act. Specifically, the government claims that the bullet proof vests containing Zylon degraded without warning and did not maintain the same level of bullet-resisting efficacy during the five year warranty period.  See <u>Second Chance</u>, 685 F. Supp. 2d at 132; <u>Toyobo</u>, 811 F. Supp. 2d at 41-42.  Furthermore, the government claims that Second Chance and Toyobo knew that the vests were unable to maintain their bullet-resisting efficacy during the five year warranty period, did not inform the government or other buyers about this degradation concern, and intentionally

placed false information into the market suggesting that there was no degradation concern.  See Second Chance, 685 F. Supp. 2d at 132; Toyobo, 811 F. Supp. 2d at 41-43.

A.   General Services Administration Contracting Program

The General Services Administration ("GSA"), a federal agency responsible for administering the Multiple Award Schedule ("MAS") contracting program, negotiates contracts for commercial off-the-shelf items and makes those items available to various federal agencies without the need for those agencies to negotiate the prices or terms with contractors for themselves. Defs. Toyobo Co., Ltd. and Toyobo America Inc.'s Statement of Undisputed Material Facts in Supp. of Their Mot. for Partial Summ. J., 04-cv-280, ECF No. 270-2 ("Toyobo's SUMF [270]") at ¶¶ 11-12; Defs. Toyobo Co., Ltd. and Toyobo America, Inc.'s Statement of Undisputed Material Facts in Supp. of Their Mot. for Partial Summ. J., 07-cv-1144, ECF No. 95-2 ("Toyobo's SUMF [95]") at ¶¶ 7-8;  United States' Combined Separate Statement of Material Facts (1) in Resp. to the Statement of Undisputed Facts of Defs. Toyobo Co. Ltd. and Toyobo America, Inc. in Supp. of Their Mot. for Partial Summ. J. against the United States; and (2) in Supp. of the United States' Statement of Facts in its Opp'n to Toyobo's Mot. for Partial Summ. J., 04-cv-280, ECF No. 295 ("Govt.'s SUMF [295]") at ¶¶ 11-12.  "In 1995, GSA solicited offers to sell body armor on the MAS."  Toyobo's SUMF [270] at

¶ 14; Toyobo's SUMF [95] at ¶ 9; Govt.'s SUMF [295] at ¶ 14.
Second Chance responded to that solicitation and was
subsequently awarded a contract from the GSA. Toyobo's SUMF
[270] at ¶¶ 17-19; Govt.'s SUMF [295] at ¶¶ 17-19. "On
October 23, 1998, GSA issued a modification of the Second Chance
contract to add certain new body armor models to the MAS, one of
which, the Ultima, contained Zylon." Toyobo's SUMF [270] at
¶ 20; Govt.'s SUMF [295] at ¶ 20. "On October 25, 1999, GSA
issued another modification of the Second Chance contract to add
another body armor model, the Tri-Flex, which also contained
Zylon." Toyobo's SUMF [270] at ¶ 22; Govt.'s SUMF [295] ¶ 22.
Various federal agencies purchased and received Zylon-containing
vests from the MAS, and were invoiced directly by Second Chance.
Toyobo's SUMF [270] at ¶¶ 28-30; Govt.'s SUMF [295] at ¶¶ 28-30.

Each Zylon vest came with the standard commercial warranty.
Toyobo's SUMF [270] at ¶¶ 16-18; Toyobo's SUMF [95] at ¶ 22;
Govt.'s SUMF [295] at ¶¶ 16-18. The standard commercial
warranty substantively stated that the vests were

> warranted to provide protection as stated on the
> protective panel label and to be free of defects in
> material and workmanship for the applicable warranty
> period . . . . The protection properties of the
> PANELS are warranted for five (5) years from the date
> of purchase . . . . If a defect is found in material
> or workmanship . . . during the applicable warranty
> period, return the vest directly to SECOND CHANCE.
> SECOND CHANCE, in its discretion, without cost to you,
> will repair or replace the defective part or the
> entire vest.

Toyobo's SUMF [270] ¶ 6; Govt.'s SUMF [295] at ¶ 6.  The parties disagree as to the proper interpretation of this warranty and as to which, if any, additional agreements between the parties bear on the current dispute.

   B.   Bullet Proof Vest Grant Partnership Act

   The Bullet Proof Vest Grant Partnership Act ("BPVGPA") program is a partial reimbursement program for state, local, and tribal law enforcement agencies.  Toyobo's SUMF [95] at ¶ 42; Toyobo Co., Ltd. and Toyobo America Inc.'s Statement of Undisputed Material Facts in Supp. of Their Mot. for Partial Summ. J., 04-cv-280, ECF No. 343-2 ("Toyobo's SUMF [343]") at ¶¶ 5, 8; United States' Resp. to Defs. Toyobo Co., Ltd. and Toyobo America Inc.'s Statement of Undisputed Material Facts in Supp. of Their Mot. for Partial Summ. J., 04-cv-280, ECF No. 357-1 ("Govt.'s SUMF [357]") at ¶¶ 5, 8.  The program operated following seven essential steps.  First, Second Chance sent at least one Zylon vest to the National Institute of Justice ("NIJ") for the NIJ to certify that the vest complied with the NIJ's Ballistic Resistance of Body Armor Standard.  Second, the Bureau of Justice Assistance ("BJA") placed the Zylon vest, along with other NIJ certified vests, on a list of approved vests.  Third, a law enforcement agency used the BJA's online platform to inform the BJA that the agency intended to purchase

approved vests.  Fourth, the law enforcement agency purchased the approved vests from the vest manufacturer.  Fifth, when it received the vests from the vest manufacturer, the law enforcement agency confirmed to the BJA that the agency purchased the vests.  Sixth, the agency, after providing proof of purchase, requested reimbursement from the federal government's BPVGPA fund.  Seventh, the law enforcement agency received a partial reimbursement for the costs of the purchased vests.  See Toyobo's SUMF [343] at ¶¶ 5-27; Toyobo's SUMF [95] at ¶¶ 36-58; Govt.'s SUMF [357] ¶¶ 5-27.

The government alleges that Zylon vests provided through these programs were defective and resulted in false claims being submitted to the government.  Specifically, the government claims that some vests containing Zylon degraded spontaneously and at a rate unpredictable to the purchasers, making the vests unusable.  Toyobo acknowledges some degradation of the Zylon fiber, but argues that this degradation and its behavior concerning the Zylon degradation issue do not constitute false claims under the FCA.  Now, both parties move for partial summary judgment.

