UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
UNITED STATES OF AMERICA, <u>ex</u> <u>rel.</u>,  )
AARON J. WESTRICK, Ph.D.,           )        Civil Action No. 04-0280 (PLF)
                                    )
            Plaintiffs,             )
                                    )
      v.                            )
                                    )
SECOND CHANCE BODY ARMOR, INC.,     )
<u>et</u> <u>al.</u>,                           )
                                    )
            Defendants.             )
_____)
                                    )
UNITED STATES OF AMERICA,           )        Civil Action No. 07-1144 (PLF)
                                    )
            Plaintiff,              )
                                    )
      v.                            )
                                    )
TOYOBO COMPANY, LTD., <u>et</u> <u>al.</u>,       )
                                    )
            Defendants.             )
_____)


<u>OPINION</u>

      This matter is before the Court on the motion of the United States for

reconsideration [Dkt. 450 in Civil Action No. 04-0280 and Dkt. 184 in Civil Action No.

07-1144] of the Court's September 4, 2015 Memorandum Opinion and Order granting in part

and denying in part the parties' cross motions for partial summary judgment on the United

States' common law claims and claims under the False Claims Act ("FCA"), 31 U.S.C. § 3729,

<u>et</u> <u>seq.</u> (1994).  <u>See</u> <u>United States ex rel. Westrick v. Second Chance Body Armor Inc.</u>, 128 F.

Supp. 3d 1 (D.D.C. 2015), <u>reconsideration denied in part sub nom.</u> <u>United States v. Second</u>

<u>Chance Body Armor Inc.</u>, No. 04-0280, 2016 WL 3033937 (D.D.C. Feb. 11, 2016).[1]  The United States contends that the Court erred in limiting its fraudulent inducement FCA claim because the Court failed to consider the declarations of General Services Administration ("GSA") Contract Specialist Kellie Stoker.  It also argues that the Court's express and implied false certification analysis failed to address several warranties, assurances, or so-called "extra-contractual considerations" in the government's contracts with vest manufacturers other than Second Chance Body Armor, Inc. ("Second Chance").  Toyobo Company, Ltd. and Toyobo America, Inc. (collectively, "Toyobo") oppose the motion.[2]  Upon consideration of the parties' written submissions, the relevant case law, the entire record in this case, and the oral argument held on May 11, 2016, the Court will grant reconsideration in part and deny it in part.[3]

---

[1]    For the purposes of the present motion for reconsideration, both related (but not consolidated) civil actions in the caption of this case contain identical filings.  Where possible, the Court in this Opinion will refer to docket numbers from <u>United States v. Toyobo Company, Ltd.</u>, Civil Action No. 07-1144.

[2]    The only remaining defendants in these cases are Toyobo and two individuals, Thomas Edgar Bachner and Richard C. Davis.  The United States named Second Chance, its various subsidiaries, and two other individuals as defendants in Civil Action No. 04-0280, <u>see</u> Second Amended Complaint ¶¶ 10-17, 22-23 (Dec. 20, 2013) [Dkt. 408 in Civil Action No. 04-0280], but previously settled with each of those defendants.  <u>See</u> Notice of Dismissal (Jan. 22, 2014) [Dkt. 415 in Civil Action No. 04-0280]; <u>see</u> <u>also</u> May 11, 2016 Hr'g Tr. at 8:6-8:15 [Dkt. 472 in Civil Action No. 04-0280].

[3]    The documents reviewed by the Court in resolving the pending motion include the following:  Amended Complaint ("Am. Compl.") [Dkt. 73 in Civil Action No. 07-1144]; Second Amended Complaint [Dkt. 408 in Civil Action No. 04-0280]; the United States' motion for reconsideration ("Mot.") [Dkt. 184]; Toyobo Company, Ltd. and Toyobo America, Inc.'s opposition ("Opp.") [Dkt. 186]; the United States' reply ("Reply") [Dkt. 187]; the United States' supplemental brief ("US Supp.") [Dkt. 194]; Toyobo Company, Ltd. and Toyobo America, Inc.'s supplemental brief ("Ds Supp.") [Dkt. 198]; and May 11, 2016 Hr'g Tr. [Dkt. 472 in Civil Action No. 04-0280].

## I. FACTUAL AND PROCEDURAL BACKGROUND

Judge Richard W. Roberts, to whom these two related (but not consolidated) cases were previously assigned, fully recounted their factual and procedural history in several prior opinions.  See, e.g., United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 5-7; United States v. Toyobo Co., Ltd., 811 F. Supp. 2d 37, 41-44 (D.D.C. 2011); United States ex rel. Westrick v. Second Chance Body Armor, Inc., 685 F. Supp. 2d 129, 132-33 (D.D.C. 2010).  Nonetheless, the Court sets forth here the facts and procedural posture relevant to the United States' FCA claims in an effort to clarify the issues for trial.

### A. Factual Background

The United States' Second Amended Complaint in Civil Action No. 04-0280 alleges that Toyobo contracted with Second Chance to sell them defective Zylon fiber for use in bulletproof vests, which Second Chance then sold to the United States under both (1) the Bulletproof Vest Partnership Grant Act of 1998, 42 U.S.C. § 3796ll, et seq. ("BPVGPA"), and (2) the General Services Administration's Multiple Award Schedule ("GSA MAS").  Second Amended Complaint ¶¶ 1-5 (Dec. 30, 2013) [Dkt. 408 in Civil Action No. 04-0280].[4]  The United States' Amended Complaint in Civil Action No. 07-0144, by contrast, alleges the same conduct based on Toyobo's contracts with five vest manufacturers other than Second Chance:

---

[4]     The parties refer to this statute as the "BPVGPA" despite the fact that the acronym does not track the actual title of the statute.  For the purposes of clarity, the Court will also use the acronym BPVGPA.  The BPVGPA is a statutory grant program, codified at 42 U.S.C. § 3796ll, et seq., which the Department of Justice administers.  It authorizes the United States to "reimburse[] state, local[,] and tribal authorities up to fifty perfect of the cost of ballistic vests" after they receive the vests.  Am. Compl. ¶¶ 20-21.  The GSA MAS is a program through which the "GSA negotiates contracts for commonly used, commercial off-the-shelf items with contractors," and "[f]ederal agencies can then purchase products under MAS contracts directly from contractors at negotiated prices, terms and conditions."  Id. ¶ 15.

(1) Armor Holdings, Inc. and its subsidiaries American Body Armor, Inc., Safariland, Inc., and Pro-Tech; (2) Point Blank Body Armor, Inc. and its subsidiary Protective Apparel Corporation of America, Inc.; (3) First Choice Armor, Inc.; (4) Gator Hawk, Inc.; and (5) Protective Products International, Inc. (collectively, the "other vest manufacturers"). Am Compl. ¶¶ 1-5, 14-25; see also May 11, 2016 Hr'g Tr. at 12:19-13:11.

In 1995, Toyobo began to communicate with the United States about the use of Zylon fiber for government "ballistic" applications such as bulletproofs vests. US Supp., Ex. 23 at PDF page 143 [Dkt. 195]. In literature Toyobo sent to the United States at that time, Toyobo touted its testing data showing Zylon's "superior tensile strength," "high temperature abrasion resistance," low "moisture regain," and "stab[ility] against humidity." Id., Ex. 24 at PDF pages 147-48. Those conversations led the United States to contract with Second Chance to sell Zylon bulletproof vests on the GSA MAS from 1995 to 2001. See Declaration of Kellie Stoker in Support of United States' Response to Toyobo's Motion for Partial Summary Judgment ¶¶ 4-8 (March 15, 2012) [Dkt. 194-4] ("First Stoker Declaration").