DISCUSSION

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment on an individual claim or part of a claim.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate

where the pleadings, the discovery and disclosure materials, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.; accord Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009). "The moving party bears the burden of providing a 'sufficient factual record that demonstrates the absence of a genuine issue of material fact.'" Walsh v. Fed. Bureau of Investigation, 905 F. Supp. 2d 80, 84 (D.D.C. 2012) (quoting Peavey v. Holder, 657 F. Supp. 2d 180, 187 (D.D.C. 2009)). At the summary judgment stage, a court must draw all "'justifiable inferences'" from the evidence in favor of the nonmovant, Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)), but not assess credibility or weigh the evidence. Anderson, 477 U.S. at 255. "The nonmovant must either 'come forward with specific facts showing that there is a genuine issue for trial[,]' or show that the materials [submitted] by the movant do not establish the absence of a genuine dispute." United States v. DRC, Inc., 856 F. Supp. 2d 159, 167 (D.D.C. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. The same summary

judgment standard applies to a motion for summary adjudication.
Barsamian v. City of Kingsburg, 597 F. Supp. 2d 1054, 1061 (E.D.
Cal. 2009) (citing, in part, California v. Campbell, 138 F.3d
772, 780-81 (9th Cir. 1998)).

I.   TOYOBO'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON THE GSA
     MAS COUNTS

      The government presents allegations under the False Claims
Act, 31 U.S.C. § 3729(a)(1)-(3)(2004).[2]  Second Am. Compl., 04-
cv-280, ECF No. 408 at ¶¶ 287-297; Am. Compl., 07-cv-1144, ECF
No. 73 at ¶¶ 239-248.  In order to prevail on a claim under the
version of the False Claims Act that was in effect when the
complaints were filed, the government must prove that a person
has "(1) knowingly present[ed], or cause[d] to be presented, to
an officer or employee of the United States Government or a
member of the Armed Forces of the United States a false or
fraudulent claim for payment or approval," or "(2) knowingly
[made], use[d], or cause[d] to be made or used, a false record
or statement to get a false or fraudulent claim paid or approved
by the Government," or "(3) conspire[d] to defraud the
Government by getting a false or fraudulent claim allowed or
paid."  31 U.S.C. § 3729(a)(1)-(3)(2004).

---

      [2] While the False Claims Act was amended in 2009, these
cases involve alleged violations of the Act's provisions that
were in effect when the complaints were filed in 2004 and 2007.

Toyobo argues that it is entitled to partial summary
judgment on the False Claim Act counts related to the bullet
proof vests sold through the GSA MAS program because the
government cannot prove that Toyobo, or Second Chance, submitted
a "false or fraudulent claim."  Toyobo's Mot. for Partial Summ.
J. [270] at 13; Toyobo's Mot. for Partial Summ. J. [95] at 13-
14.  The government argues that Second Chance, and/or Toyobo,
submitted "false or fraudulent claims" by (1) knowingly
providing defective bullet proof vests to the government, (2)
providing vests that did not meet performance benchmarks over
time, (3) withholding degradation information and releasing
manipulated data, and (4) invoicing the government for a product
that Second Chance, and/or Toyobo, knew did not comply with the
terms of the contract.  See United States' Opp'n to the Mot. of
Defs. Toyobo Co. Ltd. and Toyobo America, Inc. for Partial Summ.
J. Against the United States, 04-cv-280, ECF No. 293 ("Gov't
Opp'n to Toyobo's Mot. for Partial Summ. J. [293]") at 16-45;
see also United States' Mem. of P. & A. in Opp'n to the Mot. of
Defs. Toyobo Co. Ltd. and Toyobo America, Inc. for Partial Summ.
J. Against the United States, 07-cv-1144, ECF No. 109 ("Gov't
Opp'n to Toyobo's Mot. for Partial Summ. J. [109]") at 30-34.

United States v. Toyobo Co. Ltd, 811 F. Supp. 2d 37 (2011),
discussed at length the legal standard for falsity.  That
opinion noted that

A claim may be false under the FCA if it is either
factually or legally false.  United States v. Sci.
Applications Int'l Corp., 555 F. Supp. 2d 40, 49
(D.D.C. 2008).  A claim can be "factually false if it
invoices for services that were not rendered" or
incorrectly describes goods or services provided.
United States ex rel. Hockett v. Columbia/HCA
Healthcare Corp., 498 F. Supp. 2d 25, 64 (D.D.C.
2007).  Alternatively, a claim is legally false if it
contains an express false certification - - that is,
"a claim that falsely certifies compliance with a
particular statute, regulation or contractual terms,
where compliance is a prerequisite for payment."  Id.
(internal quotations marks omitted).  A claim also may
be legally false under an implied certification
theory.  Id.  One way to plead a false claim under
this theory is to plead "that the contractor withheld
information about its noncompliance with material
contractual requirements."  United States v. Sci.
Applications Int'l Corp., 626 F.3d 1257, 1269 (D.C.
Cir. 2010).  A contractual requirement can be
considered material if "both parties to the contract
understood that payment was conditional on compliance
with the requirement at issue."  Id.; see also United
States v. TDC Mgmt. Corp., Inc., 288 F.3d 421, 426
(D.C. Cir. 2002) (noting that withholding
"'information critical to the decision to pay'" is a
false claim (quoting Ab-Tech Constr., Inc. v. United
States, 31 Fed. Cl. 429, 434 (Fed. Cl. 1994))).
Another way to plead an implied certification claim is
to plead that the government would not have paid funds
to a party had it known of a violation of a law or
regulation, and "the claim submitted for those funds
contained an implied certification of compliance with
the law or regulation and was fraudulent."  United
States ex rel. Barrett v. Columbia/HCA Healthcare
Corp., 251 F. Supp. 2d 28, 33 (D.D.C. 2003).

Id. at 45.  While that opinion resolved various motions to

dismiss and looked no further than the pleadings, there must be

sufficient evidence at the summary judgment stage to enable a

reasonable jury to find in favor of the movant.  See Anderson,

477 U.S. at 252.  Accordingly, Toyobo, as the movant, must

demonstrate that the government lacks sufficient evidence to prove that Toyobo, or Second Chance, submitted a claim that was "false or fraudulent" within the meaning of the statute.  See Walsh, 905 F. Supp. 2d at 84.

> A.  Factual Falsity

A claim is "factually false if it invoices for services that were not rendered." Hockett, 498 F. Supp. 2d at 64.  The government argues that invoicing after "[t]he knowing sale of defective bullet proof vests to the United States is a violation of the FCA[,]" because the invoices are factually false.  Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [293] at 25; see Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [109] at 30. The government explains that the bullet proof vests sold to various agencies through the GSA MAS were defective because they

> did not meet several benchmarks of promised
> performance of bullet proof vests: [They] could not
> reliably provide protection for five years in actual
> use as guaranteed by Second Chance and as expected by
> the industry, the Government, and federal agency
> customers; [they] did not retain all but 6 percent of
> [their] V-50 speeds for five years as expressly set
> out by the Second Chance catalog; and vests that were
> dangerously defective could only be determined by
> destructive testing, thereby destroying confidence in
> all untested used Zylon vests.

Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [293] at 26. Toyobo argues that "Second Chance's standard commercial warranty cannot render Second Chance's invoices to federal agencies for vests purchased off of the MAS factually false."  Toyobo's Mot.

for Partial Summ. J. [270] at 14; see Toyobo's Mot. for Partial Summ. J. [95] at 16.  The government's factual falsity arguments rely on legal obligations, i.e. obligations to comply with contractual guarantees, performance metrics, and other contract terms - - all obligations that if violated sound in legal falsity, but do not sound in factual falsity.  See Hockett, 498 F. Supp. 2d at 64 (noting that a claim "is factually false if it invoices for services that were not rendered," and providing an example of factual falsity where the defendant submitted a claim stating "that patient X stayed [in a hospital receiving services] for five days where [the patient] really stayed for three").  Contra Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [293] at 23-30 (erroneously arguing various legal obligations as basis for factual falsity).  The government does not allege that Toyobo invoiced for 200 bullet proof vests and sent only 150 bullet proof vests; nor does the government allege that Toyobo invoiced for bullet proof vests and instead sent raincoats.  The government's claim here is not that it did not receive bullet proof vests, but that the bullet proof vests in this case did not comply with express and implied agreements. Accordingly, the government's reliance on a factual falsity theory of liability as to the GSA MAS counts is misplaced, but its supporting arguments are assessed below under a legal falsity theory.

B.   Legal Falsity

A claim "may be legally false because of an express false
certification or an implied false certification."  Hockett, 498
F. Supp. 2d at 64 (citing In re Cardiac Devices Qui Tam Litig.,
221 F.R.D. 318, 345 (D. Conn. 2004) and United States ex rel
Mikes v. Straus, 274 F.3d 687, 697-98 (2d Cir. 2001).  "[A]n
express false certification [is] 'a claim that falsely certifies
compliance with a particular statute, regulation or contractual
terms, where compliance is a prerequisite for payment.'"
Toyobo, 811 F. Supp. 2d at 45.  Also, a claim may be legally
false if "the contractor withheld information about its
noncompliance with material contractual requirements."  Sci.
Applications Int'l Corp., 626 F.3d at 1269.  For example, courts
have found claims to be legally false when a company falsely
labeled radio kits claiming that the products met certain
specifications in the contract, which they did not meet, United
States v. Bornstein, 423 U.S. 303, 307 (1976); when a company
failed to test certain brake shoes, but submitted claims to the
government claiming that the brake shoes were tested in
accordance with the contractual requirements, United States ex
rel. Compton v. Midwest Specialties, Inc., 142 F.3d 296, 304
(6th Cir. 1998); and when a company submitted counterfeit
regulators to the government claiming, by placing false labels

on the product, that the product was genuine.  United States v. Nat'l Wholesalers, 236 F.2d 944, 946 (9th Cir. 1956).

        1.    Express false certification theory

        The dispute between the parties over alleged express false certifications raises two questions: (1) what comprised the content of the contractual agreement between Second Chance and the GSA, and (2) what is the nature and legal effect of the warranty on the bullet proof vests provided by Second Chance through the GSA MAS program.

            a.    Content of the contractual agreement

        "Where parties to a contract have executed a completely integrated written agreement, it supersedes all other understandings and agreements with respect to the subject matter of the agreement between the parties, whether consistent or inconsistent[.]"  Daisley v. Riggs Bank, N.A., 372 F. Supp. 2d 61, 68 (D.D.C. 2005) (quoting Masurovsky v. Green, 687 A.2d 198, 202 (D.C. 1996)).  "Determining whether an agreement is integrated requires examining 'the intent of the parties at the time they entered into the agreement.'"  Id. (citing Piedmont Resolution, LLC, v. Johnston, Rivlin, & Foley, 999 F. Supp. 34, 50 (D.D.C. 1998).  "The first and most important step in ascertaining that intent is examination of the contract itself, for if a document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of

the parties' intent." <u>Id.</u> (citing <u>Hercules & Co., Ltd. v. Shama</u> <u>Rest. Corp.</u>, 613 A.2d 916, 927 (D.C. 1992)) (internal quotation marks omitted).

The government claims that the contract between Second Chance and the GSA included (1) Second Chance's five year warranty, (2) a guarantee in Second Chance's catalog stating that the "Zylon vests would lose no more than 6 percent of their ballistic performance over five years[,]" (3) a new material clause in the original solicitation stating that "the Contractor represents that supplies and components are new, including recycled (not used or reconditioned) and are not of such age or so deteriorated as to impair their usefulness or safety[,]" (4) a workmanship clause in the 1998 GSA contract modification with Second Chance that stated "each article must perform the functions of its intended use," (5) "a five year guarantee on the protective qualities of ballistic panels [that] was standard in the body armor industry," and (6) the expectation that vests sold as NIJ certified "would continue to stop bullets they had been designed to stop throughout the warranty period." Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [293] at 22-23; <u>see</u> Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [109] at 25. Toyobo does not dispute that the contractual agreement included the five year warranty, the new material clause, and the workmanship clause. Toyobo Co., Ltd. and Toyobo America Inc.'s

Reply Mem. of P. & A. in Further Supp. of Their Mot. for Partial

Summ. J., 04-cv-280, ECF No. 306 ("Toyobo's Reply [306]") at 7-

10; Toyobo Co., Ltd. and Toyobo America Inc.'s Reply Mem. of P.

& A. in Further Supp. of Their Mot. for Partial Summ. J., 07-cv-

1144, ECF No. 113 ("Toyobo's Reply [113]") at 7-12.  However,

Toyobo does dispute the government's contention that the

statements in Second Chance's catalog, the industry standard, or

the expectations of NIJ are a part of the contractual agreement.

Toyobo's Reply [306] at 8-11; Toyobo's Reply [113] at 11-12.

The original contract agreement between the GSA and Second

Chance establishing the first non-Zylon bullet proof vests on

the MAS contained the following key language:

> Your offer on Solicitation Number 7FXG-B3-95-8411-B
> including the additions or changes made by you which
> additions or changes are set forth in full above, is
> hereby accepted as to the items listed above and on
> any continuation sheets.  This award consummates the
> contract which consists of the following documents:
> (a) the Government's solicitation and your offer, and
> (b) this award/contract.  No further contractual
> document is necessary.