On March 30, 2001, Toyobo began to learn — through its own internal testing — that Zylon "stored in a warehouse for one year showed a strength lowering of about 20%." US Supp., Ex. 90 at 1-2 [Dkt. 195-2]; see also May 11, 2016 Hr'g Tr. at 49:24-49:25 ("[W]e are willing to agree that the beginning of the fraudulent period is March 2001." (statement of government counsel)). In July 2001, notes from an internal Toyobo meeting show that Toyobo concluded that a "Zylon hydrolysis (?) problem [had] surfaced," that "[i]t is extremely regrettable that sufficient study was not done in the development stage and we feel responsible," and that Toyobo must "enlighten the bulletproof customers." US Supp., Ex. 52 at PDF pages 13-14 [Dkt. 195-2]. It was then that Toyobo created the "Zylon Strength Degradation Improvement

Project," known as "ZKP," in order to "conduct an investigation to understand" why Zylon degraded under conditions of heat and humidity and "propose urgent measures" to address that degradation. Id., Ex. 95 at PDF page 167.

On July 5, 2001, Toyobo sent the first of quarterly (and later, semi-annual) letters to "valued customers" including vest manufacturers and "[f]ederal scientists," see US Supp. at 8, which described in very general terms Toyobo's Zylon so-called "aging test" under conditions of heat and humidity. See id., Exs. 6-22 at PDF pages 81-141 [Dkt. 195].[5] The first of those letters frankly stated the result of Toyobo's preliminary testing — evidenced by attached graphical data — that "the strength of Zylon fiber decreases under high temperature and humidity conditions" of 80 and 60 degrees Celsius and 80% humidity, id., Ex. 6 at PDF page 82, but it also stated that Toyobo "expect[ed] almost no strength loss at about 40 degree C even at 80% humidity." Id. On July 19, 2001, Toyobo sent another letter to "valued customers," concluding that, despite that testing data, Toyobo "understand[s] that ZYLON fiber is a superior material for body armor[.]" Id., Ex. 100 at PDF page 195 [Dkt. 195-2]. Subsequent letters from Toyobo to Second Chance on July 25, 2001, and August 28, 2001, respectively, stated that Toyobo "ha[d] not reached [a] conclusion" about Toyobo's Zylon testing at 40 degrees Celsius and warned that any results were "provisional." Id., Exs. 7-8, PDF pages 87, 90 [Dkt. 195].[6]

---

[5]     That same day, a Dutch manufacturer of Zylon vests — Dutch State Mines High Performance Fibers — issued an "URGENT" announcement that Zylon's use in ballistics "may not be justified" and, as a result, it would "put on hold the market introduction" of its vests. US Supp., Ex. 28 at PDF page 42 [Dkt. 195-1]. Federal scientists learned of this announcement one month later in August 2001. See US Supp. at 9.

[6]     The United States alleges in its supplemental brief — and Toyobo does not dispute — that "[g]overnment scientists . . . were aware of the public data about Zylon degradation that Toyobo published on its website and in letters to others in the body armor industry." US Supp. at 9.

By December 2001, Toyobo's internal ZKP project had compiled much more detailed and troubling findings about Zylon degradation than the anodyne data Toyobo communicated to vest manufacturers and federal scientists before and after that date. Toyobo and Second Chance convened a "crisis management meeting" on December 13, 2001, at which Toyobo researchers in the ZKP project produced data showing that Second Chance's bulletproof vests made with Toyobo's Zylon fiber degraded by 7% in less than two years, an amount of degradation which — according to the handwritten notes of Second Chance executive and pro se defendant in this case, Thomas Edgar Bachner, Jr. — would "put [defendants] out of express warranty before 5 years." See Declaration of Jennifer L. Chorpening in Support of United States' Opposition to Defendant's Motion for Partial Summary Judgment, Ex. 19 at PDF pages 3, 10 [Dkt. 111].[7] Toyobo also compiled an internal report dated December 14, 2001, which cited "residual solvent (phosphoric acid)" as "the cause" of Zylon's degradation under conditions of heat and humidity, and suggested that "[i]t is important to reduce residual phosphorus amount" for "strength retention." US Supp., Ex. 49 at PDF pages 92, 94 [Dkt. 196]. A separate internal Toyobo report dated December 18, 2001, stated that, "[f]or the primary usage of Zylon in bulletproof vests, deterioration of strength under hot and humid conditions (in particular, deterioration of strength when the environment where it is used has temperatures near 40°C and is humid) is an extremely serious problem." Id., Ex. 65 at PDF page 159 [Dkt. 196]. In the

---

[7] So far as the record shows, Toyobo did not convene any similar meetings with the other vest manufacturers. Representatives of those manufacturers testified at their depositions that — like the United States — they had no knowledge of Toyobo's internal data demonstrating that Zylon degraded under conditions of heat and humidity. See United States' Separate Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment at Fact 188, PDF pages 77-83 [Dkt. 97-2]. They also stated that they would not have used Zylon had they been aware of this undisclosed data at the time they incorporated Zylon into their ballistic vests. Id. at PDF page 78.

months following the "crisis management meeting" and these internal reports, Toyobo offered

and Second Chance accepted substantial rebates worth millions of dollars on its Zylon purchases.

See, e.g., id., Ex. 138 at 23-24 [Dkt. 195-5].[8]

        Despite the ZKP data regarding phosphorus and the 7% decline in Zylon

performance over two years under conditions of heat and humidity, on June 5, 2002, Second

Chance sent the GSA a letter enclosing a catalog for Zylon that "guarantee[d] its vests to perform

at" the military's standard ballistics requirements "within normal statistical variation (+/-6%)

during the five-year guaranteed life of the vest." US Supp., Ex. 1 at PDF page 51 [Dkt. 195].

On August 5, 2002, a federal scientist emailed Toyobo researchers for "assistance" in testing the

presence of phosphorus in Zylon fiber, id., Ex. 47 at PDF page 119 [Dkt. 195-1], to which

Toyobo's researcher responded without mentioning its December 2001 internal data identifying

phosphorus as the "cause" of degradation. Id., Ex. 48 at PDF page 122. In addition, in a May

2003 email to a federal scientist, Toyobo represented without elaboration that "[w]e established

[a] basic recipe to improve [the] heat/humidity problem." Id., Ex. 51 at PDF page 2

[Dkt. 195-2]. Toyobo also represented to the Department of Justice in an April 1, 2004 letter that

"Zylon [is] an extremely strong fiber capable of producing very light and wearable bullet-

_____

[8]      The United States' supplemental brief describes these events as a "conspiracy between Toyobo and Second Chance." US Supp. at 15 n.43. Judge Roberts previously rejected any such conspiracy, stating:

> The government's allegations that the vest manufacturers were aware by mid-2001 that Zylon was defective [] yet continued to sell Zylon vests through 2005 are insufficient to aver that Toyobo and the vest manufacturers agreed to anything. Moreover, the notion that Toyobo conspired with the vest manufacturers is inconsistent with the government's allegations that Toyobo misrepresented the extent and severity of Zylon's degradation to the vest manufacturers to induce them to continue to sell their vests to the government.

United States v. Toyobo Co., 811 F. Supp. 2d at 51.

resistant vests." Id., Ex. 66 at PDF page 71. Toyobo continued to send quarterly or semi-annual letters to vest manufacturers and to federal scientists concerning its "aging testing" until at least 2005. The final letter in the record from January 2005 simply advises recipients "to make use of these [sic] information for your application," without offering any firm conclusions as to how quickly and severely Toyobo degraded at 40 degrees Celsius and 80% humidity. Id., Ex. 22 at PDF page 140 [Dkt. 195]. On July 1, 2005, Toyobo issued a press release in which it maintained that Zylon was appropriate "for ballistic use" and that it was "not aware of any legitimate scientific evidence showing" that the residue of phosphoric acid is responsible for Zylon's degradation under conditions of heat and humidity. Id., Ex. 86 at PDF page 125 [Dkt. 195-2].

The United States' did not finalize its own testing of Zylon under conditions of heat and humidity until September 20, 2005, years after Toyobo's internal research produced conclusions concerning the rates and causes of Zylon degradation. See US Supp., Ex. 64 at 2 [Dkt. 195-2].