Toyobo's Mot. for Partial Summ. J. [270], Ex. 15, ECF No. 270-18

("Second Chance's 8/1/96 Award Contract") at 2.  The language

quoted above is "facially unambiguous" as to the parties' intent

for the government's solicitation, Second Chance's offer, and

the "Award/Contract" letter to serve as the complete and

integrated terms of the contractual agreement.  See, e.g.,

Daisley, 372 F. Supp. 2d at 68; Washington v. Thurgood Marshall

Academy, Civil Action No. 03-2570 (CKK), 2006 WL 1722332 at *9
(D.D.C. June 19, 2006); see also, Toyobo's Mot. for Partial
Summ. J. [270], Ex. 13, ECF No. 270-16 ("Carol Batesole Dep.")
at 35:24 - 36:3 (negotiating party for the GSA agreeing that the
government's solicitation, Second Chance's offer, and the
Award/Contract letter "encompassed the contract between Second
Chance and the GSA"). Any term alleged to be a part of the
contractual agreement between GSA and Second Chance, then, must
be found in the government's solicitation, Second Chance's
offer, the "Award/Contract" letter, or a subsequent modification
of the contract.

Regarding in turn each disputed provision of the contract,
the government and Toyobo first disagree about the incorporation
of statements made in Second Chance's catalog. Generally, "when
a document incorporates outside material by reference, the
subject matter to which it refers becomes part of the
incorporating document just as if it were set out in full."
Tower Ins. Co. of New York v. Davis/Gilford, 967 F. Supp. 2d 72,
80 (D.D.C. 2013) (quoting BP Amoco Corp. v. NLRB, 217 F.3d 869,
874 (D.C. Cir. 2000)). The government asserts that the catalog
statements were part of the contractual agreement because they
were included with a 2002 modification to the original GSA MAS
contract. See Gov't Opp'n [293] at 6 (citing Gov't SUMF [295]
¶ U.S. Fact 21) ("This catalog guarantee was another express

warranty that was incorporated into the GSA contract."); see also Gov't SUMF [295], Ex. 74, ECF No. 297-3 ("Second Chance Catalog Statement") at 1 ("This modification is being submitted to add new items, delete obsolete ones, and have our current pricelist incorporated. Two copies of all product literature and properly marked pricelists are attached."). Because the catalog statement was attached to the contract modification, it was properly incorporated into the contractual agreement. See, e.g., Tower Ins. Co. of New York, 967 F. Supp. 2d at 80; Maryland Nat. Capital Park and Planning Comm'n v. Lynn, 514 F.2d 829, 833 (D.C. Cir. 1975) ("It is a general rule that reference in a contract to extraneous writings renders them part of the agreement for indicated purposes[.]"). Accordingly, the following statement from the Second Chance catalog ("the 6% guarantee") was a term of the contract for all claims after the 2002 contract modification:

> Second Chance also measures and records benchmark V-50 results at the time of certification. V-50 is a scientifically reproducible ballistic limit employed by the U.S. military that measures the velocity at which 50% of the projectiles are stopped by the armor. This number provides a reference point against which we can measure the performance of the armor over time. Second Chance guarantees its vest to perform at this level within normal statistical variation (+/-6%) during the five year guaranteed life of the vest.[3]

---

[3] This statement appears in the frequently asked questions ("FAQ") section of the Second Chance catalog in response to the question: "To what standards are Second Chance vests certified?" Second Chance Catalog Statement at 5. The following warranty

Second Chance Catalog Statement at 5.

Second, the government and Toyobo disagree about incorporating the industry standard into the contract.  The government does not point to anything in the government's solicitation, Second Chance's offer, or the "Award/Contract" that explicitly incorporates the government's interpretation of the five year industry standard.  See Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [293] at 22 (citing deposition testimony about the advent of the five year warranty).  Thus, the industry standard is not an explicit term of the contractual agreement.

Third, the government and Toyobo disagree about incorporating into the contractual agreement NIJ's expectations about the longevity of the bullet proof vests.  Specifically, the government seems to argue that because vests bearing the "NIJ Certified" label were expected to perform at a certain level, Toyobo should be held liable under the FCA because some vests deteriorated below the expectations that come with an "NIJ Certified" label.  Id. at 22.  However, the government again does not point to anything in the government's solicitation,

language also appears in the FAQ section of the Second Chance catalog: "Second Chance Warrants its ballistic armor for 5 years to perform as stated on the label to protect against the designated projectiles for each level.  Warranty is null and void if improper care, misuse or neglect occurs."  Id.

Second Chance's offer, or the "Award/Contract" that expressly incorporates the expectations of NIJ, nor does the government argue that Toyobo gained the "NIJ Certified" label for its vests through faulty means.  See id. at 22-23 (citing deposition testimony from NIJ officials).  NIJ expectations, at least as the government has presented them, are not explicit terms in the contractual agreement.

That leaves the five year commercial warranty, the workmanship clause, the new material clause, and the Second Chance Catalog statement as the contractual language upon which the government may rely to prove its express false certification theory.  The essence of the government's argument is that Toyobo, and Second Chance, made false claims after furnishing to various government agencies bullet proof vests that they knew did not comply with those four contractual provisions.  Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [293] at 22-26; Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [109] at 24-25.  Specifically, the government argues that these contractual terms individually or in tandem created an explicit obligation for the bullet proof vests to perform at a specified level for five years, at which level some of the vests did not perform; and further that Toyobo and Second Chance knew when the vests were sold to federal agencies that the vests would not meet the expected performance level during the five year period.  Gov't

Opp'n to Toyobo's Mot. for Partial Summ. J. [293] at 25-26; see also Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [109] at 24-25.  The government finds this explicit obligation in the obligation-creating language found in the four noted contract terms.

        b.   Nature and legal effect of the warranty

    At the heart of this case is a dispute over the meaning of the word "warranty," and other obligation-creating language. "[A]s with any contract, if its terms are unambiguous on their face, interpretation is considered a question of law appropriately resolved by this court."  United States ex rel. Dept. of Labor v. Ins. Co. of N. Am., 131 F.3d 1037, 1042 (D.C. Cir. 1997) (citing NRM Corp. v. Hercules, Inc., 758 F.2d 676, 682 (D.C. Cir. 1985)).  "Where, however, a contract provision is ambiguous, extrinsic evidence may be necessary to ascertain the mutual intent of the parties and thus resolve the ambiguity, and its admission is within the province of the district court." Id. (citing America First Inv. Corp. v. Goland, 925 F.2d 1518, 1522 (D.C. Cir. 1991)).  "[A] contract provision is ambiguous 'if it is reasonably susceptible of different constructions, but it is not ambiguous merely because the parties later disagree on its meaning.'"  Id. (quoting Bennet Enters., Inc. v. Domino's Pizza, Inc., 45 F.3d 493, 497 (D.C. Cir. 1995)).