### B. Claims Brought by the United States

These facts generally form the basis of the claims brought by the United States: that Toyobo, Second Chance, and certain individual officers of Second Chance violated the False Claims Act, 31 U.S.C. § 3729(a)(1)-(3) (1994), and engaged in common law fraud, payment by mistake, unjust enrichment, and breach of contract. See generally Am. Compl.; Second Amended Complaint [Dkt. 408 in Civil Action No. 04-0280].[9] During the course of litigation,

---

[9] The Court recently issued an Opinion and Order granting in part and denying in part a separate motion for reconsideration filed by the United States. See Opinion and Order (March 31, 2017) [Dkt. 212]. That March 31, 2017 Opinion and Order erroneously cited to the current language of the FCA, see id. at 7-8, when in fact the 1994 version of the FCA in existence at the time of the conduct at issue in this case controls the Court's analysis. Any differences between the 1994 version of the FCA, 31 U.S.C. § 3729(a)(1)-(3) (1994), and the

the United States has developed four theories of how defendants allegedly violated the FCA:

(1) factual falsity, whereby the United States alleges that defendants made "factual[ly] fals[e]"

statements by invoicing the United States for services that defendants did not actually render, see

United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 9-10;

(2) express false certification, whereby the United States alleges that defendants made "legal[ly]

fals[e]" statements to the United States by falsely certifying that bulletproof vests complied with

certain statutory, regulatory, or contractual terms, see id. at 10-17; (3) implied false certification,

whereby the United States alleges that defendants made statements to the United States that,

even if not completely false, were at best half-truths that bulletproof vests complied with certain

statutory, regulatory, or contractual terms, see id. at 17; and (4) fraudulent inducement, whereby

the United States alleges that Toyobo committed a fraud on the market by "provid[ing] invalid

assurances to the market and put[ting] manipulated data into the marketplace," and that Toyobo

used the same assurances and data to fraudulently induce Second Chance and the other vest

manufacturers.  See id. at 21.[10]

   The United States relied on all four theories in instituting its suit against Toyobo

and Second Chance in Civil Action No. 04-0280, see Second Amended Complaint ¶¶ 287-97

[Dkt. 408 in Civil Action No. 04-0280], and in its suit against Toyobo alone in Civil Action No.

07-1144, concerning Toyobo's actions with respect to the other vest manufacturers.  See Am.

---

currently operative provision of the FCA, 31 U.S.C. § 3729(a)(1)(A)-(B), are immaterial to the
Court's legal analysis of implied false certification in it March 31, 2017 Opinion and Order.

  [10] The United States does not allege its fraud on the market theory of fraudulent
inducement with respect to vests it purchased off the GSA MAS, only vests that local, state, and
tribal authorities purchased through the BPVGPA and for which they subsequently sought
reimbursement from the United States.  See United States Reply in Support of its Second Motion
for Reconsideration at 19 [Dkt. 211].

Compl. ¶¶ 239-48.  The four theories also cut across vests sold by Second Chance and the other

vest manufacturers to (1) the United States through the GSA MAS and (2) state, local, and tribal

authorities through the BPVGPA.  See Second Amended Complaint ¶¶ 287-97 [Dkt. 408 in Civil

Action No. 04-0280]; Am. Compl. ¶¶ 239-48.

        With respect to the express and implied false certification claims, the United

States identifies six things with which it asserts Second Chance and the other vest manufacturers

falsely certified their compliance:  (1) three express provisions of the GSA MAS contracts and

(2) three "extra-contractual considerations" for those contracts.  See United States ex rel.

Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 16.  While not entirely

coextensive, these same six contractual provisions or extra-contractual considerations are

generally the same "assurances" that, it alleges, caused state, local, and tribal authorities to

purchase vests from defendants and seek reimbursement from the United States under the

BPVGPA.  Id. at 20-21.  For example, when the state of Pennsylvania purchased vests for which

it would seek reimbursement from the United States under the BPVGPA, it executed contracts

with Second Chance and the other vest manufacturers in which those manufacturers attested that

the vests would "be free of any defects affecting durability, serviceability or the safety of the

user" and "be warranted for a minimum of five (5) years to meet the ballistic-resistant and

deformation requirements of [National Institute of Justice ("NIJ")] . . . ."  See United States'

Opposition to Defendant's Motion for Partial Summary Judgment, Ex. 85 at PDF page 5 [Dkt.

109-14].

        The three provisions of the contracts between the United States and Second

Chance — as well as those between the United States and other vest manufacturers — are:  (1) a

five-year commercial warranty clause that the vests are "warranted to provide protection as

stated on the protective panel label and to be free of defects in material and workmanship for the applicable warranty period," see United States' Second Motion for Reconsideration, Ex. 81 at PDF page 3 [Dkt. 207-32]; (2) a "workmanship" clause requiring that "[a]ny item contracted for must be new, current model at the time of offer, unless otherwise specified[,]" and "[e]ach article must perform the functions for its intended use," see Declaration of Kellie Stoker in Support of United States' Motion for Partial Summary Judgment (June 20, 2013) [Dkt. 97-11] ("Second Stoker Declaration"), Ex. 10 at PDF page 64 [Dkt. 100-2]; and (3) a "new materials" clause that "the Contractor represents that supplies and components are new, including recycled (not used or reconditioned) and are not of such age or so deteriorated as to impair their usefulness or safety." See United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 11.[11]

The three "extra-contractual considerations" that the United States alleges animated the bargain it struck when purchasing the vests from Second Chance and the other vest manufacturers are: (1) a 6% "catalog guarantee" that Second Chance "guarantees its vests to perform at this level [in V50 ballistics performance] within normal statistical variation (+/-6%) during the five-year guaranteed life of the vest," see US Supp., Ex. 1 at PDF page 51 [Dkt. 195]; (2) a guarantee that "[a]ll Second Chance vests are [National Institute of Justice] certified to the most recent standards," id.; and (3) a guarantee that "[t]he protective properties of the PANELS are warranted for five (5) years from date of purchase." See United States Second' Motion for Reconsideration, Ex. 28 at PDF page 15 [Dkt. 208]. Importantly, only Second Chance's catalog

---

[11]    The Court is aware that the contracts between the United States and vest manufacturers other than Second Chance contained a different general commercial warranty than that quoted in number one of this list. That general commercial warranty stated that, "[f]or five years after date of purchase[, the manufacturer] warrants that the ballistic panels will pass the [National Institute of Justice ("NIJ")] protocol for ballistic intervention and their NIJ designated velocities during an actual occurrence, not necessarily during an NIJ independent laboratory retest procedure." See Second Stoker Declaration, Ex. 2 at PDF page 8 [Dkt. 100-2].

and not the catalogs of any other vest manufacturer contained the 6% guarantee. See First Stoker Declaration ¶¶ 9, 17 [Dkt. 194-4]. Second Chance made the 6% catalog guarantee in the "product literature" it attached to a June 5, 2002 letter to GSA proposing a contract "modification" for its GSA MAS contract. See United States Motion for Partial Summary Judgment, Ex. 6 at PDF page 23 [Dkt. 258-5 in Civil Action No. 04-0280].

*C. Procedural Posture*

In September 2015, Judge Roberts granted in part and denied in part defendants' motion for partial summary judgment, and denied the United States' motion for partial summary judgment. United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 22.[12]

With respect to the United States' FCA claims related to the BPVGPA, Judge Roberts stated that "Toyobo's motion for partial summary judgment as to the BPVGPA counts will be denied." United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 21. In his opinion, Judge Roberts discussed only the United States' fraudulent inducement theory for its FCA claims related to the BPVGPA, and explained that the theory was "based on the claim that Toyobo placed false information into the market that caused the individual agencies to purchase the Zylon vests, for which the government partially reimbursed the agencies." Id. at 20. Judge Roberts found genuine issues of material fact surrounding fraudulent inducement with respect to the BPVGPA claims as to whether Toyobo (1) "assured the industry that it had not found any serious indication of Zylon strength degradation when Toyobo actually

---

[12] The cross motions concerned only the United States' FCA claims and not its common law claims.

did have such data," and (2) "released into the market manipulated Zylon degradation data." Id. at 20-21.