The word warranty, or a derivative of it, appears in two of
the contract terms properly relied on by the government.  <u>See</u>
Second Chance's 8/1/96 Award Contract at 5 ("WARRANTY
PROVISIONS: 5 years on ballistic panels, 2 years on carriers"),
and Second Chance Catalog Statement at 5 ("Second Chance
warrants its ballistic armor for 5 years to perform as stated on
the label to protect against the designated projectiles for each
level.").  The parties do not dispute that the warranty language
in these contract terms referred to Second Chance's standard
commercial warranty, although the parties disagree about the
interpretation of the standard commercial warranty.  <u>See</u>
Toyobo's SUMF [270] ¶ 6; Gov't SUMF [295] ¶ 6.  Furthermore, the
parties agree that

> Second Chance's standard commercial warranty on its
> body armor was stated differently at different times,
> though remained consistent in substance, e.g.: '[T]his
> vest is warranted to provide protection as stated on
> the protective panel label and to be free of defects
> in material and workmanship for the applicable
> warranty period . . . .  The protection properties of
> the PANELS are warranted for five (5) years from the
> date of purchase . . . .  If a defect is found in
> material or workmanship . . . during the applicable
> warranty period, return the vest directly to SECOND
> CHANCE.  SECOND CHANCE, in its discretion, without
> cost to you, will repair or replace the defective part
> or the entire vest.'

Toyobo's SUMF [270] ¶ 6; Gov't SUMF [295] ¶ 6.  The parties'
obligations under the warranty are facially unambiguous.  If at
any point within the five-year period the bullet proof vests

became defective, the owner was to send the vest to Second Chance to be repaired or replaced.  Nothing in the language of the warranty explicitly guarantees that the vests will function perfectly for the five-year period; indeed the warranty presupposes that some of the vests may not survive the five-year period.  It may very well be a poor business decision to put a product into the market with a warranty that the manufacturer knows the product cannot satisfy, but poor business decisions do not necessarily create an express false certification claim under the FCA.

The government conflates two distinct ideas: defectiveness and durability.  A product is not defective simply because it does not last as long as the parties expect it to, unless the parties have explicitly contracted for a durability requirement - - a requirement that cannot be found in the standard commercial warranty here.  See Walsh v. Ford Motor Co., 588 F. Supp. 1513, 1535-1538 (D.D.C. 1984).  In Walsh, as here, the manufacturer warranted its product for a limited period of time and promised to "repair, replace or adjust free any parts . . . found to be defective in factory materials or workmanship."  Id. at 1535.  The plaintiffs in Walsh, relying on the warranty, sought to have Ford Motor Company repair defects that may have developed during the warranty period, but that were not brought to Ford's attention during the warranty period.  Id. at 1536.

The <u>Walsh</u> Court declined the plaintiffs' invitation to reinterpret the plain language of the warranty to include these "latent defects." <u>Id.</u> ("The Court cannot accept such a drastic interpretation of the plain language of the warranty."). Unlike the plaintiffs in <u>Walsh</u>, the government became aware of the defects in the bullet proof vests during the warranty period. However, as did the plaintiffs in <u>Walsh</u>, the government asks that the warranty be reinterpreted to require more than the plain language of the warranty unambiguously requires. Second Chance's warranty reasonably bears only one promise - - if the bullet proof vests become defective within five years, they will be repaired or replaced.

The new material clause and the workmanship clause do no more than the warranty provisions do to advance the government's argument that some vests were defective because they deteriorated during the five year warranty period. The operative language in the new material clause provides that "the Contractor represents that supplies and components are new, including recycled (not used or reconditioned) and are not of such age or so deteriorated as to impair their usefulness or safety." Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [293] at 22. The government has not alleged that Second Chance used old materials in the construction of the vests, but instead alleges that "[t]he vests deteriorated unpredictably and

invisibly, and so impaired their usefulness or safety." Id.
at 23.  However, the plain language of the new material clause
would require some nexus between a falsely described condition
of the vests, and their component materials at the time of
delivery and the resulting impairment to establish falsity.
That is, the government would have to allege and show that the
vests were old, worn out, or in poor condition when delivered,
impairing their safety or usefulness.  The government does not
claim that the vests were in poor condition because the vests
were old or created from used material when they were received.
Instead, the government claims that with no prior warning from
the defendants, the vests deteriorated during the life of the
vest.  Because a durability requirement cannot be read into the
language of the new material clause, the new material clause
cannot provide the basis for an express false certification
claim under the FCA.

The workmanship clause provides that: "[a]n item contracted
for must be new, current model at the time of offer, unless
otherwise specified.  Each article must perform the functions
for its intended use."  Gov't SUMF [295], Ex. 23, ECF No. 295-2
("10/13/1998 Contract Modification") at 2; United States'
Separate Statement of Undisputed Material Facts in Supp. of its
Mot. for Partial Summ. J. or in the Alternative, Summ. Adjudic'n
of Issues Against Defs. Toyobo Co., Ltd. and Toyobo America

Inc., 07-cv-1144, ECF No. 97-2 ("Gov't SUMF [97]") at ¶ U.S.
Fact 32.  The government argues that "[a] deteriorated vest does
not perform the functions of its intended use."  Gov't Opp'n to
Toyobo's Mot. for Partial Summ. J. [293] at 23.  The intended
use for bullet-proof vests is to stop bullets.  There is no
dispute between the parties that some of the vests performed
this function, and some of them did not.  See Gov't Opp'n to
Toyobo's Mot. for Partial Summ. J. [293] at 29; Toyobo's Reply
[306] at 9-10.  For those vests that did not meet their intended
use, the government argues that their failure is a function of
the vests inability to meet the government's interpretation of
the warranty requirements.  See Gov't Opp'n to Toyobo's Mot. for
Partial Summ. J. [293] at 29.  As is discussed above, the plain
language of the warranty provision cannot bear the government's
interpretation.  The workmanship clause, then, is an
insufficient basis for an express false certification claim
under the FCA.

    Even if the term "warranty" were ambiguous, which the
government does not explicitly argue, the government would need
to put forward objective evidence of extra-contractual
statements that inform the meaning of the warranty.  See Mesa
Air Grp., Inc. v. Dep't of Transp., 87 F.3d 498, 503 (D.C. Cir.
1996) ("However, when a court determines that a contract's
language is ambiguous as a matter of law, it must consider other

factors in determining the intentions of the parties in constructing the agreement.  To be sure, the existence of an ambiguity must be demonstrated by objective evidence." (citations omitted)).  Presumptively, the government would offer the industry standard and NIJ expectation evidence that was excluded from consideration in the analysis above.  Taking the government's factual assertions regarding the industry standard and NIJ expectation evidence as true, there is no evidence that these extra-contractual considerations were a part of, or otherwise informed, the actual contracting for Second Chance vests to be placed on the GSA MAS.  The government's broad assertion that "[h]ad the United States known that the Second Chance Zylon vests were defective and would not meet the above benchmarks, the United States would not have accepted or paid for the vests" makes perfect sense, but the government does not substantiate with record evidence that its assertion stemmed from a false warranty.  Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [293] at 26-27; see also Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [109] at 35.