Judge Roberts's treatment of the United States' FCA claims related to the GSA MAS is more complex because he addressed each of the United States' four theories discussed above, see supra at 8-9, but he did so only with respect to Second Chance's contracts with the United States to sell vests on the GSA MAS and not the contracts of the other vest manufacturers.[13]  First, Judge Roberts granted summary judgment to defendants on the United States' factual falsity theory because the United States has not alleged that defendants "'invoice[d] for services that were not rendered.'"  See United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 9 (quoting United States ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 64 (D.D.C. 2007)).  He explained that "[t]he government does not allege that Toyobo invoiced for 200 bulletproof vests and sent only 150 bulletproof vests; nor does the government allege that Toyobo invoiced for bulletproof vests and instead sent raincoats."  Id. at 10.  Rather, he said, the claim is not that the government did not receive bulletproof vests but "that the bulletproof vests . . . did not comply with express and implied agreements."  Id.  Reliance on a factual falsity theory therefore was "misplaced."  Id.[14]

Second, Judge Roberts granted summary judgment to defendants on the United States' express and implied false certification theories, except with respect to claims (1) "that arose after the 2002 [Second Chance] contract modification was executed" and (2) that are based

---

[13]    The United States explained at the May 11, 2016 oral argument that it "think[s]" that "the fraudulent inducement of the GSA sales of both Second Chance and the other manufacturers" are still live claims in this case.  May 11, 2016 Hr'g Tr. at 45:22-46:03 (emphasis added).

[14]    The United States does not seek reconsideration of this portion of Judge Roberts's September 4, 2015 Memorandum Opinion and Order.

on noncompliance with the 6% catalog guarantee.  See United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 17.  Judge Roberts granted summary judgment to defendants for all vests sold before 2002 because that is when Second Chance included the 6% guarantee in the catalog it sent to the United States and, relying on the catalog, the United States modified its GSA MAS contract with Second Chance.  Id.  Judge Roberts did not explicitly address the United States' express or implied false certification claims with respect to vest manufacturers other than Second Chance.

Judge Roberts focused his reasoning on the 6% catalog guarantee because he found that it is an "ambiguous" term of Second Chance's GSA MAS contract.  United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 16-17.  He explained that the parties offered multiple "reasonable interpretation[s]," but because "[n]either party ha[d] put forward evidence that negates [the other's] interpretation[,]" a jury must resolve that ambiguity. Id.  Judge Roberts also found that "[t]he 6% guarantee is a contract term that might impose a durability requirement."  Id. at 17.  He distinguished "defectiveness" from "durability" because "[a] product is not defective simply because it does not last as long as the parties expect it to, unless the parties have explicitly contracted for a durability requirement," and expressed skepticism that the parties would include a durability requirement in their contracts where, as here, they also included a "repair and replace" provision.  Id. at 14-15.[15]  He explained that "[n]othing in the language" of the contract "explicitly guarantees that the vests will function perfectly for the five-year period; indeed the [contract] presupposes that some of the vests may

_____

[15]      The repair and replace provision states that, "[i]n the event a defect is found, in material or workmanship, in either component or your vest, carrier outershell or panels, during the applicable warranty period, . . . SECOND CHANCE, in its discretion, without cost to you, will repair or replace the defective part or the entire vest."  See United States' Second Motion for Reconsideration, Ex. 28 at PDF page 5 [Dkt. 208].

not survive the five-year period." Id. at 14.  Judge Roberts concluded that "a jury must determine" whether the 6% catalog guarantee in Second Chance's GSA MAS contract with the United States is, in fact, a durability requirement.  Id. at 17.

Beyond the 6% catalog guarantee, Judge Roberts rejected the three contract provisions and the two other "extra-contractual considerations" as bases for express or implied false certification claims and granted summary judgment to defendants on these claims.  United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 14-16.  He explained that:  (1) "Nothing in the language of the [contract's general commercial] warranty explicitly guarantees that the vests will function perfectly for the five-year period; indeed the warranty presupposes that some of the vests may not survive the five-year period," id.; (2) the United States "has not alleged" that defendants failed to comply with the contract's new materials clause by, for example, "us[ing] old materials in the construction of the vests," id. at 15; (3) the workmanship clause cannot impose a durability requirement because it refers to the "intended use" of the vests, begging the question of whether the parties intended the vests to last for five years, id. at 15-16; and (4) "there is no evidence that the[] extra-contractual considerations" of NIJ certification and protective properties "were a part of, or otherwise informed, the actual contracting."  Id. at 16.

Finally, with respect to the United States' fraudulent inducement FCA claims related to the GSA MAS, Judge Roberts held that "[t]he government has not presented any evidence that suggests that [it] relied on the allegedly manipulated data when making the contract modifications to add Zylon vests to the GSA MAS," i.e., "that Toyobo's allegedly manipulated data caused the government to place the Zylon vests on the GSA MAS."  United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 19.  Judge

Roberts found the lack of reliance dispositive and granted summary judgment to defendants on the United States' fraudulent inducement FCA claims related to the GSA MAS "[b]ecause . . . the government cannot bear its burden to prove that false claims were submitted or fraudulently induced in relation to those Second Chance Zylon vests placed on the GSA MAS before 2002." Id. (emphasis added). He therefore granted Toyobo's motions for partial summary judgment related to the vests placed on the GSA MAS. Id.[16]

The United States moved for reconsideration "on three issues" in Judge Roberts's September 4, 2015 Memorandum Opinion and Order on summary judgment, arguing: (1) its fraudulent inducement analysis conflicted with Judge Roberts's 2011 Memorandum Opinion and Order resolving defendants' motion to dismiss, United States v. Toyobo Co., 811 F. Supp. 2d 37 (D.D.C. 2011); (2) its fraudulent inducement analysis failed to address two declarations of GSA Specialist Kellie Stoker demonstrating the United States' reliance on defendants' alleged misconduct; and (3) its express and implied false certification analysis failed to address "several warranties" in the GSA MAS contracts with vest manufacturers other than Second Chance that constitute "express language setting forth a five-year durability requirement." Mot. at 2-3.

In his February 11, 2016 Memorandum Opinion and Order, Judge Roberts denied the United States' motion for reconsideration on the first issue "insofar as they assert a conflict with an earlier ruling and a failure to consider other manufacturers' warranties." United States v. Second Chance Body Armor Inc., 2016 WL 3033937, at *5. Judge Roberts reserved ruling on the United States' second issue and ordered supplemental briefing concerning: "(1) what, if any, information the government had that was contradicted by data that Toyobo withheld; (2) how, if

---

[16] Judge Roberts did not explicitly address the United States' fraudulent inducement claims for the GSA MAS contracts with respect to vest manufacturers other than Second Chance.

at all, the withheld data contradicted the data within the government's possession; and (3) what, if any, duty Toyobo had to disclose the withheld data in order to avoid making a fraudulent omission." Id. at *5. Judge Roberts did not address the United States' third issue for reconsideration. The parties then submitted supplemental briefs concerning the issues Judge Roberts identified.[17]

## II.  DISCUSSION

"Motions for reconsideration are not specifically addressed in the Federal Rules of Civil Procedure. While the most analogous rule is Rule 60, which provides relief from a final judgment or order, motions to reconsider interlocutory orders are not governed by Rule 60(b), but rather, such determinations 'are within the discretion of the trial court.'" Estate of Klieman v. Palestinian Auth., 82 F. Supp. 3d 237, 241-42 (D.D.C. 2015) (quoting Keystone Tobacco Co. v. United States Tobacco Co., 217 F.R.D. 235, 237 (D.D.C. 2003)); see also FED. R. CIV. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). "Notwithstanding the broad discretion of a court to reconsider its own interlocutory decisions, however, and 'in light of the need for finality in judicial decision-making,' district courts should only reconsider interlocutory orders 'when the movant demonstrates (1) an intervening change in the law; (2) the discovery of new

---

[17] Following supplemental briefing, the United States moved for reconsideration of Judge Roberts's treatment of the implied false certification claim in light of the Supreme Court's intervening decision in Universal Health Services, Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989 (2016) ("Escobar"). See United States Second Motion for Reconsideration [Dkt. 206]. On March 31, 2017, this Court held that that "Escobar warrants reconsideration but commands the original result." Opinion and Order at 11-12 (Mar. 31, 2017) [Dkt. 212].

evidence not previously available; or (3) a clear error of law in the first order.'" Estate of

Klieman v. Palestinian Auth., 82 F. Supp. 3d at 242 (quoting In re Vitamins Antitrust Litig., No.