In defending against Toyobo's motions for partial summary judgment, the government also relies on the 6% guarantee in the Second Chance catalog.  This guarantee applies only to those claims after the 2002 contract modification - - the time at which the Second Chance catalog was properly incorporated into

the terms of the agreement between the parties.  The plain
language of the Second Chance catalog statement guaranteed that
the vests would not fail to perform at the certified V-50 level
within "normal statistical variation (+/-6%) during the five
year guaranteed life of the vest."  Second Chance Catalog
Statement at 5.  Toyobo argues that the 6% guarantee is "an
explanation of how Second Chance would interpret its standard
commercial warranty," i.e., if the vests deteriorated below 6%
of the certified V-50 level, the vest would be replaced or
repaired consistent with the standard commercial warranty.
Toyobo's Mot. for Partial Summ. J. [270] at 17.  This may be a
reasonable interpretation of the 6% guarantee, especially in
light of the warranty language that appears on the same page of
the Second Chance Catalog as the 6% guarantee.  See Second
Chance Catalog Statement at 5.  However, the government's
reading of the 6% guarantee as an independent term of the
agreement may also be a reasonable interpretation of the
guarantee language.  Neither party has put forward evidence that
negates either interpretation of the 6% guarantee.  "If there is
more than one interpretation that a reasonable person could
ascribe to the contract, while viewing the contract in context
of the circumstances surrounding its making, the contract is
ambiguous."  Nextel Spectrum Acquisition Corp. v. Hispanic Info.
& Telecomm. Network, Inc., 503 F. Supp. 2d 334, 338 (D.D.C.

2007) (citing <u>Morgan v. American Univ.</u>, 534 A.2d 323, 330 (D.C. 1987)).   "The choice among reasonable interpretations of an ambiguous contract is for the fact-finder to make based on the evidence presented by the parties to support their respective interpretations."   <u>Id.</u> (citing <u>Howard Univ. v. Best</u>, 484 A.2d 958, 966 (D.C. 1984)).   Since a jury must decide whether Second Chance's 6% guarantee was an express false certification for the vests purchased from the GSA MAS after the 2002 contract modification, Toyobo's motion for partial summary judgment as to those claims will be denied.

2.   Implied false certification

The D.C. Circuit recently held

> that to establish the existence of a "false or
> fraudulent" claim on the basis of implied
> certification of a contractual condition, the FCA
> plaintiff - - here the government - - must show that
> the contractor withheld information about its
> noncompliance with material contractual requirements.
> The existence of express contractual language
> specifically linking compliance to eligibility for
> payment may well constitute dispositive evidence of
> materiality, but it is not, as [the defendant] argues,
> a necessary condition.   The plaintiff may establish
> materiality in other ways, such as through testimony
> demonstrating that both parties to the contract
> understood that payment was conditional on compliance
> with the requirement at issue.

<u>Sci. Applications Int'l Corp.</u>, 626 F.3d at 1269.   Relying on an implied false certification theory, the government argues that "[t]he invoices submitted by Second Chance constituted an implied certification that the Zylon vests would meet their

five-year warranty of ballistic performance and the 6% catalog guarantee." Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [293] at 31. The government also argues that Second Chance's alleged failure to meet industry standards and NIJ-compliance testing standards rendered the invoices impliedly false certifications. Id. at 34.

The D.C. Circuit's test for falsity based on an implied certification theory requires the government to prove (1) that Toyobo withheld information about its noncompliance with (2) material contract requirements. Sci. Applications Int'l Corp., 626 F.3d at 1269. The underlying dispute here - - whether a material contract requirement existed that the bullet-proof vests meet certain benchmarks for a five-year period - - implicates the second prong of the D.C. Circuit's test.[4] The 6% guarantee is a contract term that might impose a durability requirement, and a jury must determine that. Because the issues of whether any material contract term imposes a durability requirement for GSA MAS claims after the 2002 contract

---

    [4] Sci. Applications Int'l Corp. involved no dispute between the parties that Science Applications International Corporation ("SAIC") was required to refrain from conflict of interest relationships and to notify the government if any conflict of interest relationships arose. 626 F.3d at 1261-65. Instead, the key issue in Sci. Applications Int'l Corp. was whether falsity based on the implied certification theory can be satisfied when the contract does not expressly condition payment on a particular obligation in the contract. Id. at 1264-65.

modification was executed, and whether an implied false
certification theory applies in this matter cannot be decided at
the summary judgment stage, Toyobo's motion for partial summary
judgment on the GSA MAS claims that arose after the 2002
contract modification was executed will be denied.

    C.    <u>Fraudulent Inducement</u>

    "Although the focus of the FCA is on false 'claims,' courts
have employed a 'fraud-in-the-inducement' theory to establish
liability under the Act for each claim submitted to the
Government under a contract which was procured by fraud, even in
the absence of evidence that the claims were fraudulent in
themselves."  <u>United States ex rel. Bettis v. Odebrecht
Contractors of Cal., Inc.</u>, 393 F.3d 1321, 1326 (D.C. Cir. 2005)
(citation omitted).

> To prevail under [a] fraudulent inducement theory,
> [the government] must prove not only that the omitted
> information was material but also that the government
> was induced by, or relied on, the fraudulent statement
> or omission when it awarded the contract. . . .  In
> essence, the essential element of inducement or
> reliance is one of causation.  [The government] must
> show that the false statements upon which [the
> government] relied, assuming [it] establishes that it
> did, caused [the government] to award the contract at
> the rate that it did.

<u>United States ex rel. Thomas v. Siemens AG</u>, 991 F. Supp. 2d 540,
569 (E.D. Pa. 2014) (citing <u>United States ex rel. Marcus v.
Hess</u>, 317 U.S. 537, 543-44 (1943)).  Toyobo presents two

preliminary arguments as to why the fraudulent inducement theory should not be considered in this case at all.