99-1097, 2000 WL 34230081, at *1 (D.D.C. July 28, 2000)).

Within this framework, the United States argues that Judge Roberts committed a

clear error of law by failing to consider the United States' two declarations from GSA Contract

Specialist Kellie Stoker, the first dated March 15, 2012, and the second dated June 20, 2013. See

Mot. at 2-3; see also First Stoker Declaration [Dkt. 194-4]; Second Stoker Declaration [Dkt.

97-11]. It also argues that Judge Roberts's express and implied false certification analysis failed

to consider several of the warranties or assurances, or extra-contractual considerations, in the

contracts with vest manufacturers other than Second Chance.

## A. BPVGPA

In its motion, the United States does not seek reconsideration of Judge Roberts's

ruling with respect to its FCA claims related to the BPVGPA. Nevertheless, it appears that there

clearly is some confusion over what portion of those claims remain for trial. At the May 11,

2016 hearing, counsel for the United States expressed her understanding that Judge Roberts had

denied Toyobo's motion for summary judgment "in its entirety as to those claims . . . for Zylon

vest sales by manufacturers that were reimbursed under — by the Federal Government under the

[BPV] program[.]" May 11, 2016 Hr'g Tr. at 28:20-28:24; see also id. at 33:07-33:14; United

States Reply in Support of its Second Motion for Reconsideration at 19 (chart showing United

States' understanding of live claims) [Dkt. 211]. Counsel for the United States also stated:

"[W]e have struggled with [Judge Roberts's summary judgment] opinions and I am not clear

what he is trying to say. . . . I think there was simply a misunderstanding as to the scope of" the

BPVGPA claims. May 11, 2016 Hr'g Tr. at 38:05-38:16.

The Court now clarifies which BPVGPA claims survive summary judgment. As noted, Judge Roberts stated in his September 2015 opinion that defendants' motion for summary judgment on the BPVGPA claims "will be denied." <u>United States ex rel. Westrick v. Second Chance Body Armor Inc.</u>, 128 F. Supp. 3d at 21. In his February 11, 2016 opinion, he reiterated that he "denied Toyobo's partial motion for summary judgment on the [BPVGPA] count." <u>United States v. Second Chance Body Armor Inc.</u>, 2016 WL 3033937, at *3. Judge Roberts also stated in his September 2015 opinion, however, that the United States "conceded" in its opposition to defendants' motion for partial summary judgment that its BPVGPA claims rested solely on a fraudulent inducement theory of FCA liability. <u>United States ex rel. Westrick v. Second Chance Body Armor Inc.</u>, 128 F. Supp. 3d at 20 n.5. This Court does not agree that there was any such concession.

A review of the United States' Opposition to defendants' motion for summary judgment indicates that the United States did not cabin its BPVGPA claims to a fraudulent inducement theory of FCA liability. <u>See</u> United States' Opposition to Defendant's Motion for Partial Summary Judgment at 6-8, 23-25 [Dkt. 109]. To the contrary, the United States explained in its Opposition that its BPVGPA claims rested on defendants' noncompliance with "warranties, catalog guarantees, or implied warranties" contained in the contracts vests manufacturers struck with local, state, and tribal authorities. <u>Id</u>. at 8, 24. Such noncompliance is at the core of the United States' express and implied certification theories of FCA liability, not just its fraudulent inducement claim.[18] The Court recently held, however, that "[t]he United

---

[18] The United States also argues that defendants' conduct through the BPVGPA gives rise to common law fraud and unjust enrichment claims — the only common law claims remaining in the case, <u>see</u> May 11, 2016 Hr'g Tr. at 33:14-33:19; <u>see also</u> Notice of Dismissal at 2 [Dkt. 415 in Civil Action No. 04-0280] — and the defendants did not seek summary judgment on those claims.

States' implied false certification claim under the FCA [] is limited to its theory that the 6% catalog guarantee was a durability requirement." <u>See</u> Opinion and Order at 12 (Mar. 31, 2017) [Dkt. 212]. And the contracts between vest manufacturers and local, state, or tribal entities contained in the record do not include the 6% catalog guarantee. <u>See</u> United States' Opposition to Defendant's Motion for Partial Summary Judgment, Ex. 85 at PDF page 5 [Dkt. 109-14]. As such, the United States' BPVGPA claims cannot include an implied false certification theory of FCA liability. For the same reasons, which the Court explains <u>infra</u> at 32-34, the United States' BPVGPA claims also cannot include an express false certification theory of FCA liability.

The Court therefore holds that defendants' motion for summary judgment on the United States' BPVGPA claims is denied, except with respect to its express and implied false certification theories of FCA liability. The United States may proceed to trial on its BPVGPA claims with respect to common law fraud and unjust enrichment, as well as the FCA theory of fraudulent inducement.

## B. GSA MAS

In his September 4, 2015 Memorandum Opinion and Order, Judge Roberts addressed Second Chance's 6% catalog guarantee and Second Chance's 2002 contract modification with GSA. He did not deal with the United States' GSA MAS claims concerning vest manufacturers other than Second Chance. <u>See</u> <u>United States ex rel. Westrick v. Second Chance Body Armor Inc.</u>, 128 F. Supp. 3d at 22; <u>see</u> <u>also</u> <u>supra</u> note 16. The Court therefore finds it appropriate to reconsider Judge Roberts's September 4, 2015 Memorandum Opinion and Order with respect to the United States' GSA MAS claims relating to the other vest manufacturers. In doing so, the Court will also address the two arguments the United States raises in its motion for reconsideration: (1) whether the declarations of Kellie Stoker satisfy the

materiality and reliance prongs of a fraudulent inducement FCA claim; and (2) whether the

"several warranties" in the United States' GSA MAS contracts with other vest manufacturers

may impose durability requirements sufficient to support express or implied false certification

FCA claims.

## 1. Fraudulent Inducement

To survive summary judgment on a fraudulent inducement claim, the United

States must point to false or omitted information in the course of the defendants' contracting or

contract negotiations with the United States that was capable of influencing the United States in

the negotiation and award of the GSA MAS contracts at issue. The Court ordered supplemental

briefing concerning the materiality issue, as well as the predicate issue of whether the United

States can demonstrate "that Toyobo made fraudulent representations or omissions." United

States v. Second Chance Body Armor Inc., 2016 WL 3033937, at *4. The Court will address the

predicate issue first as it relates both to Second Chance and to the other vest manufacturers,

before turning to the question of whether those false representations or omissions were material

under the GSA MAS contracts.

### a. False or Omitted Information

"Fraudulent inducement exists where a contract was procured by fraud or when a

party to a contract makes promises at the time of contracting that it intends to break." United

States ex rel. Barko v. Halliburton Co., --- F. Supp. 3d ----, 2017 WL 1018309, at *15 (D.D.C.

Mar. 14, 2017). To prevail under a fraudulent inducement theory, the government must prove

that it was induced by, or relied upon, the fraudulent statement or omission when it awarded a

contract or, as in this case, when it agreed to contract modifications. United States ex rel.

Westrick v. Second Chance Body Armor, Inc., 128 F. Supp. 3d at 18.  "[F]raudulent inducement claims simply require an initial false representation to the government."  United States ex rel. Keaveney v. SRA Int'l, Inc., 219 F. Supp. 3d 129, 141-42 (D.D.C. 2016).  A person contracting with the United States violates the False Claims Act when he or she procures the contract by fraud in the inducement.  United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc., 393 F.3d 1321, 1326 (D.C. Cir. 2005).