First, Toyobo argues that "to proceed under a fraudulent inducement theory, the United States must prove that the 1995 contract was 'originally obtained . . . through fraud.'" Toyobo's Mot. for Partial Summ. J. [270] at 23 (citing United States ex rel. Head v. Kane Co., 798 F. Supp. 2d 186, 196-97 (D.D.C. 2011)); see also Toyobo's Mot. for Partial Summ. J. [95] at 26-27. The government argues that "[a] party can be fraudulently induced to modify or extend a contract[,]" and that the government was in fact fraudulently induced to modify the contract to add Zylon vests. Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [293] at 41-42 (citing United States ex rel. Frascella v. Oracle Corp., 751 F. Supp. 2d 842, 855-56 (E.D. Va. 2010) and Veridyne Corp. v. United States, 86 Fed. Cl. 668 (2009)); see also Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [109] at 35-36. Because each contract modification provided an opportunity for Second Chance to add new products to the GSA MAS program and a new opportunity for reliance on allegedly false statements, there is no reason to limit the opportunities for fraudulent inducement to the original 1995 contract. If false statements were used to induce the government to make bullet-proof vests available to various federal agencies, those statements are a violation of the FCA whether they induced the

government to make the initial contract or any subsequent
modifications.

Next, Toyobo argues that the fraudulent inducement theory
cannot be applied to it in this case because Toyobo did not
actually contract with the government itself.  See Toyobo's Mot.
for Partial Summ. J. [270] at 25-26; Toyobo's Mot. for Partial
Summ. J. [95] at 28-29; Toyobo's Reply [306] at 16-17.  However,
Toyobo's attempt to limit the fraudulent inducement theory in
such a way is at odds with that theory's history in FCA
doctrine.  The apparent genesis, or at least the prominent
beginning, of the fraudulent inducement theory under the FCA is
found in United States ex rel. Marcus v. Hess, 317 U.S. 537
(1943), superseded by statute on other grounds as recognized in
Schindler Elevator Corp. v. United States ex rel. Kirk, 131
S. Ct. 1885, 1893-94 (2011).  See Odebrecht Contractors of Cal.,
Inc., 393 F.3d at 1326 ("The most prominent [fraudulent
inducement] case[] is United States ex rel. Marcus v. Hess.").
In Hess, the Supreme Court held a group of potential federal
contractors liable under the FCA for colluding in the bidding
process and artificially increasing bid prices.  317 U.S. at
537, 539.  The Court reasoned that the provisions of the FCA
"considered together, indicate a purpose to reach any person who
knowingly assisted in causing the government to pay claims which
were grounded in fraud, without regard to whether that person

had direct contractual relations with the government." Id. at
544-45.  Hess shows that the lack of a direct contractual
relationship between Toyobo and the government should not end
the analysis.  Indeed, only one of the bidders engaged in the
artificial bid inflation scheme in Hess ultimately received a
contract from the government, but all of the "bid-rigging"
companies were liable under the FCA.  Toyobo's preliminary
arguments do not present a barrier to applying the fraudulent
inducement theory in this case.

    Regarding the parties' substantive arguments, the
government claims that "Toyobo's withholding of key degradation
information and releasing data that it had manipulated in order
to present a more favorable degradation trend line" substantiate
a claim under the fraudulent inducement theory.  Gov't Opp'n to
Toyobo's Mot. for Partial Summ. J. [293] at 44-45; see also
Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [109] at 37-
38.  Assuming that the government is correct that Toyobo
manipulated data to present a more favorable degradation trend
line and that the government became aware of the data at some
point before a contract modification, the government would still
need to demonstrate that it relied on the manipulated data when
making the decision to initially contract or modify the
contractual agreement.  See United States ex rel. Thomas, 991 F.
Supp. 2d at 569-70.  The government has not presented any

evidence that suggests that the government relied on the allegedly manipulated data when making the contract modifications to add Zylon vests to the GSA MAS.  Indeed, Toyobo has presented evidence which suggests that the data was not relied upon by the government during the contract modifications. See Carol Batesole Dep. at 55:1 – 55:13 (the negotiating party for the GSA explaining that price, not scientific data served as the basis for contract modifications).  Because the government has not presented any evidence that Toyobo's allegedly manipulated data *caused* the government to place the Zylon vests on the GSA MAS, the government's fraudulent inducement theory as to those counts cannot survive.

Because Toyobo has sufficiently demonstrated that the government cannot bear its burden to prove that false claims were submitted or fraudulently induced in relation to those Second Chance Zylon vests placed on the GSA MAS before 2002, Toyobo's Motions for Partial Summary Judgment [95, 270] on Counts 1, 2, and 3 related to the vests placed on the GSA MAS will be granted.  Because a genuine dispute as to material facts exists as to those Zylon vests purchased through the GSA MAS after the 2002 contract modification, specifically under the legal falsity analysis, Toyobo's Motions for Partial Summary Judgment [95, 270] on Counts 1, 2, and 3 related to those vests will be denied.

II.  TOYOBO'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON BPVGPA
     COUNTS

     The government alleges that Toyobo fraudulently induced

contracts between various agencies and Second Chance that were

partially reimbursed under the BPVGPA.  See United States' Mem.

of P. & A. in Opp'n to the Mot. for Partial Summ. J. of Defs.

Toyobo Co. Ltd. and Toyobo America, Inc., 04-cv-280, ECF No. 357

("Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [357]") at

25; Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [109] at

34-35.  The government's fraudulent inducement theory for the

BPVGPA counts is based on the claim that Toyobo placed false

information into the market that caused the individual agencies

to purchase the Zylon vests, for which the government partially

reimbursed the agencies.  Gov't Opp'n to Toyobo's Mot. for

Partial Summ. J. [357] at 11-13; Gov't Opp'n to Toyobo's Mot.

for Partial Summ. J. [109] at 34-35.  Toyobo's second motion for

partial summary judgment attacks the government's fraudulent

inducement theory on three grounds.[5]  Toyobo's Mot. for Partial

---

[5] The government's brief opposing Toyobo's dispositive
motion on the BPVGPA counts does not defend against Toyobo's
argument that no claims submitted for the BPVGPA program were
factually false or legally false.  Instead, the government
argues that "Toyobo's (1) fraudulent inducement of Government
officials involved with the BPVGPA program, the federal
researchers who attempted [to] determine Zylon's effectiveness
as a ballistic-resistant material and the Agencies that
purchased bulletproof vests, [and the] (2) misconduct in causing
Second Chance to make implied false certifications relating to
its warranties and catalog guarantees," sufficiently establish

Summ. J. [343] at 17-19.   First, Toyobo argues that there was no

contract between Toyobo or Second Chance and the government

under the BPVGPA program.   Id. at 17; Toyobo's Mot. for Partial

Summ. J. [95] at 28.   While neither Toyobyo nor Second Chance

had a *direct* contract with the federal government for the vests

sold under the BPVGPA program, there were contracts between

Second Chance and the various agencies.   Each sale of a vest to

an agency that was later reimbursed by the federal government

through the BPVGPA program was a contract to which Second

Chance, and consequently Toyobo, bore a significant relationship

as direct supplier, and materials-provider, respectively.   As is

discussed above, demonstrating falsity under a fraudulent

inducement theory does not necessarily require a contractual

relationship between the government and the party alleged to

have engaged in the fraudulent inducement.   Toyobo's argument

that the lack of a direct contractual relationship between it

and the federal government entitles it to partial summary

judgment on the BPVGPA counts fails.