        With respect to Second Chance, the Court recently explained that there is a genuine issue of material fact about whether Second Chance's "ambiguous" 6% catalog guarantee in its June 5, 2002 letter requesting modification of its GSA MAS contract "impose[s] a durability requirement."  See Opinion and Order at 10 (Mar. 31, 2017) [Dkt. 212].  "Whatever the ambiguous 6% catalog guarantee means, it is for the jury to decide."  Id.  If a jury were to determine that Second Chance guaranteed Zylon's durability in its catalog, then such a guarantee would surely constitute a false representation because Toyobo had testing data demonstrating that Zylon would not satisfy the 6% catalog guarantee, and Second Chance was aware of Toyobo's data at the time it made the guarantee.  The Court therefore is satisfied that there is a genuine issue of material fact about whether Second Chance made a false representation in its 6% catalog guarantee.[19]

---

[19]        The Court's conclusion that there is a genuine issue of material fact concerning whether the 6% catalog guarantee was a false statement obviates the need for it to apply the same analysis to whether the "three express contractual requirements" and the two other "extra-contractual considerations" besides the 6% catalog guarantee support the United States' fraudulent inducement claim against Second Chance.  See Opinion and Order at 10-11 (Mar. 31, 2017) [Dkt. 212].  Judge Roberts's September 2015 and February 2016 summary judgment opinions did not reach this question, and the Court considered those provisions in the different context of implied false certification in its March 31, 2017 Opinion and Order.

By contrast, vest manufacturers other than Second Chance never made a 6% catalog guarantee, but — as the Court will discuss infra at 26-28 — Toyobo failed to disclose its testing data to them and, in turn, to the United States. Whether the United States can ground its fraudulent inducement FCA claim against Toyobo on those omissions requires a finding that either the vest manufacturers or Toyobo had a "legal obligation" to disclose the testing data to the United States in the course of their GSA MAS contracting, contract negotiations, or contract modifications. See United States ex rel. Ervin & Associates, Inc. v. Hamilton Sec. Grp., Inc., 370 F. Supp. 2d 18, 54 (D.D.C. 2005) (false representation under FCA includes "failure to disclose information only where the defendant had a legal obligation to disclose the omitted information"); cf. Escobar, 136 S. Ct. at 2001 n.4 (quoting RESTATEMENT (SECOND) OF TORTS, § 529, Comment a, pp. 62-63 (1976)) ("'[A] statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.'").

The Court concludes that, as of July 2001, Toyobo had a legal obligation to disclose the full scope of its Zylon testing data to the United States during the course of the other vest manufacturers' negotiations with the United States about modifications to GSA MAS contracts, and that Toyobo's omission or omissions therefore constituted false representations for the purposes of the United States' fraudulent inducement FCA claim. Of course, the vest manufacturers other than Second Chance did not know about Toyobo's testing data at the time they contracted with the United States under the GSA MAS and modified those contracts, see United States' Separate Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment at Fact 188, PDF pages 77-83 [Dkt. 97-2], so they are not liable under the FCA. But the FCA's provisions, "considered together, indicate a purpose to reach any

person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." United States ex rel. Marcus v. Hess, 317 U.S. 537, 544-45 (1943), superseded by statute on other grounds, Act of Dec. 23, 1943, Pub. L. No. 78-213, 57 Stat. 609, as recognized by Schindler Elevator Corp. v. United States ex rel. Kirk, 563 U.S. 401, 412 (2011); see also 31 U.S.C. § 3729(a)(1), (2), (7) (1994) (using terms such as "causes to be presented," "causes to be made or used," and "causes to be made or used," which suggest third party liability).

Toyobo is subject to liability for fraudulent inducement stemming from the GSA MAS contracts that the other vest manufacturers struck with the United States because Toyobo knowingly disclosed positive information about Zylon to the government while omitting the most damaging information about Zylon in its possession. At least as early as December 2001, Toyobo had knowledge of Zylon testing data demonstrating that degradation under conditions of heat and humidity was an "extremely serious problem" for Zylon's use in ballistics applications. US Supp., Ex. 65 at PDF page 159 [Dkt. 196]. Its testing data even suggested that "the cause" of degradation was "residual solvent (phosphoric acid)." Id., Ex. 49 at PDF pages 92, 94. Yet Toyobo's letters to vest manufacturers and to federal scientists used bland, inconclusive language about the negative data. Id., Exs. 7-8, PDF pages 87, 90 [Dkt. 195]. Its public statements as late as June 2005 affirmed that Zylon was appropriate "for ballistic use" but denied that the presence of phosphorus was a cause of Zylon's degradation. Id., Ex. 86 at PDF page 125 [Dkt. 195-2]. These facts, taken together, place Toyobo's conduct squarely within the purpose of the FCA as the Supreme Court articulated in United States ex rel. Marcus v. Hess.

Toyobo's legal obligation to completely disclose its testing data is rooted in the common law of fraud. "[W]here a common-law principle is well established," such as the

meaning of the word "fraudulent" in the FCA, see 31 U.S.C. § 3729(a) (1994), "courts may take it as given that Congress has legislated with an expectation that the principle will apply except 'when a statutory purpose to the contrary is evident.'" Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991) (quoting Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783 (1952)).  Where a fraudulent inducement claim is based on the defendant's failure to disclose material facts, rather than an affirmative misrepresentation, that nondisclosure of a fact can constitute a fraudulent misrepresentation.  Intelsat USA Sales Corp. v. Juch-Tech, Inc., 24 F. Supp. 3d 32, 47 (D.D.C. 2014).  While "mere silence does not constitute fraud unless there is a duty to speak," id. (quoting Kapiloff v. Abington Plaza Corp., 59 A.2d 516, 517 (D.C. 1948)); accord Sundberg v. TTR Realty, LLC, 109 A.3d 1123, 1131 (D.C. 2015), a duty to speak arises "when there is some special relationship or contact between the parties justifying the imposition of a duty."  Jefferson v. Collins, 905 F. Supp. 2d 269, 287 (D.D.C. 2012); see generally RESTATEMENT (SECOND) OF TORTS § 551(2) (1976).  One such relationship or contact arises "as a result of a partial disclosure" from one contracting party to another, see Intelect Corp. v. Cellco Partnership GP, 160 F. Supp. 3d 157, 187 (D.D.C. 2016) (internal citation and quotation marks omitted), or where the "disclosure of the omitted fact is necessary in order to make a defendant's affirmative statements not misleading."  Intelsat USA Sales Corp. v. Juch-Tech, Inc., 24 F. Supp. 3d at 47.  "[U]nder the familiar principle that when one undertakes to speak, either voluntarily or in response to inquiry, he must not only state truly what he tells but also must not suppress or conceal any facts within his knowledge which materially qualify those stated.  If he speaks at all he must make a full and fair disclosure."  Kapiloff v. Abington Plaza Corp., 59 A.2d at 518 (internal quotation marks omitted).

While Toyobo had no direct contractual relationship with the United States —
only Second Chance and the other vest manufacturers did — from 1995 to 2005 Toyobo publicly
and privately shared information on a regular basis with the United States generally and federal
scientists specifically. See supra at 4-8. As far back as Toyobo's 1995 communications with the
United States, Toyobo emphasized Zylon's performance in conditions of "high temperature" as
well as "moisture" and "humidity." See, e.g., US Supp., Ex. 24 at PDF pages 147-48 [Dkt. 195];
id., Ex. 51 at PDF page 2 [Dkt. 195-2]. Those representations — presumably Toyobo's true
beliefs at the time — were part of the basis for the United States agreeing with Second Chance to
enter into contracts for Second Chance to sell Zylon bulletproof vests on the GSA MAS. See
First Stoker Declaration ¶¶ 4-8. But as the record demonstrates, Toyobo had reason to change its
view but failed to fully disclose what it knew.