    Second, Toyobo argues that no false statements were made.

Toyobo's Mot. for Partial Summ. J. [343] at 18; Toyobo's Mot.

for Partial Summ. J. [95] at 30.   Toyobo suggests that "it would

---

an FCA claim.   Gov't Opp'n to Toyobo's Mot. for Partial Summ. J.
[357] at 2-3.   Toyobo's attack on the government's factual and
legal falsity theories as to the BPVGPA counts accordingly are
deemed conceded.

have been impossible for Toyobo to have made any statements to
induce the government with respect to its BVPA reimbursements"
because "[t]he only relevant representation made to the
government when law enforcement agencies sought BVPA
reimbursement was that the vests were on the BJA's list of NIJ-
certified vests."  Toyobo's Mot. for Partial Summ. J. [343] at
18; Toyobo's Mot. for Partial Summ. J. [95] at 30.  The
government argues that it was fraudulently induced to make
reimbursements due to false statements made by Toyobo that were
relied on by the various agencies when they selected vests.
Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [357] at 25;
Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [109] at 38-
39.  Specifically, the government alleges that Toyobo "assured
the industry that it had not found any serious indication of
Zylon strength degradation" when Toyobo actually did have such
data.  United States' Separate Statement of Undisputed Material
Facts in Supp. of its Mot. for Partial Summ. J. or, in the
Alternative, Summ. Adjudic'n of Issues, Against Defs. Toyobo Co.
Ltd. and Toyobo America, Inc., 04-cv-280, ECF No. 344-4 ("Gov't
SUMF [344]") at ¶ U.S. Fact 62;[6] Gov't SUMF [97] at ¶ U.S. Fact
62.  Furthermore, the government alleges that Toyobo released
into the market manipulated Zylon degradation data.  Gov't SUMF

---

[6] The government incorporated by reference Gov't SUMF [344]
into Gov't SUMF [357].

[344] at ¶ 117; Gov't Opp'n to Toyobo's Mot. for Partial Summ. J. [109] at 37.   Toyobo disputes both of these allegations. Resp. of Toyobo Co. Ltd. and Toyobo America, Inc. to United States' Separate Statement of Undisputed Material Facts in Supp. of its Mot. for Partial Summ. J., or in the Alternative, Summ. Adjudic'n of Issues Against Defs. Toyobo Co. Ltd. and Toyobo America, Inc., ECF No. 358-1 ("Toyobo's SUMF [358]") at ¶¶ 62, 117.   This factual dispute as to the nature and validity of Toyobo's assurances to the market present a genuine dispute as to material facts that cannot be resolved at the summary judgment stage.   Moore, 571 F.3d at 66.   If Toyobo provided invalid assurances to the market and put manipulated data into the marketplace, that could allow the government to demonstrate that it was fraudulently induced to reimburse for vests that agencies selected in reliance on Toyobo's assertions.

     Third, Toyobo argues that the fraudulent inducement theory should not extend to third parties and that the nexus between Toyobo and the "claim" that was presented to the government is too attenuated.   Toyobo's Mot. for Partial Summ. J. [343] at 18-19; Toyobo's Mot. for Partial Summ. J. [95] at 31-32.   Since demonstrating falsity under a fraudulent inducement theory does not necessarily require a contractual relationship between the government and the party alleged to have engaged in the fraudulent inducement, Toyobo's third party liability argument

is insufficient in and of itself to warrant partial summary
judgment.   Toyobo's argument that the nexus between the
government and Toyobo on the BPVGPA counts is too attenuated may
deserve further attention if the government sufficiently proves
that Toyobo disseminated false information.   However, there is
no need to reach this issue now.   If the government cannot prove
that Toyobo actually disseminated false information, which is
currently in dispute, then there may be no reason to turn to
Toyobo's attenuation argument.   This issue cannot be properly
resolved on the current motion for partial summary judgment
because reaching the question requires resolution of a genuine
dispute as to material facts.

     Because a genuine dispute as to material facts exists,
Toyobo's motion for partial summary judgment [343] will be
denied, and Toyobo's motion for partial summary judgment [95] as
to the BPVGPA counts will be denied.

III. GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

     The government "seeks partial summary judgment, or in the
alternative, summary adjudication of issues, on liability only
with respect to a portion of the United States' claims for
violations of FCA Sections 3729(a)(1) and (2)."   Gov't Mot. for
Partial Summ. J. [344] at 1; see also Gov't Mot. for Partial
Summ. J. [97] at 2.   Only the vests related to the GSA MAS
program are at issue in the government's motion.   Gov't Mot. for

Partial Summ. J. [344] at 1 n.1; see also Gov't Mot. for Partial Summ. J. [97] at 2 n.3.  As is discussed above, a genuine dispute as to material facts exists on the GSA MAS-related counts, specifically whether the 6% guarantee contains the durability requirement that the government claims.  Thus, the government's motions for partial summary judgment [97, 344] will be denied.

CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

ORDERED that Toyobo's Motion for Partial Summary Judgment in Civil Action 04-280 [270], and Toyobo's Motion for Partial Summary Judgment in Civil Action 07-1144 [95], be, and hereby are, DENIED in part and GRANTED in part.  Summary judgment is granted as to the government's claims related to Zylon vests sold off of the GSA MAS before the 2002 contract modification, but denied as to the government's claims related to Zylon vests sold off of the GSA MAS after the 2002 contract modification. It is further

ORDERED that Toyobo's Motion for Partial Summary Judgment in Civil Action 04-280 [343] be, and hereby is, DENIED.  It is further

ORDERED that the United States' Motion for Partial Summary Judgment in Civil Action 04-280 [344] be, and hereby is, DENIED. It is further

ORDERED that the United States' Motion for Partial Summary Judgment in Civil Action 07-1144 [97] be, and hereby is, DENIED. It is further

ORDERED that all pending motions in limine in Civil Action 04-280, namely, ECF Nos. 374, 375, 376, 377, 378, 379, 380, 381, 382, 383, 384, 385, 386; and Civil Action 07-1144, namely, ECF Nos. 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, be, and hereby are, STAYED.  The parties shall confer and file a joint status report no later than 11/4/2015 detailing which motions in limine still must be resolved after this Opinion and setting forth a proposed schedule on which these cases should proceed.

SIGNED this 4th day of September, 2015.


_____/s/_____
RICHARD W. ROBERTS
Chief Judge