From 1995 until March 2001, Toyobo's communications with the United States
took the form of promotional materials. In March 2001, Toyobo's internal Zylon testing showed
degradation relating to aging. US Supp., Ex. 90 at 1-2 [Dkt. 195-2]. Beginning in July 2001,
Toyobo's testing data began to show degradation related to Zylon's use in conditions of heat and
humidity, and Toyobo thought it should "enlighten the bulletproof [vest] customers" about what
it had learned." Id., Ex. 52 at PDF pages 13-14. At the same time, Toyobo began sending
regular letters and emails to the United States concerning its testing data. See, e.g., id., Exs. 6-22
at PDF pages 81-141 [Dkt. 195]; see also supra at 5. And by December 2001, Toyobo's ZKP
project had extensive data supporting its conclusions — memorialized across multiple reports —
that Zylon's performance declined 7% over two years under conditions of heat and humidity, at
least in part due to the presence of phosphorus, which the researchers in Toyobo's ZKP project
deemed "an extremely serious problem" for Zylon's use in ballistics applications. Id., Ex. 49 at

PDF pages 92, 94 [Dkt. 196]; id., Ex. 65 at PDF page 159; see also supra at 6.  But Toyobo did not disclose this more serious information about degradation.

From July 2001 until July 2005, Toyobo partially disclosed the degradation problem to vest manufacturers and the United States, including to federal scientists.  It explained the degradation problem in bland, non-urgent language through a series of quarterly (and later, semi-annual) letters, as well as in various public statements that contained the bare minimum amount of Zylon testing data to illustrate the degradation problem.  US Supp., Exs. 6-22 at PDF pages 81-141 [Dkt. 195].[20]  Those letters and public statements failed to communicate Toyobo's findings — reached in December 2001 — that (1) degradation under conditions of heat and humidity was an "extremely serious problem" for Zylon's use in ballistics applications, id., Ex. 65 at PDF page 159 [Dkt. 196], and (2) "the cause" of degradation was "residual solvent (phosphoric acid)."  Id., Ex. 49 at PDF pages 92, 94.  The Court considers Toyobo's quarterly updates to be partial and perhaps misleading disclosures because they identify Zylon's degradation in conditions of heat and humidity but fail to communicate what Toyobo knew to be the severity and cause.

In addition to simply downplaying the problem of Zylon degradation, the Court finds that Toyobo made several statements to the United States that one could charitably consider partial disclosures, but a jury may find to be outright misdirection.  First, Toyobo failed to mention its December 2001 phosphorus testing data at two critical junctures:  (1) in August 2002 when a federal scientist indicated he was looking into phosphorus as a potential cause of the degradation, id., Ex. 47 at PDF page 119 [Dkt. 195-1]; id., Ex. 48 at PDF page 122; and (2) in

---

[20]     Again, the United States was aware of Toyobo's public statements and was in receipt of the quarterly data letters that Toyobo sent from 2001 through 2005.  US Supp. at 9.

July 2005 when Toyobo issued a press release stating that it was "not aware of any legitimate scientific evidence showing" that phosphoric acid is responsible for Zylon's degradation.  Id., Ex. 86 at PDF page 125 [Dkt. 195-2].  Second, it appears that Toyobo attempted to divert a federal scientist's attention from degradation issues during a May 2003 email exchange in which Toyobo averred that it had "improve[d] [the] heat/humidity problem."  Id., Ex. 51 at PDF page 2.  But from what rate of degradation had Zylon "improved"?  No record evidence substantiates the alleged improvement — nor could it, given the testing data contained in the record.  Third, Toyobo continued from 2001 through 2005 to represent that Zylon was appropriate "for ballistic use," id., Ex. 86 at PDF page 125, even though its December 2001 testing revealed the opposite.  These partial statements "suppress or conceal [] facts within [the speaker's] knowledge which materially qualify those stated."  See Kapiloff v. Abington Plaza Corp., 59 A.2d at 518 (internal quotation marks omitted).

        For these reasons, the Court concludes that these partial disclosures triggered Toyobo's duty to disclose its large amount of contrary testing data.  See Kapiloff v. Abington Plaza Corp., 59 A.2d at 518 ("[W]hen one undertakes to speak, . . . he must make a full and fair disclosure.") (internal quotation marks omitted).  The Court finds that Toyobo's partial disclosures to the United States — at the same time as the United States was contracting with the other vest manufacturers under the GSA MAS —to be fraudulent omissions.  The United States therefore has demonstrated a genuine issue of material fact concerning the predicate for its fraudulent inducement FCA claim against Toyobo — namely, "that Toyobo made fraudulent representations or omissions."  United States v. Second Chance Body Armor Inc., 2016 WL 3033937, at *4.

One final dispute among the parties is the date that marks the beginning of the alleged fraud. The United States urges that March 2001 is the correct date, but the Court disagrees. Toyobo's testing data from March 2001 demonstrated that Zylon degraded due to age, not due to its exposure to conditions of heat and humidity. US Supp., Ex. 90 at 1-2 [Dkt. 195-2]. That distinction is important because the most harmful data that Toyobo never disclosed to the United States concerned the severity of Zylon degradation due to its exposure to conditions of heat and humidity, not due to age. See supra at 26-28. The Court therefore finds that July 2001 is the earliest date on which Toyobo learned of testing data showing that Zylon degraded under conditions of heat and humidity. US Supp., Ex. 52 at PDF pages 13-14 [Dkt. 195-2]; see also id., Ex. 95 at PDF page 167.

### b. Materiality and Reliance

Once the United States has established that a defendant made a false representation or omission, the FCA also requires proof that the omitted or false information was material and that the United States was "induced by, or relied on, the fraudulent statement or omission when it awarded the contract.'" United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 18 (quoting United States ex rel. Thomas v. Siemens AG, 991 F. Supp. 2d 540, 569 (E.D. Pa. 2014), aff'd, 593 F. App'x 139 (3d Cir. 2014)). "'In essence, the essential element of inducement or reliance is one of causation. [The government] must show that the false statements upon which [the government] relied, assuming [it] establishes that it did, caused [the government] to award the contract at the rate that it did.'" Id.; see also D'Agostino v. ev3, Inc., 845 F.3d 1, 7-8 (1st Cir. 2016) ("[T]he elements of [] fraudulent inducement claims include not just materiality but also causation; the defendant's conduct must cause the government to make a payment or to forfeit money owed.").

The Court concludes that the Stoker declarations create genuine issues of material fact as to the United States' reliance. Kellie Stoker is a GSA employee who "had primary responsibility" for all of the GSA MAS contracts at issue in this case between 2005 and 2013. Second Stoker Declaration ¶ 1.[21] In her declarations, Ms. Stoker detailed the contract modifications with all of the vest manufacturers, with the dates of the modifications. First Stoker Declaration ¶¶ 5-10; Second Stoker Declaration ¶¶ 5-7. As relevant to the issue of materiality, Stoker attests that "[i]f GSA had been provided in 2001 with Toyobo documents showing the extent of Zylon's degradation, GSA would have provided those documents to agencies within the United States . . . for a scientific interpretation of the data to determine whether any Zylon-containing vests should remain on the GSA MAS schedule." Second Stoker Declaration ¶ 13. She further states that "[i]f GSA had known that Zylon was defective in bulletproof vests prior to 2005, GSA would have removed all Zylon-containing vests from the GSA MAS schedule whenever that fact was determined by [government agencies], but could have also done so earlier than 2005 if Zylon Vest Manufacturers had voluntarily recalled their defective products.'" Id. ¶ 16. She also claims that the fact that Zylon "degrades unpredictably and quickly over time . . .

_____

[21]     The Court will not consider Stoker's third declaration, dated February 22, 2016, which the United States submitted with its supplemental briefing. US Supp., Ex. 1 [Dkt. 194-1]. Discovery closed in these cases on February 22, 2013. December 13, 2012 Minute Order in Dkt. 07-1144. Rule 26(e) of the Federal Rules of Civil Procedure permits a party to "supplement or correct" declarations and other materials produced in discovery such as Stoker's if they have become "incomplete or incorrect" or "as ordered by the court." FED. R. CIV. P. 26(e)(1)(A), (B). Neither circumstance is present here. The Court will not permit the United States to bootstrap new materiality arguments into the record at this late juncture. See Wannall v. Honeywell, Inc., 775 F.3d 425, 429-30 (D.C. Cir. 2014) (finding "the district court did not abuse its discretion by excluding the new [] declaration" where discovery had closed and declaration was untimely); Reetz v. Jackson, 176 F.R.D. 412, 414-15 (D.D.C. 1997) (party may not create genuine issues of material fact by contradicting, embellishing, or "clarifying" prior sworn testimony).

and makes vests containing it defective was material to GSA's decision to remove Zylon-containing vests from the GSA MAS contracts with Zylon vest manufacturers."  Id. ¶ 12.

Ms. Stoker also suggests in her declarations that the GSA did not seek or consider scientific information about Zylon's properties such as strength and degradation when awarding or modifying contracts, only pricing and warranty:  "As part of the solicitation process with GSA, vendors are required to make certain representations about prices offered to commercial customers, prices that will be offered to government customers, and agree to other terms and conditions, including, but not limited to, providing a warranty on their products."  Second Stoker Declaration ¶ 2.  Carol Batesole, Stoker's colleague at GSA with substantially similar responsibility for MAS contracts, answered "no" at her deposition when asked if "GSA [did] any sort of testing or product evaluation to determine whether any particular model included on the commercial price list was appropriate to be added to the [MAS]."  See Toyobo's Motion for Partial Summary Judgment, Ex. 13 at 28:21-25 [Dkt. 270-16 in Civil Action No. 04-0280].  She explained that, in her personal negotiations with Second Chance over its MAS contract, "most things had to do with pricing, delivery terms, basic discount, quantity discount, [and] aggregate discount."  Id. at 29:5-29:12.

Stoker's statement that, in deciding whether to award or modify MAS contracts, the GSA only considered pricing and whether vest manufacturers "provid[ed] a warranty on their products" suggests that the GSA did not care whether Zylon degraded over time and under conditions of heat and humidity.  On the other hand, Ms. Stoker also states that "agencies within the United States" would have used Toyobo's Zylon testing data to conduct further tests and, if it obtained bad results, terminated GSA MAS contracts with those vest manufacturers using Zylon vests.  Second Stoker Declaration ¶ 13; see also id. ¶ 12 (GSA removed Zylon-containing vests

from GSA MAS once it learned that Zylon "degrades unpredictably and quickly over time"). The August 2002 and May 2003 email exchanges between federal scientists and Toyobo show that the United States was already conducting this exact testing itself, which suggests that the United States was considering more than just pricing and warranty factors when making contracting and payment decisions under the GSA MAS. See US Supp., Ex. 51 at 1 [Dkt. 195-2]. The Stoker declarations thus create a genuine issue of material fact as to whether defendants' false statements or omissions were capable of influencing the United States in the negotiations and award of the GSA MAS contracts or contract modifications at issue. It will be the province of the jury to resolve whether the United States cared solely about price and warranty as defendants maintain, or whether the United States would have terminated its GSA MAS contracts had it known earlier of Toyobo's testing data.

The Court rejects Toyobo's argument in its supplemental brief — for which it cites no legal authority — that because "there is no evidence of a single Toyobo statement about Zylon in GSA's possession or that any GSA contracting officer ever saw any statement by Toyobo . . . there can be no 'partial disclosure' from Toyobo to the GSA." Ds Supp. at 5. It is sufficient under the FCA that Toyobo made its partial disclosure to the United States generally and not GSA specifically because to hold otherwise would permit defendants to escape liability when they make false statements to governmental actors other than those making payment decisions. In other words, the federal scientists who emailed Toyobo in August 2002 and May 2003 would have communicated directly or indirectly with Stoker and Batesole if Toyobo had communicated the full scope of its Zylon testing data to those scientists at the time. See US Supp., Ex. 47 at PDF page 119 [Dkt. 195-1]; id., Ex. 51 at PDF page 2 [Dkt. 195-2].

The Court finds that the Stoker declarations demonstrate that there is a genuine issue of material fact as to whether defendants' false representations or omissions would have changed the United States' payment decision. The Court therefore will deny summary judgment to defendants' on all of the United States' fraudulent inducement FCA claims relating to GSA MAS contracts.

2. Express and Implied False Certification Claims

The United States asks the Court to reconsider Judge Roberts's September 4, 2015 Memorandum Opinion and Order with respect to the express and implied false certification claims in light of "several warranties provided by body armor manufacturers to GSA." Mot. at 2-3. As discussed supra at 13-16, Judge Roberts limited the United States' express and implied false certification claims to those (1) "that arose after the 2002 [Second Chance] contract modification was executed" and (2) that are based on defendants' noncompliance with the Second Chance 6% catalog guarantee. See United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 17. The United States now argues that "several warranties" beyond the 6% contract guarantee also support express or implied false certification claims, such as the three contract provisions and the two other "extra-contractual considerations." Mot. at 17-18; see also supra at 10-12 (quoting the language of those provisions and considerations).

The Court concludes that reconsideration is not warranted on this issue. The Court has already extensively reconsidered the United States' implied false certification claim against Second Chance and the other vest manufacturers in light of Escobar, see Opinion and Order at 11-12 (Mar. 31, 2017) [Dkt. 212], and addressed precisely the arguments the United States raises here. In its March 31, 2017 Opinion and Order, the Court found no basis to revisit Judge Roberts's holding that the "the 6% catalog guarantee was the only 'term of the contract'

that could give rise to an implied false certification claim under the FCA," id. at 11 (quoting

United States ex rel. Westrick v. Second Chance Body Armor Inc., 128 F. Supp. 3d at 12, 17), or

that the "extra-contractual considerations . . . were not material to the United States' payment

decision under the FCA." Id. at 12. In addressing the implied false certification claim, the Court

agreed with Judge Roberts that, "[w]hile the three express clauses of the contract — the five-year

commercial warranty, the workmanship clause, and the new materials clause — do not impose a

durability requirement, the 6% catalog guarantee may," and, "[w]hatever the ambiguous 6%

catalog guarantee means, it is for the jury to decide." Id. at 10. While the 6% guarantee only

appears in the Second Chance contract, the Court's analysis concerning the three contract clauses

and the other two extra-contractual considerations applied equally to all the vest manufacturers.

See id. at 3.

That analysis with respect to implied false certification also controls the

applicability of the contractual provisions and extra-contractual considerations to the United

States' express false certification claim because both claims turn on defendants' noncompliance

with those provisions. The United States contends in its motion for reconsideration that Judge

Roberts "never analyzed the different representations made by the other body manufacturers as

to durability." Mot. at 16-17 (emphasis added). This Court's Opinion and Order concerning

implied false certification clarifies that only the 6% catalog guarantee, and none of the other

provisions or extra-contractual considerations may impose a durability requirement. See

Opinion and Order at 10 (Mar. 31, 2017) [Dkt. 212]. That conclusion applies equally to the

United States' express false certification claims because, if there is no genuine issue of material

fact as to whether those provisions or considerations impose a durability requirement,

noncompliance with them cannot be a basis for the United States' express false certification theory of FCA liability.

For these reasons, the Court therefore limits the United States' express false certification claim under the FCA to its theory that the 6% catalog guarantee was a durability requirement.

## III. CONCLUSION

For the reasons set forth in this Opinion, the Court will grant the United States' motion for reconsideration in part and deny it in part. Toyobo's alleged fraud for all claims could have begun no earlier than July 2001, the earliest date on which Toyobo learned of testing data showing that Zylon degraded under conditions of heat and humidity. Whether the evidence presented by the United States at trial will support a finding of liability that early or not until Second Chance made the 6% catalogue guarantee sometime between June 5, 2002, and July 1, 2002, remains to be seen. Regardless, only the following claims survive summary judgment and shall proceed to trial:

1. Common law claims of fraud and unjust enrichment against all defendants concerning both the BPVGPA and the GSA MAS;

2. Fraudulent inducement under the FCA against all defendants concerning both the BPVGPA and the GSA MAS;

3.      Express and implied false certification under the FCA against all defendants concerning only the GSA MAS and limited to the United States' theory that the Second Chance's 6% catalog guarantee was a durability requirement.

An Order consistent with this Opinion shall issue this same day.

SO ORDERED.


_____/s/_____
PAUL L. FRIEDMAN
DATE:  July 14, 2017                                United States District Judge